UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ANTHONY CURCIO,
        a/k/a "Brendan Wooley,"

                    Defendant.

24 Cr. 312 (RA)

# THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT ANTHONY CURCIO'S MOTIONS *IN LIMINE*

JAY CLAYTON
United States Attorney
Southern District of New York
The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278

David R. Felton
Kingdar Prussien
Cecilia Vogel
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... 1

PRELIMINARY STATEMENT ....................................................................................... 2

ARGUMENT .................................................................................................................... 2

   I.    THE COURT SHOULD ADMIT CERTAIN EVIDENCE.................................... 2

     A. The Government Seeks to Admit Fact and Lay Opinion Testimony, Not Expert Testimony, By PSA Representatives.............................................................. 2

     B. The Court Should Admit Curcio's Admissions in His Autobiography Regarding His Nearly Identical Prior Trading Card Fraud Scheme as Direct Evidence or Pursuant to Rule 404(b) ........................................................................................................ 7

     C. The Court Should Admit Evidence of Conduct that is Central to Curcio's Scheme ...... 14

     D. Certain Evidence of Prior Conviction or Other Bad Acts are Admissible at Trial ......... 16

   II.   THE COURT SHOULD PRECLUDE CERTAIN EVIDENCE AND ARGUMENTS THAT ARE IRRELEVANT AND UNFAIRLY PREJUDICIAL.................................... 18

     A. The Court Should Exclude Evidence and Argument Regarding DNA Evidence ........... 18

     B. The Court Should Preclude Legally Deficient Defenses Smuggled in as Purported State of Mind Evidence ......................................................................................... 19

CONCLUSION................................................................................................................ 21

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Anthony Curcio's motions *in limine*. (Dkt. Nos. 59 (motion) & 60 (memorandum of law), "Defendant's MILs" or "Def. MILs"). The defendant moves to preclude the Government from offering (i) expert testimony (Def. MILs at 2-3); (ii) DNA evidence (*id.* at 3-4); (iii) evidence of prior bad acts, including excerpts from Curcio's Book (*id.* at 4-5, 8-11); and (iv) evidence that Curcio fabricated or modified certain of the trading cards used in his scheme (*id.* at 5-7).[1] The defendant also moves to admit extrinsic acts evidence regarding good faith (*id.* at 12). The Government does not intend to offer DNA evidence, so that motion *in limine* is moot, and—although the defense has not expressly indicated they plan to do so—the Court should reciprocally preclude Curcio from making arguments or eliciting testimony about the Government's decision not to perform DNA testing in this case. For the reasons set forth below, the remainder of the Defendant's MILs are meritless and should be denied.

## ARGUMENT

### I. THE COURT SHOULD ADMIT CERTAIN EVIDENCE

#### A. The Government Seeks to Admit Fact and Lay Opinion Testimony, Not Expert Testimony, By PSA Representatives

As set forth in the Government's MILs, (Gov't MILs at 16-23), the testimony that the Government seeks to admit by the two Profession Sports Authenticator ("PSA") representatives is not expert testimony, but fact and/or lay opinion testimony, admissible under Federal Rules of Evidence 602 and 701.

---

[1] Capitalized terms not otherwise defined herein have the same meanings ascribed to them in the Government's motions *in limine* (Dkt. No. 64, hereinafter the "Government's MILs" or "Gov't MILs").

As described in more detail in the Government's motion, PSA's senior director of brand management is expected to testify, based on her first-hand knowledge of PSA's holders and labels due to her employment at PSA and her observations of the counterfeit PSA holders and labels at issue here, about visible characteristics that differentiate authentic PSA holders and labels from the counterfeit PSA holders and labels sold or possessed by the defendant. In addition, this witness is expected to testify about visible distinctions between cards graded and certified by PSA and the cards within the counterfeit PSA holders, where PSA has photographs of the cards it certified or has the physical certified card in its possession. This testimony is all non-expert fact testimony based on the witness's employment at PSA and observations of visible characteristics of the cards at issue in this case. This witness will further testify, based on her observation and comparison of these visible characteristics, that specific cards sold or possessed by the defendant were in holders that PSA did not make with labels that PSA did not print, and that those cards thus had grades that PSA did not issue, *i.e.*, those cards were in counterfeit PSA holders with counterfeit PSA labels and grades. This is lay opinion testimony under Rule 701 because, as further discussed in the Government's MILs, it is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *United States* v. *Cuti*, 720 F.3d 453, 458 (2d Cir. 2013). [2] Here, where the witness is merely visually comparing observable characteristics of the fake holders and labels to characteristics of authentic PSA holders and labels, her opinion that PSA did not make the holders or print the labels is lay opinion because it "results from a process of reasoning familiar in everyday life" and not "from a process of

---

[2] All case citations herein omit internal citations, alterations, and quotation marks unless otherwise indicated.

reasoning which can be mastered only by specialists in the field." Fed. R. Evid. 701 advisory comm. note to 2000 amendment (quoting *State v. Brown*, 839 S.W.2d 530, 549 (1992)). Notably, this witness will not opine as to whether the cards at issue were fraudulently misrepresented to buyers.

The second witness, the director of grading at PSA, is expected to explain in his testimony, as described in the Government's MILs, the criteria PSA uses to evaluate the physical condition of the card for grading purposes. This is non-expert fact testimony based on this witness's employment at PSA. This witness is further expected to testify, based on these criteria and his personal examination of certain cards at issue in this case, whether the card could receive the grade it purportedly received from PSA. This, too, is lay opinion testimony under Rule 701 because it satisfies the rules' three criteria, as discussed at length in the Government's MILs. Whether the card could have received the grade it purportedly received from PSA is relevant to showing that the holder, label, and grade purportedly issued by PSA were not issued by PSA and are fake.

Contrary to the defendant's representation in his motion, courts have not held generally that product authenticity is necessarily within the scope of Federal Rule of Evidence 702. As cited in the Government's MILs, courts have in fact admitted lay opinion testimony regarding the authenticity of goods. *See, e.g., Fendi Adele S.R.L. v. Filene's Basement, Inc.,* 696 F. Supp. 2d 368, 382 (S.D.N.Y. 2010) (Fendi's Logistics Director and Industrial Director of Leather Goods permitted to offer lay opinion testimony regarding the inauthenticity of certain counterfeit goods); *Koch v. Greenberg,* 14 F. Supp. 3d 247, 268 (S.D.N.Y. 2014), *aff'd*, 626 F. App'x 335 (2d Cir. 2015) (employee of Sotheby's permitted to testify regarding the authenticity of purportedly fraudulent wine as lay opinion testimony). The mere fact that the PSA representatives have some

specialized knowledge from their employment that inform their testimony does not alone render their testimony expert testimony.

Moreover, the cases cited by the defendant are distinguishable or not on point. First, in *Gucci Am., Inc. v. Duty Free Apparel, Ltd*., a lawsuit regarding counterfeit Gucci goods, the court in no way evaluated whether the declaration by Gucci's expert, submitted on behalf of Gucci's motion for summary judgment, was lay opinion or expert testimony under the Federal Rules of Evidence. 286 F. Supp. 2d 284, 285, 288 (S.D.N.Y. 2003). Instead, the court merely accepted that the declaration was submitted by an expert, with no discussion on whether that expert designation was necessary or appropriate under Rule 702. *Id.* Indeed, the court made no mention of either Rule 701 or 702. *Id.*

*Michael Kors, LLC v. Hernandez Int'l Inc.* is likewise unavailing. No. 15. Civ. 0844, 2016 WL 6306129 (S.D. Tex. Oct. 27, 2016). In *Kors*, a trademark infringement lawsuit regarding counterfeit products, the court held that testimony on the counterfeit nature of purported Michael Kors products by investigators from a third-party forensic examination company was expert testimony under Rule 702. 2016 WL 6306129, at *14. Significantly, however, the court explained that this constituted expert opinion because the third-party "investigators gained their knowledge necessary to detect counterfeit Kors-labeled goods through repeated and updated training from [their client] Michael Kors, . . . *not by virtue of their investigators' employment or experience at Michael Kors.*" *Id* (emphasis added). Accordingly, the witnesses in *Kors* were markedly different from the PSA representative witnesses the Government intends call: whereas the investigators in that case received training as third-parties on what constituted authentic Michael Kors goods, the Government's witnesses are expected to testify regarding the authenticity of purported PSA products by virtue of their employment and experience at PSA and their resulting familiarity with

PSA products, which is permissible lay testimony under Rule 701. *See* Fed. R. Evid. 701 advisory comm. note to 2000 amendment (opinion testimony based on "the particularized knowledge that the witness has by virtue of his or her position in the business" is permissible); *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004) ("Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his [ ] position in the business." (quoting *id.*)).

Nussberg v. Tatintsian*, also cited by the defendant, is no more persuasive or applicable. In that case, the court precluded lay testimony of certain witness regarding the identification and authenticity of certain artworks that were purportedly forgeries in a lawsuit alleging conversion. 2013 NY Slip Op 7415, 1 (N.Y. App. Div. 1st Dep't.). That case is inapposite because authenticating unique artwork virtually always requires opinion from a third-party based entirely on specialized knowledge, unless the opinion testimony is provided by the artist him or herself. Here, the PSA representatives will be testifying about the standard characteristics of their own company's products and criteria used by PSA, about which they are familiar based on their employment, and physical observations of the purported PSA-issued holders and labels that they personally observed and compared to PSA's products. *United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007) ("A witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as it was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise.").

In sum, for all the reasons stated in the Government's MILs, the proposed testimony by the PSA representatives satisfies the criteria under Rules 602 and 701 and is not expert testimony.

**B. The Court Should Admit Curcio's Admissions in His Autobiography Regarding His Nearly Identical Prior Trading Card Fraud Scheme as Direct Evidence or Pursuant to Rule 404(b)**

For the reasons set forth in the Government's MILs, which the Government repeats and incorporates by reference herein, (Gov't MILs at 4-16), the Court should admit Curcio's admissions in his autobiography regarding his nearly identical prior trading card fraud scheme as direct evidence or, alternatively, pursuant to Federal Rule of Evidence 404(b). Curcio does not object to the Government introducing certain portions of his book, such as his "knowledge of the card market, card grading system, and similarly uncontested matters" (Def. MILs at 8), but does object to the Government introducing other excerpts, including the book's description of his prior trading card fraud scheme, his physical manipulation of card cases as part of his process to change their grade, his determination not to "do anything in his own name again," and his efforts to deceive a police officer who had investigated his prior fraudulent card sales. (Def. MILs at 8-11). Curcio's arguments for precluding these excerpts fail.

To start, Curcio's staleness argument lacks merit. (Def. MILs at 9). As detailed in the Government's motions *in limine* (Gov't MILs at 9, 14-15), relevance is not myopically determined based on the date of the prior acts; rather, the Second Circuit focuses on whether the prior acts are "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge or intent inference advocated by the proponent of the evidence." *United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994). It is thus unsurprising that the Second Circuit and other circuits have upheld the admission of analogous and even older Rule 404(b) evidence, especially where, as here, the defendant's state of mind is in controversy. *See, e.g.*, *United States v. Curley*, 639 F.3d 50, 59 (2d Cir. 2011) (15 years); *United States v. Terry*, 702 F.2d 299, 316 (2d Cir. 1983) (20 years); *United States v. Lingat*, No. 21 Cr. 573 (MKV), 2024 WL 1051633, at *2-3 (S.D.N.Y. Mar. 11, 2024) (20 years), *aff'd sub nom. United States v. Lemay*, No. 24-2328-CR, 2025 WL

1873404 (2d Cir. July 8, 2025); *United States v. Valenzuela*, 57 F.4th 518, 523 (5th Cir. 2023) (17 years); *Edelmann*, 458 F.3d at 810 (15 years); *United States* v. *Spillone*, 879 F.2d 514 (9th Cir. 1989) (18 years); *United States v. Ross*, 886 F.2d 264, 267 (9th Cir. 1989) (13 years). Thus, the age of Curcio's prior trading card fraud does not render it inadmissible, particularly given the relevance of the evidence here to Curcio's intent and knowledge, and the numerous and obvious parallels between his self-described prior scheme and the current charges.

Curcio's claim that the prior card fraud is irrelevant is also meritless. (Def. MILs at 9-10; Gov't MILs at 11-14). Prior conduct going to the defendant's knowledge and intent is relevant and admissible when there is similarity between the prior conduct and the charged conduct. *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006); *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir. 1987) (holding that a prior act is probative of knowledge if it is sufficiently similar "to permit the jury reasonably to draw from that act the knowledge inference advocated by the proponent of the evidence"); *see also United States v. Landrau-Lopez*, 444 F.3d 19, 24 (1st Cir. 2006) ("The other bad act need not be identical to the crime charged so long as it is sufficiently similar to allow a juror to draw a reasonable inference probative of knowledge or intent."); *United States v. Burkett*, 821 F.2d 1306, 1309 (8th Cir. 1987) ("When admitted for the purpose of showing intent, the prior acts need not be duplicates, but must be sufficiently similar to support an inference of criminal intent."). The *Garcia* case cited by Curcio notes that for prior acts to be relevant, there must be "a similarity or some connection between the prior and current acts." (Def. MILs at 10 (citing *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002))). Such a similarity plainly exists here.

To begin, Curcio's misleading, overly-generalized framing of the Government's relevance argument—"wire fraud conduct involving the trading card industry," (Def. MILs at 9)—elides the

striking similarities between the two schemes. As charged in the Indictment, Curcio intended and agreed to, and in fact did, induce victims to pay more money for cards than they otherwise would have paid by making false statements about the condition of cards, including misrepresenting the grade purportedly assigned to the cards by PSA. The Government expects the evidence to show at trial that Curcio carried out the charged fraud by, among other things, (1) altering cards, card holders, and labels to make the purportedly PSA-graded cards appear authentic; (2) repeatedly using as fronts real third parties, such as co-defendant Iosif Bondarchuk, as well as elaborately concocted fake names and identities—such as "Brendan Wooley," and a fake attorney named "John Steel"—to conceal Curcio's personal involvement in the fraud; and (3) deceiving law enforcement through his use of altered cards, cases, and labels. Curcio's Book describes how he used effectively the same techniques in his prior scheme.

As but one example, the Government anticipates the trial evidence will show that Curcio's scheme involved trimming cards, altering cards to remove creases, opening and resealing card cases, and altering the printed grade on the card's label to facilitate the charged fraud. Curcio's prior conduct, as described in his own book, is stunningly similar: Curcio discussed in his book trimming cards (Dkt. 64-1 ("Gov't MILs Ex. A" or "Ex. A") at 90); physically altering cards (Ex. A at 90); opening and resealing card cases (Ex. A at 90, 103); and altering the printed PSA grade on the card's label (Ex. A at 90). In fact, Curcio even described in his book a supplier's printing on card stock sheets a 1952 Topps Mantle card, (Ex. A at 90-91), and then later discusses with Bondarchuk, as part of the charged fraud, his desire to counterfeit the *very same card* on card stock sheets. (*See* Ex. 1 at 2 (left side of message thread) ("[T]he pigment printer I have, along with being able to alter all aspects of graphics/design – *I want to get some card stock and straight up*

*make a card. . . . The 1952 Topps [M]antle* or 51 bowman I have right now. . . . The older cards would be easiest" (emphasis added))).

In an effort to manufacture distinctions between the fraud he describes in his book and that charged in the Indictment, Curcio misleadingly claims that the charged fraud involves misrepresentations regarding card grades issued by third-party grading companies, whereas he describes in his book "altering cards so that he can change the grades in his *own* card-grading business." (Def. MILs at 10 (emphasis added)). Not so. In Curcio's Book, he unmistakably describes—just as in the charged fraud—upcoding the lower PSA—*i.e.*, third-party—grade to a purported higher PSA grade to sell cards at inflated values. (Ex. A at 90 (describing "re-grad[ing] a PSA-4 Mantle *to a PSA-7*"); 103 (describing selling a *PSA* Mantle that Curcio had "broken into and resealed")).[3]

Moreover, integral to both the charged and prior card frauds was Curcio's use of the names of third parties (*e.g.*, Bondarchuk) to further the frauds, including his personally creating and using elaborate fake identities (*e.g.*, "Wooley" and fake attorney "Steel") to conceal his personal involvement in the fraud. As Curcio texted Bondarchuk in the charged fraud, "I need u to be what keeps me insulated." (*See* Ex. 1 at 3 (left side of message thread)). Likewise, Curcio wrote in his book about using a third party to "set up new eBay and PayPal accounts" (Ex. A at 89); learning "never to do anything in his own name again" (Ex. A at 91); and, to further the card fraud, "clos[ing] the trust gap with buyers online" by creating a sham escrow company purportedly owned and operated by two attorneys whose identities, in truth and in fact, Curcio made up (Ex.

---

[3] No more persuasive is Curcio's misleadingly generic characterization of the prior card fraud as simply "insurance fraud." (Def. MILs at 10). Indeed, far from an unrelated "insurance fraud scheme," the prior card fraud, just like the charged card fraud, involved material misrepresentations about the cards sold to victims.

A at 103). Curcio's lifetime ban from eBay, as described in his book, is directly relevant to the charged fraud, providing needed background and context for Curcio's use of eBay accounts in the names of third parties, including Bondarchuk, as part of the charged scheme.

Additionally, in both the charged and prior card frauds, Curcio deceived law enforcement through his sophisticated altered cards, cases, and labels. As Curcio texted Bondarchuk as part of the charged fraud, "authorities would also never really understand any of this." (*See* Ex. 1 at 4 (left side of message thread)). Similarly, Curcio wrote in his book, "Detective Bell had been told what to look for, but it was clear to Anthony that he didn't know much. To the untrained eye, it's very difficult to detect a counterfeit." (Ex. A at 91).

At the risk of understatement, the similarities in Curcio's frauds—which include the same major card grading company (PSA), the same marketplace (eBay), and the same methods of altering cards—are far more than reflected by the broad bucket of "wire fraud conduct involving the trading card industry." (Def. MILs at 9). The prior conduct and the charged conduct are plainly sufficiently similar to be relevant. *Paulino*, 445 F.3d at 223; *Peterson*, 808 F.2d at 974.

Moreover, Curcio's assertion that the prior card fraud is unduly prejudicial and should be excluded under Rule 403 is baseless. (Def. MILs at 10-11; Gov't MILs at 9-11, 15-16). The prior fraud is advanced for a proper purpose, relevant to the charged crimes, has probative value that is not substantially outweighed by any unfair prejudicial effect, and, if requested, will be admitted with limiting instructions to the jury. *See United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012). Likewise, the prior fraud is neither "more sensational" nor more "disturbing" than the evidence of the charged crimes. To the contrary, compared to the prior conduct, the charged crimes are for a longer, more lucrative fraud involving significantly more victims, cards, and losses. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). In light of the substantial similarities between

the charged and prior card fraud schemes and the vital importance of the prior card fraud scheme in understanding the charged fraud, the prior scheme's considerable probative value is not outweighed, much less substantially outweighed, by the danger of unfair prejudice. In any event, any potential prejudice can be adequately minimized through a limiting instruction to the jury, and the Government would consent to an appropriate limiting instruction. *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990).

Nor is there any merit to Curcio's baseless speculation that admitting the highlighted excerpts from Curcio's Book would "open[] the door to a trial-within-a-trial concerning the context of these statements and the circumstances under which they were written." (Def. MILs at 11). Unlike prior acts evidence in many other cases, which can involve distinct fraud schemes, complex crimes, or prior convictions with multiple witnesses and additional documentary evidence, the prior acts evidence here would consist of a discrete single exhibit containing the highlighted excerpts of nine pages from Curcio's Book. (Ex. A). Because Curcio does not, and cannot reasonably, contest the authenticity of his own book—which he co-authored, copyrighted, and extensively promoted,[4] and which notes in the final chapter on page 272 that Curcio wrote the book while in prison ("These choices also put me in prison, where I write this now")—the Government intends to admit the excerpts of Curcio's Book pursuant to Fed. R. Evid. 801(d)(2)(A)

---

[4]  *See, e.g.*, https://www.seattletimes.com/seattle-news/inner-tube-robber-now-free-warning-about-life-of-drugs-crime/ (newspaper story about Curcio promoting the book and noting that book proceeds go toward his restitution); https://acurcio.com/about/ (Curcio personal website promoting the book, taking authorship credit, and noting that the book "has been the recipient of several awards"); https://www.facebook.com/HeistandHigh/posts/heist-and-high-author-anthony-curcio-and-good-morning-americas-gio-benitez-durin/605701829462321/ (Facebook page for the book linking to Curcio's personal website, including, at https://www.facebook.com/HeistandHigh/posts/heist-and-high-author-anthony-curcio-and-good-morning-americas-gio-benitez-durin/605701829462321/, a picture of Curcio with a pen in hand opening the book for a host of *Good Morning America* before Curcio's ABC *20/20* interview).

and to have a paralegal simply read the excerpts aloud into the record. Far from a "trial-within-a-trial," this limited testimony of a single witness reading portions of nine pages from a single exhibit will introduce the prior acts evidence in a streamlined, straightforward manner without further need for extraneous records or testimony.

Finally, Curcio's unsupported suggestion that the book excerpts cannot be admitted because the book was co-authored and parts of the book were written in the third person does not tip the Rule 403 balancing in his favor. Curcio cites no authority for the fact that statements within the book cannot be attributed to him because they were co-authored, let alone any precedent ruling that this alters the Rule 403 balancing in any way.

For the avoidance of doubt, the statements in Curcio's Book fall squarely within the realm of Rule 801(d)(2)(A) and are appropriately attributed to Curcio at trial.[5] Rule 801(d) "call[s] for generous treatment of the avenue of admissibility for admissions in general." *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 258 (S.D.N.Y. 2003) (citing Fed. R. Evid. 801(d)(2), advisory comm. notes). Courts evaluate adoption "by examining the behavior of the party it is to be offered against. Adoption of another's statement can be manifest by any appropriate means, such as language, conduct or silence." *Id.* "Ultimately any

---

[5] Even if this Court disagrees that Curcio's co-authorship is a sufficient basis to attribute these statements to the defendant, the book excerpts are nonetheless admissible pursuant to Rule 801(d)(2)(B)-(C) as statements that Curcio manifested that he "adopted or believe to be true" by signing on as the book's co-author, *see Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 258 (S.D.N.Y. 2003) ("When a statement is offered as an adoptive admission, the proponent must show that the party against whom the statement is offered adopted or acquiesced to the statement and that adoption or acquiescence may be manifested in any appropriate manner."). Curcio undoubtedly adopted the statements in the book, if not through his authorship, then certainly through his subsequent promotion of the text. *See supra* n. 4. They are separately admissible as adoptive statements either because Curcio's co-author was authorized to make those statements, or because he was an agent acting on Curcio's behalf. Notably, even in his briefing, Curcio does not challenge the veracity of the book, only its admission at trial under Rules 401 and 403.

ambiguities and questions surrounding a party's actions and silences with regard to adoptive admissions should be for the jury to assess." *Id.* at 259.

Here, Curcio's Book contains no disclaimer as to its truth or the relative responsibility of the authors for the book's accuracy. *See, e.g.*, *id.* at 260 (admitting under all of Rules 801(d)(2)(B)-(D) as an adoptive admission a religious organization's publication of an organizational history book, where there was no disclaimer as to the book's truth, written by a co-founder with involvement by other officers and board members). As noted above, there is no question that Curcio co-authored, copyrighted, and extensively promoted his book, and the book on page 272 is described as having been written by Curcio while in prison. Under such circumstances, the excerpts from the book are all admissible, pursuant to Rule 801(d)(2)(A)-(D), as an opposing party's statement: (A) made by the party in an individual or representative capacity; (B) that the party manifested that it adopted or believed to be true; (C) made by a person whom the party authorized to make a statement on the subject; and (D) made by the party's agent or employee on a matter within the scope of that relationship and while it existed.

Accordingly, the Court should admit Curcio's admissions in his autobiography regarding his substantially similar prior trading card fraud scheme as direct evidence or, alternatively, pursuant to Rule 404(b).

### C. The Court Should Admit Evidence of Conduct that is Central to Curcio's Scheme

In the Defendant's MILs, Curcio narrowly defines the Government's case as an "upcoding" scheme, which, according to the defense, does not include allegations of fabrication or falsification of the trading cards themselves. (Def. MILs at 6). The Court should reject the defense's attempt at precluding evidence that Curcio fabricated or modified trading cards, as such evidence is inextricably tied to the false assignment of a higher PSA rating: namely, Curcio's manipulation of

the trading cards was in many cases necessary to pass off lower-graded cards as higher-graded cards.

The Second Circuit "has consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial." *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012) (quoting *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007); *see also United States v. Patino*, 962 F.2d 263, 266 (2d Cir. 1992). "The 'core of criminality' of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview." *D'Amelio*, 683 F.3d at 418; *see also id.* at 422 (holding that "the *specific means* used by a defendant to effect his or her crime does not constitute an 'essential element' of the offense" (emphasis in original)).

Here, the Indictment specifically charges that, "in order to induce victims to pay more money for sports and Pokémon trading cards than they otherwise would have paid, CURCIO and BONDARCHUK made and caused to be made false statements regarding the grade assigned to the cards by Company-1, and aided and abetted the same, when, in truth and in fact, the defendants knew that Company-1 had not assigned the grade to the cards that they represented." (Ind. ¶ 16; *see also* Ind. ¶ 14 (substantially similar *to wit* clause for the conspiracy count)). The Government intends to prove at trial that, to convince victims that particular trading cards were graded as perfect or near-perfect by PSA and thereby induce victims to pay more money for trading cards than they otherwise would have, Curcio took steps to improve the cards' physical features to ensure they were not immediately detected as fraudulently-graded, including, but not limited to trimming cards, color-fixing, and making new cards appear aged. In one particularly salient example involving a Michael Jordan trading card that Curcio attempted to sell multiple times, Curcio

attempted to remove or otherwise minimize a particular crease, which would have otherwise been glaringly inconsistent with the grade he had fraudulently assigned to that card.

Contrary to the defense's assertion, proof that such conduct took place would clearly explain to the jury why the alleged scheme was more likely to have occurred and why the scheme was initially so successful. This was not "separate, irrelevant bad conduct" (Def. MILs at 6), but a necessary feature of the scheme charged in the Indictment.

Furthermore, the defendant's argument that evidence of Curcio's counterfeiting is expert testimony is wholly misplaced. (*See* Def. MILs at 6-7). Percipient witnesses with direct knowledge that Curcio was counterfeiting and/or manipulating trading cards should obviously be permitted to testify about what they saw and heard given that it is the gravamen of the charged scheme. For example, the Government anticipates that a Bondarchuk will testify to his firsthand conversations with Curcio regarding counterfeiting cards, which is corroborated by Curcio's statements in his book explaining his extensive experience counterfeiting and manipulating trading cards. and then later discusses with Bondarchuk, as part of the charged fraud. (*See, e.g.*, Ex. 1 at 2 (left side of message thread) (text message from Curcio to Bondarchuk where Curcio explicitly declares his intention to "get some card stock and straight up make a card"). It is axiomatic that this cannot qualify as expert testimony, and will provide the jury indispensable context to explain Curcio's acumen at passing off lower-graded cards as higher-graded cards. This evidence speaks to the core of the charged scheme and should not be precluded.

### D.  Certain Evidence of Prior Conviction or Other Bad Acts are Admissible at Trial

The Government does not intend to introduce in its case-in-chief inflammatory details regarding the circumstances of Curcio's prior conviction and other bad acts. (Def. MILs at 4-5). As noted in the Government's MILs, with seemingly no opposition from Curcio, (Def. MILs at 4-5; Gov't MILs at 5-6 n.2), in the event Curcio testifies at trial, the Government does intend to

cross-examine Curcio about prior bad acts and the details of his prior federal conviction (including the nature of the conviction itself) in order to impeach him, challenge his credibility, and attack his character for truthfulness. These bad acts include Curcio's: serial and sophisticated use and creation of aliases, fake identities, and fake personal and corporate identity documents; false statements to law enforcement; prior armored car robbery for which he was federally convicted of robbery; prescription drug and real estate/mortgage fraud schemes; and unprosecuted thefts (including of computers and furniture, involving planning and using disguises), all of which bear upon his credibility and which are necessary for the jury to assess his testimony. These bad acts were described by Curcio in his book.

The Government does, however, intend to introduce as part of its affirmative case the fact of a prior federal conviction that generated media attention. During the course of the charged card scheme, Curcio repeatedly detailed the circumstances of his prior federal conviction and the subsequent news coverage to explain certain subterfuge that he adopted as part of his fraud. Given the centrality of this narrative to Curcio's motivation to commit the charged crime, and his repeated invocation of it in communications with Bondarchuk and multiple victims, the parties appear to be in agreement that admitting at trial the fact of a prior conviction—albeit in limited form—is necessary to explain certain of Curcio's actions. The parties are endeavoring in good faith to reach a stipulation regarding Curcio's prior conviction and are largely in agreement. The parties appear to concur that any stipulation may set forth "(i) that Mr. Curcio was previously convicted in 2009; . . . and (iii) that the prior conviction may have generated public notoriety for Mr. Curcio." (Def. MILs at 5).[6]

---

[6] The Government disputes the defense's proffered description of the offense as "not for fraud or dishonesty" given that "[t]he general rule in the Second Circuit . . . is that robbery convictions are admissible as probative of a witness's honest character." *United States v. Steele*, 216 F. Supp. 3d

The Government likewise intends to admit as part of its case-in-chief Curcio's "alleged creation of a fake escrow company." (Def. MILs at 5). Curcio's self-professed creation of a sham escrow company purportedly owned and operated by two attorneys whose identities Curcio made up was integral to and part and parcel of the prior card fraud scheme because it furthered the card fraud by, in Curcio's own words in his book, "clos[ing] the trust gap with buyers online." (Ex. A at 103). The Court should thus deny Curcio's motion *in limine* to the extent it seeks to bar the Government from introducing excerpts of Curcio's Book relating to Curcio's creation of a fake escrow company, irrespective of whether Curcio ultimately testifies.

## II. THE COURT SHOULD PRECLUDE CERTAIN EVIDENCE AND ARGUMENTS THAT ARE IRRELEVANT AND UNFAIRLY PREJUDICIAL

### A. The Court Should Exclude Evidence and Argument Regarding DNA Evidence

The Government is unaware of any DNA evidence in this case. It thus does not intend to introduce DNA evidence and this aspect of Curcio's motion *in limine* is moot. (Def. MILs at 3-4). For the avoidance of doubt, and in light of Curcio's motion on this issue, the Government moves to preclude Curcio from making arguments or eliciting testimony about the Government's decision not to perform DNA testing in this case, which is irrelevant to Curcio's guilt and would be inconsistent with standard jury instructions and settled law providing that law enforcement is not required to undertake any particular investigative techniques. *See, e.g.*, *United States v. Saldarriaga*, 204 F.3d 50, 52 (2d Cir. 2000) (describing as "legally sound" jury instruction on irrelevance of Government's investigative techniques); *United States v. Banyan*, No. 25 Cr. 208 (JSR), Dkt. 45 at 18-19 (granting, in a recent felon-in-possession of ammunition case, the

---

317, 326-27 (S.D.N.Y. 2016). This is particularly so in the case of *this* elaborate robbery, which involved multiple forms of deception. Notwithstanding this difference of opinion, the Government will work in good faith with the defense to arrive at a stipulation that is acceptable to both parties, and will alert the Court if no agreement can be reached.

Government's nearly identical motion to preclude argument about why the Government did not take certain investigative steps, including DNA testing, since such evidence would be, as here, "completely irrelevant").

### B.    The Court Should Preclude Legally Deficient Defenses Smuggled in as Purported State of Mind Evidence

In the Defendant's MILs, Curcio vaguely declares that he anticipates a defense that focuses on his engaging in the charged conduct not for the purposes of executing a fraud, but for other, purportedly innocent purposes, and because he was allegedly reacting to unspecified developments related to the Government's actions. (Def. MILs at 12). The Court should be wary of Curcio's attempt to hide his intended defenses until the point of no return, where the Court and the Government cannot un-ring the bell. Accordingly, the Government respectfully requests that the Court direct defense counsel to proffer this defense and the factual basis for its assertions before the parties deliver their opening statements to the jury.

Curcio's vague assertion that "state of mind evidence and contextual evidence that explains the defendant's actions is generally probative of the *mens rea* element of the offense," (Def. MILs at 12), does not provide the Court or the Government an opportunity to assess the relevance or prejudice of the *mens rea* evidence or argument the defense intends to invoke.

To the extent the defense intends to argue that PSA or the Government somehow influenced Curcio's behavior, caused him to engage in purported misconduct, or is otherwise to blame for his conduct, for the reasons stated in the Government's MILs (Gov't MILs at 31-34, 35-38), these so-called defenses are insufficient as a matter of law at best, and are an invitation for jury nullification at worst, and therefore the Court should not allow the defendant to present the evidence, or advance the defenses, to the jury without a meaningful advance proffer as to any arguments or evidence the defense intends to introduce on this score. *See, e.g.*, *Abu Dhabi Comm.*

*Bank v. Morgan Stanley & Co.*, No. 08 Civ. 7508 (SAS), 2013 WL 1155420, at *7 (S.D.N.Y. Mar. 20, 2013) (precluding evidence about general failures by credit rating agencies leading up to financial crisis and noting that court will not "let this trial become an inquiry into the role of the Rating Agencies in the financial crisis"); *United States v. Korogodsky*, 4 F. Supp. 2d 262, 265-66 (S.D.N.Y. 1998) ("It is no defense that the victims of the fraud may have been engaged in some misconduct" and therefore "possible misconduct of the victim [is] not relevant . . . ."); *United States v. Regan*, 103 F.3d 1072, 1081 (2d Cir. 1997) (affirming decision precluding "evidence at trial that the grand jury investigation was illegitimate"); *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004) (noting that the defendant "may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case"), *aff'd*, 173 F. App'x 899 (2d Cir. 2006).[7]

---

[7] Depending on what defense Curcio intends to raise—which at this point is impossible to ascertain—he may need to make a required evidentiary showing for certain arguments to be permissible. For example, to the extent Curcio intends to make an entrapment defense, Curcio would have the burden of producing some credible evidence that the Government induced him to commit the crimes. *United States v. Cabrera*, 13 F.4th 140, 146-48 (2d Cir. 2021). The Government is not aware of any viable basis for such a defense, but this possibility reinforces the need, as requested by the Government, that the defendant be required to make a proffer regarding his proposed defense and the factual basis for it before the parties deliver their opening statements.

**CONCLUSION**

For the foregoing reasons, the Court should deny the defendant's motions *in limine* to the

extent outlined herein.

Dated:  New York, New York
        December 18, 2025

                                          Respectfully submitted,

                                          JAY CLAYTON
                                          United States Attorney

                                  By: _____/s/_____

                                          David R. Felton
                                          Kingdar Prussien
                                          Cecilia Vogel
                                          Assistant United States Attorneys
                                          (212) 637-2299/-2223/-1084