

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 5, 2026

**BY ECF**

The Honorable Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

  Re: *United States v. Anthony Curcio*, 24 Cr. 312 (RA)

Dear Judge Abrams:

  Largely in response to various arguments raised by the defendant, the Government respectfully submits this letter to supplement its requests to charge, proposed voir dire, and motions *in limine*.

  **A. Additional Proposed Request to Charge**

  In his opposition to the Government's motions *in limine*, the defendant stated that he anticipates raising a defense at trial that he did not intend to defraud card purchasers but instead intended to expose PSA's purported dubious practices. (ECF No. 66 at 20). In light of the defendant's intent to affirmatively mount such a defense, the Government proposes the following additional request to charge, in connection with charging the jury about the intent to defraud and good faith (*see* Dkt. No. 62 at 11-15), to prevent the jury from believing—contrary to binding, Second Circuit precedent—that it must find that the defendant's *sole* intent was to deceive card purchasers in order to convict:

> The law recognizes that there may be multiple motives for human behavior; thus, a specific intent need not be the defendant's sole, or even primary, purpose. A defendant may have the requisite intent to defraud even if the defendant was also motivated by other lawful, proper, or neutral purposes or reasons for his actions. A defendant may properly be convicted if his intent to commit the crime was any one of his objectives.
>
>   Adapted from the jury charge by the Honorable Lewis A. Kaplan in *United States v. Samuel Bankman-Fried*, No. 22 Cr. 673 (Oct. 3, 2023), the jury charge of the Honorable Jennifer L. Rochon in *United States v. Brend*, No. 22 Cr. 551 (Mar. 4, 2024), and the Second Circuit's statement of the law in *United States v. Phillips*,

No. 24-1908, 2025 WL 2528201, at *15 (2d Cir. Sept. 3, 2025) (rejecting a sole-intent instruction and making clear that "[t]he intent element for specific intent crimes . . . can usually be satisfied even if the defendant has multiple reasons for taking an action, so long as one reason is the intent to deceive."), and *United States v. Technodyne LLC*, 753 F.3d 368, 385 (2d Cir. 2013) ("It is commonplace that the law recognizes that there may be multiple motives for human behavior; thus, a specific intent need not be the actor's sole, or even primary, purpose. It is well established that a defendant accused of such a crime may properly be convicted if his intent to commit the crime was any of his objectives.") (collecting cases).

### B. Additional Proposed Voir Dire Questions

The Government proposes the following additional voir dire question:

In your role as fact finder in this trial, you may be called upon to examine and evaluate the characteristics of certain physical evidence, such as trading card labels, cases, or the cards themselves. Is there anything about your eyesight, in particular your ability to see or read details up close, that you believe would affect your ability to serve on this jury?

This question regarding jurors' eyesight is relevant because, in connection with testimony regarding visual, physical distinctions between authentic PSA card cases and labels and counterfeit PSA card cases and labels, the Government expects to introduce authentic and counterfeit items themselves as physical evidence that the jurors will be able to review and evaluate in the context of that testimony.

### C. The Court Should Preclude the Defendant From Eliciting Testimony from Special Agent Campbell Concerning Impermissible Topics

On December 22, 2025, pursuant to the procedures set forth in 28 C.F.R. §§ 16.21–16.29 and *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), the defense requested that the Government make FBI Special Agent Christopher Campbell available to testify at trial. The defense seeks SA Campbell's testimony regarding two wide-ranging topics: (i) "his direct involvement in the investigation into Mr. Curcio, including the application for and execution of the search warrant for Mr. Curcio's residence," which consists of "the procedures followed during the search, the manner in which evidence was collected and preserved, the decision to collect certain items, and the precise locations where items were found"; and (ii) "the FBI's relationship with third parties that acted as agents of the FBI in connection with its investigation into Mr. Curcio," including "the nature and extent of any coordination between the FBI and its third-party agents, the role those third parties played in gathering evidence, and any communications or joint

efforts between the FBI and such third parties" and "the timing and substance of" those communications with third parties.

The Government presently intends to call SA Campbell primarily to testify at trial concerning two narrow subjects: (1) the July 2023 law enforcement undercover purchase of a fraudulently misrepresented 1999 Pokémon Venusaur card from Curcio through an intermediary; and (2) the May 23, 2024, search of Curcio's residence. While the Government generally takes no issue with some of the defense's identified testimony from SA Campbell—namely, testimony related to the execution of search warrant for Curcio's residence, including search procedures, evidence collection and preservation, and where items were found—we object to the admissibility of the other lines of inquiry on various grounds, including relevance, hearsay, and Federal Rule of Evidence 403.

The objectionable lines of inquiry include SA Campbell's application for the premises search warrant, which the Court has already upheld in denying Curcio's pretrial suppression motion (*see* Dkt. No. 39), and testimony regarding the FBI's relationship with third parties, specifically, the nature and extent of the FBI's coordination with third parties, the role third parties played in gathering evidence, and the timing and substance of any communications with third parties. The identified testimony from SA Campbell would have no probative value and would serve only to create a danger of undue prejudice, confusing the issues, and misleading the jury.

As explained in greater detail in the Government's MILs (*see* Dkt. No. 64 at 29-30, 35-38), a defendant is entitled to present a defense only if the defense has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667-68 (2d Cir. 1995), and as long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to present the evidence, or advance the defense, to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citing *United States v. Bailey*, 444 U.S. 394, 416-17 (1980)).

As to SA Campbell's application for the search warrant, there is no relevance whatsoever for engaging in this inquiry given that the Court has already ruled that the warrant was properly obtained and executed. Curcio had a full and fair opportunity to make motions prior to trial, and indeed he moved to suppress the evidence seized during a search of his home in Washington and for a *Franks* hearing. The Court rejected these meritless arguments. (Dkt. No. 39). The sought-after testimony impermissibly seeks to put the Government's investigation on trial. Curcio should be precluded from eliciting the identified testimony and/or improperly re-raising those legal arguments to the jury, as such testimony and arguments would only serve to mislead and confuse the jurors. *See* Fed. R. Evid. 403.

As to SA Campbell's interactions with third parties, the relevance of such interactions is opaque at best. It is of course black letter law that the Government's investigation is not on trial. The jury should "base its decision on the evidence or lack of evidence that had been presented at trial," and the Government's use of, or "failure to utilize some particular technique or techniques[,] does not tend to show that a defendant is not guilty of the crime with which he has been charged." *United States v. Saldarriaga*, 204 F.3d 50, 52-53 (2d Cir. 2000) (per curiam); *see, e.g.*, *United States v. Ngono*, 801 F. App'x 19, 24 (2d Cir. 2020) (summary order) ("We have held that a district

court does not commit error in instructing the jury that the Government has no legal obligation to use any particular investigative technique in preparing its case."). Accordingly, issues like "the investigative techniques used" are "irrelevant." *United States v. Duncan*, No. 18 Cr. 289 (SHS), 2019 WL 2210663, at *3 (S.D.N.Y. May 22, 2019); *see United States v. Aleynikov*, 785 F. Supp. 2d 46, 65 (S.D.N.Y. 2011) ("As a general matter, the quality and scope of the Government's investigation are not appropriate lines of examination . . . ."), *rev'd on other grounds*, 676 F. 3d 71 (2d Cir. 2012).

In his *Touhy* letter to the Government, Curcio suggested that this testimony will be elicited for the purpose of establishing Curcio's state of mind because "[t]he FBI's involvement with these third parties . . . was suspected by [] Curcio and may have influenced his actions at points during the scheme." But it is unclear how SA Campbell's interactions with third parties—as opposed to interactions with Curcio—could have had any relevant impact on Curcio's state of mind. And any testimony from SA Campbell recounting a third party's communications with Curcio to which he was not party would be impermissible hearsay. In short, law enforcement's interactions with a third party do not illuminate Curcio's understandings or motivations without some admissible, non-speculative connection to Curcio's actual knowledge.

Judge Stein's opinion in *Duncan* is instructive. There, a defendant sought to examine a case agent on three topics: (1) the length of the FBI's investigation; (2) the law enforcement techniques that were used and not used; and (3) contacts and communications with that defendant prior to his arrest. Letter, *Duncan*, Dkt. No. 130. Judge Stein explained that the testimony and the argument were "absolutely irrelevant," because "[w]hat matters is whether the government has proven its case against [the defendant] here beyond a reasonable doubt." *Id.* at 1168:12-25; *see Duncan*, 2019 WL 2210663, at *3 ("Evidence about the length of the investigation, the techniques used, and when [the defendant] became a target is therefore not admissible pursuant to Fed. R. Evid. 401."); *see also, e.g.*, *United States v. Knox*, 687 F. App'x 51, 54-55 (2d Cir. 2017) (summary order) (instructing jury that the "government is not on trial" is "appropriate" (internal quotation marks omitted)); *United States v. Maxwell*, 20 Cr. 330 (AJN), Hr'g Tr., dated Nov. 1, 2021, at 20 (excluding evidence about the use or non-use of certain investigative techniques under Rule 403 because whether the Government employed a certain investigative procedure "does not tend to show the defendant's innocence of the charges"); *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004) (noting that the defendant "may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case" and "any attempt by [the defendant] to dissect an individual law enforcement agent's state of mind during the course of the investigation, or to belabor the details of the investigation's chronological development, would be irrelevant to the central question of [the defendant's] guilt or innocence, and as such, is inadmissible"), *aff'd*, 173 F. App'x 899 (2d Cir. 2006).

### D. Statements of Two Additional Co-Conspirators Are Admissible as Co-Conspirator Statements

At trial, the Government anticipates offering evidence of out-of-court statements made by two of Curcio's co-conspirators in furtherance of the conspiracy: (1) Curcio's romantic partner ("CC-1"); and (2) Curcio's associate ("CC-2"). The evidence will include text messages and

Telegram messages between Curcio and each of CC-1 and CC-2, which, on their face, establish by a preponderance of the evidence that Curcio's conspiracy included CC-1 and CC-2, and the statements were made during the course and in furtherance of that conspiracy. While Curcio's statements are independently admissible as an opposing party's statements under Federal Rule of Evidence 801(d)(2)(A), CC-1 and CC-2's statements should be admitted for their truth, and not simply as context to understand Curcio's statements, under Federal Rule of Evidence 801(d)(2)(E).

As explained in greater detail in the Government's MILs (*see* Dkt. No. 64 at 24-29), Rule 801(d)(2)(E) provides, in relevant part, that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement pursuant to this rule, a district court must find two facts by a preponderance of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *see also United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). Co-conspirator statements must also satisfy Rule 403 to be admitted.[1]

CC-1's statements during and in furtherance of the conspiracy are admissible under Rule 801(d)(2)(E). As charged, Curcio and his co-conspirators agreed to (a) alter and create trading cards, card holders, and labels, and (b) use real and fake third parties and identities to deceive victims about whether PSA had graded certain trading cards, awarded those cards a particular grade, and catalogued those cards with particular certification numbers. The evidence at trial will demonstrate that CC-1 and Curcio planned trips to various trading card shows around the country (*see, e.g.*, GX 2359-E7, E8, E9). Not only did CC-1 know that Curcio intended to sell fraudulently labeled cards at the shows, she helped develop cover stories for how Curcio acquired the cards at issue in this case. (*See, e.g.*, GX 2359-E10 (CC-1: "when we're gone somehow we have to find a way to add a bunch of cards, old label, to someone's 'collection' being sold. Out of state, completely unrelated to you and person who had the cards is fucking dead" / "If you can pull that off without being connected/detected it's your get out of jail free card"); GX 2359-E18 ("maybe we go to Vancouver too. It's been forever since I've been up there and I'm dying to go… plus you can check out some 'international' card shops.")). CC-1's contemporaneous communications with Curcio are classic communications updating co-conspirators on the process of the conspiracy. *See United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001).

---

[1] While CC-1's and CC-2's statements were plainly made during and in furtherance of the charged conspiracy, to the extent the Court determines that the statements were made in furtherance of some other joint venture between CC-1 and CC-2, they would still be admissible. As the Second Circuit has made clear, for purposes of the co-conspirator hearsay exception, which "has its roots in the law of agency," a conspiracy's objective "need not be criminal at all" and a "joint venture" among the parties counts as a "conspiracy" for purposes of the Rule. *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002); *see also United States v. Hwa*, No. 18 Cr. 538 (MKB), 2022 WL 901796, at *1 (E.D.N.Y. Mar. 27, 2022) (approvingly citing *Russo*'s lawful-joint-venture framework).

The evidence will show that CC-1 and Curcio fully understood their respective roles in the conspiracy, and exchanged communications to "provide reassurance," *Desena*, 260 F.3d at 158, and "facilitate and protect" the conspiratorial activities, *United States v. Diaz*, 176 F.3d 52, 87 (2d Cir. 1999):

| | |
|---|---|
| **CC-1:** | You've heard of good cop, bad cop, right? Well with us it would be good criminal, bad criminal. |
| | I'm the bitchy, non-cooperative one. You're the, trying to be accommodating, but have nothing to offer because done nothing wrong one. |
| | I piss people off and they harass me and look more at my shit, while you're wizard behind the curtain. |
| **Curcio:** | The wizard and the unicorn |
| | How romantic |
| **CC-1:** | *Laughed at "The wizard and the unicorn"* |

(GX 2359-E15). With respect to each of the categories of proof, CC-1's statements are admissible under Rule 801(d)(2)(E).

Likewise, CC-2's statements during and in furtherance of the conspiracy are admissible under Rule 801(d)(2)(E). Among other things, CC-2 and the defendant discussed selling trading cards enclosed in fraudulent cases at a card show to make money.

| | |
|---|---|
| **Curcio:** | Could be all day us at a card show bouncing around but not many around this time of year. If there are, let me know and we can go make some quick $$ bc I can make those with quickness |
| **CC-2:** | Don't rush the case |
| | Make sure that shit is perfectly aligned and done right |
| **Curcio:** | I will, which is why I'm using their own to do it |
| **CC-2:** | Yessir |
| | You got some some at PSA to do it ? |
| **Curcio:** | No, I wish. These are cracked off cards- sanded down from 400 to 10,000 grit, then buffed with tiny ass machine |
| **CC-2:** | Jesus |

> **Curcio:** Yeah wasn't like that when I started. Used shit from China, which is nearly identical match but they assembled team and were able to identify some differences, most of them I know, but high dollar at auction, big $, can have no issues.
>
> But it's not easy. Takes me sometimes days to get one good enough to attempt. Then when I do, the welder becomes another issue. Start again.
>
> Repeat and repeat.
>
> I'll get it right, I always do, just takes time.
>
> Much more than I would want
>
> Could have had better cases made already. But I've got to watch my imports at this point
>
> **CC-2:** Yeah just focus on the details

(GX 2466-E2 at 14-16).

Additionally, CC-2 is one of the numerous third parties the defendant used to transact in trading cards at the defendant's direction, in order to conceal the defendant's involvement in the charged conspiracy. In discussing CC-2 fraudulently registering an account at a trading card auction house, PWCC, to transact in cards at the defendant's direction using bank statements doctored by the defendant, the parties discussed the following, including Curcio providing CC-2 with a burner phone:

> **Curcio:** No I actually would want your account number and would just make same as where they send payments later OR just do a completely fake one to fake business and then have transfer to ur account after
>
> Remember this here is for something we never are using- it's just playing the game like your on that level before selling one
>
> Meaning, right after you get approved. Bid 55k on something u know will sell later for 90k
>
> Then when u go to sell something big later it doesn't seem that big of deal since all makes sense

| | |
|---|---|
| **CC-2:** | lol |
| | I think my joint account is a business account |
| | So use my bank account right? |
| | I got 0 money right now so not sure if that will raise a red flag |
| **Curcio:** | I can make up all the stuff. They aren't going to check, that's the whole point of asking for statements |
| | . . . . |
| | So would be photoshopping from mine et[c] and needing to add in a bunch of things |
| **CC-2:** | Lemme try giving them mine |
| **Curcio:** | No, they MUST have $$$$$ in there |
| | They need to be doctored- either I create yours or I create from mine |
| | Tel me u didn't send yours in there |
| | If you sent them - then we need to find different auction house |
| | I never left you that phone. |
| | A good burner is cricket, my favorite anyways. If u just get the device and setup account under bs name, address etc- give me that name and address u used and I'll pay for couple months under the same bs name |
| | . . . . |
| | Yo we good at PWCC or what? |
| **CC-2:** | Fell asleep ahahag |
| | Imma send it to them now |
| | It's just sent it to them as well |
| **Curcio:** | All good but ur sending the ones I made above correct? |
| | U didn't sent your actually statements did u? |

      **CC-2:**      No sent all the ones you made

(GX 2466-E2 at 3-11). CC-2's contemporaneous communications with Curcio are likewise communications updating a co-conspirator on the process of the conspiracy, *Desena*, 260 F.3d at 158, and those which "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990). CC-2's statements are thus admissible under Rule 801(d)(2)(E).

      Nor is there any unfair prejudice in admitting messages between Curcio and each of CC-1 and CC-2. Rule 403 is concerned only with *unfair* prejudice, and evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Evidence is not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (noting that evidence is not unduly prejudicial under Rule 403 when it is not "more inflammatory than the charged crime[s]"). The fact that evidence may be "damning" does not render it inadmissible. *See United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972). Here, CC-1's and CC-2's messages with Curcio are part of the charged conspiracy and thus are not more inflammatory than the charged crimes; indeed, they are the charged crimes.

      Respectfully submitted,

      JAY CLAYTON
      United States Attorney

by:   /s/
      David R. Felton
      Kingdar Prussien
      Cecilia Vogel
      Assistant United States Attorneys
      (212) 637-2299/-2223/-1084

cc:     All counsel of record (by ECF)