**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

     v.

ANTHONY CURCIO,

          Defendant.

24 Cr. 312 (RA)

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT ANTHONY CURCIO'S RULE 33 MOTION FOR A NEW TRIAL**

## TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT ........................................................................... 1

II.     BACKGROUND ..............................................................**Error! Bookmark not defined.**

        A.      The Indictment.................................................................................. 2

        B.      The Trial............................................................................................ 3

        C.      After the Trial ................................................................................... 6

III.    ARGUMENT.............................................................................................. 7

        A.      The Extra-Record Evidence Was Highly Relevant and Would Likely Affect
                an Average Jury ................................................................................. 7

        B.      Constitutional Rights and the Interest of Justice Require a New Trial ................. 11

        C.      The Extra-Record Evidence Was Not Harmless.................................................. 11

        D.      An Evidentiary Hearing Pursuant to Rule 606(2) Is Warranted ........................... 13

IV.     CONCLUSION............................................................................................ 14

# TABLE OF AUTHORITIES

Page

**Cases**

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
739 F. Supp. 2d 576 (S.D.N.Y. 2010).......................................................................................... 8

*Loliscio v. Goord*,
263 F.3d 178 (2d Cir. 2001)............................................................................................... 10, 11

*Manley v. AmBase Corp.*,
337 F.3d 237 (2d Cir. 2003)...................................................................................................... 8

*Remmer v. United States*,
347 U.S. 227 (1954)................................................................................................................. 12

*Sassounian v. Roe*,
230 F.3d 1097 (9th Cir. 2000) ................................................................................................. 12

*Sher v. Stoughton*,
666 F.2d 791 (2d Cir. 1981)..................................................................................................... 10

*Turner v. Louisiana*,
379 U.S. 466 (1965).................................................................................................................. 11

*United States v. Calbas*,
821 F.2d 887 (2d Cir. 1987), *cert. denied*, 485 U.S. 937 (1988)............................................. 8

*United States v. Camporeale*,
515 F.2d 184 (2d Cir. 1975)..................................................................................................... 13

*United States v. Castello*,
526 F. Supp. 847 (W.D. Tex. 1981)...................................................................................... 7, 12

*United States v. Greer*,
285 F.3d 158 (2d Cir. 2000).................................................................................................. 8, 12

*United States v. McCourty*,
562 F.3d 458 (2d Cir. 2009)....................................................................................................... 7

*United States v. Morrison*,
984 F. Supp. 2d 125 (E.D.N.Y. 2013) ..................................................................................... 12

*United States v. Olano*,
507 U.S. 725 (1993).................................................................................................................. 11

*United States v. Salameh*,
  54 F. Supp. 2d 236 (S.D.N.Y. 1999) .................................................................................. 13

*United States v. Sanchez*,
  969 F.2d 1409 (2d Cir. 1992) ..................................................................................... 7, 12

*United States v. Sasso*,
  59 F.3d 341 (2d Cir. 1995) .......................................................................................... 13

*United States v. Schwarz*,
  283 F.3d 76 (2d Cir. 2002) ......................................................................................... 8, 12

*United States v. Siddiqi*,
  959 F.2d 1167 (2d Cir. 1992) ...................................................................................... 13

*United States v. Walker*,
  289 F. Supp. 3d 560 (S.D.N.Y. 2018) ............................................................................ 7

## Rules

Federal Rule of Criminal Procedure 33 ................................................................... passim

Rule 606(b)(2)(B) .................................................................................... 13, 14

Defendant Anthony Curcio respectfully submits this memorandum of law along with the declarations of Nicolas Lussier ("Lussier Decl.") and Gineen Abuali ("Abuali Decl.") in support of his motion for a new trial pursuant to Federal Rule of Criminal Procedure 33.

## I.    PRELIMINARY STATEMENT

Mr. Curcio was charged with conspiracy to commit wire fraud and wire fraud.  On January 28, 2026, the jury found Mr. Curcio guilty of both counts.  Mr. Curcio was accused of engaging in a scheme to defraud buyers by falsely representing the grades assigned to sports and Pokémon cards.  At trial, the Government highlighted the importance of a 1999 Pokémon Charizard card through multiple witnesses.  The Government also contrasted Mr. Curcio's practices for storing his trading cards with those of other collectors, eliciting testimony that collectors typically safeguard valuable cards in safes, thereby portraying Mr. Curcio's approach as atypical.

Immediately following the guilty verdict, the defense spoke to some members of the jury and discovered that one of the jurors, Juror No. 4, received extrinsic evidence relevant to those issues.  Juror No. 4 revealed that he had communicated with his brother about the potential value of Charizard cards—specifically $500,000.  Juror No. 4 later stated that it did not make sense for valuable cards to be lying on the floor.

Juror No. 4's receipt of relevant and material extrinsic evidence requires a new trial, or at the very least, an evidentiary hearing, for three reasons.  *First*, Juror No. 4's decision to consult his brother regarding the value of the central Charizard card irreparably tainted the integrity of Mr. Curcio's trial because it would improperly influence an average jury.  Despite explicit instructions from the Court prohibiting such conduct, Juror No. 4 considered an out-of-court valuation that was not only highly material but also far exceeded anything presented in the trial record.  That extrinsic evidence, which originated from a source the defense contends that the juror personally trusted,

bore directly on Juror No. 4's assessment of the core factual disputes presented at trial. The circumstances conclusively establish that an average jury could not reasonably be expected to disregard such information. *Second*, the introduction of prejudicial, extrinsic evidence on central issues violated Mr. Curcio's constitutional right to a fair trial and compels a new trial under Rule 33. *Lastly*, the extra-record evidence was not harmless, nor was it cumulative. Juror No. 4 received an inflated valuation from his brother, and no trial witness valued the Charizard card during the alleged fraud scheme at even half of the half-million extrinsic estimate. Mr. Curcio is entitled to a new trial under Rule 33, or, at a minimum, an evidentiary hearing to determine the full extent of the violation and resulting prejudice.

## II.    BACKGROUND

### A.    The Indictment

On May 20, 2024, a grand jury indicted Mr. Curcio for conspiracy to commit wire fraud, 18 U.S.C. §1349, and wire fraud, 18 U.S.C. §1343. Indict. (Dkt. 1) ¶¶ 13, 14. The Indictment alleged that Mr. Curcio engaged in a scheme to defraud buyers and marketplaces by falsely representing that the low-to-mid grade sports and Pokémon cards had received high-grade ratings from a card authentication company, *see* Indict. ¶ 1, later identified as Professional Sports Authenticator ("PSA"). In effect, Mr. Curcio was accused of representing that his cards were worth more than they actually were. An example prominently featured in the Indictment was a 1999 Pokémon Charizard card with a PSA grade of 10. Indict. ¶ 8. In total, the card was referenced nine times in the Indictment and is even depicted graphically therein as an example of the fraud.

**B.      The Trial**

The Charizard card served as a cornerstone of the Government's case-in-chief at trial as well, with the prosecution repeatedly highlighting its value through witness testimony and exhibits published to the jury.  With this evidence, the Government sought to prove that the card's grade was inauthentic by showing that the price at which Mr. Curcio attempted to sell the card was lower than the market value.

For example, the Government elicited testimony from Ryan Dills that he would value a PSA 10 Charizard card, like Mr. Curcio's, at approximately $250,000.   Tr. 336:11-13. Government Exhibit 1401-F reflects Mr. Dills' efforts to connect a seller named Joey (Mr. Curcio's alleged alias) with another buyer, Ashish Jain, and to explore potential sale prices for the Charizard card.  During their text conversation, Mr. Dills suggested $125,000 as a starting point, to which Joey responded, in sum and substance, that a private sale at that price would be comparable to a $200,000 sale at auction, given the avoidance of auction house fees.  Tr. 344:13-24.  Moreover, the Government had Mr. Dills identify its Exhibit 1415 as a "screenshot[] showing the last seven sales and what those prices were with [the Charizard] card as a PSA 10" "between August 3, 2018 and January 8, 2022."  Tr. 345:18-23.  Mr. Dills explained that he sent the screenshot to Joey because Joey "was having a hard time figuring out a good value for that card." Tr. 345:11-16.  On cross examination, Mr. Dills acknowledged that the dates and prices for sales of PSA 10 Charizard cards as reflected in Government Exhibit 1415 varied, and confirmed that the market price of such cards fluctuated over time.  Tr. 368:19-21.

Several other witnesses testified similarly.  Mr. Jain testified that Mr. Dills introduced him to Joey, who was offering a Charizard card for $125,000, a price Mr. Jain considered "cheap" given his belief that it was "a 200 plus thousand dollar card."  Tr. 510:12-13.  Mr. Jain further

3

explained, "immediately you're leery when you get something that's 60 percent of its value." Tr. 510:16-18. Darren Adams likewise testified that the Charizard card was worth "at least $200,000 current market value at the time." Tr. 717:10-11. By comparison, Corey Trammell testified that he priced the Charizard card based on the "going rate" in the market and Mr. Curcio's desired sale price and listed it for "probably 100-some thousand." Tr. 580:2-3, 16.[1]

The Government also elicited testimony from witnesses regarding their own practices for storing their trading cards, emphasizing that, unlike Mr. Curcio, they secured their cards in safes and by other secure means. Joe Baudo, for example, testified that he would not keep his cards on the floor "[b]ecause they're valuable and it's not traditionally a place where you keep cards." Tr. 162:1-2. And Brian Rzewnicki testified that he would not keep his cards on the floor either because "I don't want them to get damaged or lost or kicked around or broken." Tr. 1277:1-2.

The Government further elicited extensive testimony from ten other witnesses to the effect that they would store valuable cards in safes. *See, e.g.*, Tr. 122:10-11 (Mr. Baudo) ("When I acquired those cards, I got them, I put them in my safe."); 242:20-243:8 (Remington Ewald) (testifying that he stores his most valuable cards "in a vault . . . [that] would withstand a nuclear explosion," that for cards valued in the thousands, he has "so many safes in my house," and that he "had to have a 300-pound standalone safe in [his] house"); 374:20 (Luke Raynolds) ("I store them in a lock box."); 436:13-14 (Sean McMillan) (testifying that he stores valuable cards in a safe); 507:25-508:3 (Mr. Jain) (testifying that he stores his more valuable cards in a safe); 559:22-23 (Mr. Trammell) (testifying that he keeps his valuable cards safe by storing them in a safe); 710:2-5 (Mr. Adams) (testifying that he stores his most valuable trading cards using "a couple

---

[1] Special Agent Chris Campbell clarified during his testimony that Mr. Trammell listed the Charizard card for $140,000. Tr. 1169:13-17.

banks, multiple safe deposit boxes, a safe" because the cards "are valuable"); 1018:15-19 (Matthew Greaney) (testifying that he stores his most valuable cards in "[f]ireproof, waterproof, theft-proof safes, vaults, . . . .  But predominantly you want to keep it safe from the elements; either fire, water, and/or theft"); 1189:24-25 (Michael Grossbarth) ("In a safe."); 1410:18-21 (Daniel Bliss) ("I keep them locked up.  I have a safety deposit box at a bank as well.").

In contrast, the Government admitted photographs from the search of Mr. Curcio's home, which depicted his cards on the floor.  *See, e.g.*, GX-61.  Special Agent Chris Campbell emphasized that the images showed trading cards in binders and plastic bags on the floor.  *See, e.g.*, Tr. 1126:9-11 ("little more close-up view of some of the items that were located on the floor. We see some trading cards in binders."); *see also* Tr. 1128:25-1129:1 ("A closer-up picture of a binder that I pointed out earlier in Room A, on the floor in Room A."); 1136:6 ("This, again, is the binder that was on the floor of Room A."); 1142:1-2 ("Some more items that were on the floor."); 1142:18-20 ("a tighter view of one of the items that contained plastic Ziploc type bags with sports cards inside."); 1163:23-25 ("So this is a Hefty bag, one of the bags we saw in the photographs and some of the cards that were contained in the bag that were on the floor.").  As he was describing Government Exhibit 61, a photograph of some cards found in the plastic bags that photographers spread out on the ground for purposes of photography, the Government elicited testimony from Special Agent Campbell that a "[m]ajority or at least more than half [of the cards were] Pokémon." Tr. 1152:20.  When asked whether any trading cards were found in the safes in the residence, Special Agent Campbell testified that all cards were recovered on the floor.  Tr. 1157:14-21.

During summation, the Government again emphasized Mr. Curcio's method of storage in comparison to card collector witnesses' testimony and tied it to Mr. Curcio's knowledge of the alleged fraudulent scheme:

> Now, you also know that Curcio knew that the grades were fake based on the haphazard way he stored his cards on the floor in his home and paraded his cards around card shows, and the extremely low prices he charged for the cards. The card collector witnesses testified across the board that they stored their valuable cards in safes and banks, a far cry from the scattered collection of cards on the floor you see on your screen and saw in some of the other search photos.

Tr. 1836:6-13 (closing arguments).

> Let's look at the cards on the floor, Government Exhibit 32. Curcio purportedly had valuable PSA 9s and 10s just lying around the workshop, not kept in any kind of safe. All the other victims testified that they keep these kind of valuable cards locked away in a safe. Curcio had a safe. You saw the photos. But he kept his cards on the floor. Curcio did that because he knew they were worth very little because they weren't really PSA 9s and 10s. He did that because he knows that he created the grade. Curcio knew exactly what he was doing.

Tr. 1972:4-13 (rebuttal arguments).

Throughout the trial, the Court repeatedly instructed the jury not to speak with anyone about the case, including each other, and to keep an open mind. *See, e.g.*, Tr. 132:25-133:1; 171:21-22; 221:4-5; 263:11-12; 356:22; 431:4-5; 496:4-5; 600:17-18; 674:17-18; 781:17-18; 889:5-7; 1054:2-3; 1119:24; 1181:20-21; 1296:13-14; 1371:24-25; 1507:25-1508:1; 1544:3-4; 1593:13-14; 1658:22-23; 1782:12-16.

### C.    After The Trial

On January 28, 2026, the jury convicted Mr. Curcio on both counts in the Indictment. Following the guilty verdict and immediately after the jury was dismissed, the defense spoke with several jurors outside the courtroom. Juror No. 4 spoke to the attorneys at length. During the conversation, Juror No. 4 informed defense counsel that his brother knows about cards. Lussier Decl. Ex. A ¶¶ 6, 7; Abuali Decl. Ex. B ¶4. Juror No. 4 further stated that he asked his brother about how much a Charizard card is worth and was told that it is worth half a million dollars.

Lussier Decl. Ex. A ¶¶ 6, 7; Abuali Decl. Ex. B ¶ 4.  Later in the conversation, Juror No. 4 stated that it did not make sense for valuable cards to be lying on the floor.  Abuali Decl. Ex. B ¶4.[2]

## III.   ARGUMENT

Federal Rule of Criminal Procedure 33(a) provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  In weighing a Rule 33 motion, a district court must determine "whether 'it would be a manifest injustice to let the guilty verdict stand.'"  *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (quoting *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989)).  "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33."  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).  Additionally, the court is "not required to review the evidence in the light most favorable to the prosecution" in a Rule 33 analysis.  *United States v. Walker*, 289 F. Supp. 3d 560, 567 (S.D.N.Y. 2018) (quoting *United States v. Levy*, 594 F. Supp. 2d 427, 435 (S.D.N.Y. 2009)).

### A.   The Extra-Record Evidence Was Highly Relevant and Would Likely Affect an Average Jury

It is axiomatic that "jurors have no right to investigate or acquire information relating to the case outside of that which is presented to them in the course of the trial in accordance with established trial procedure."  *United States v. Castello*, 526 F. Supp. 847, 849 (W.D. Tex. 1981) (quoting *Farese v. United States*, 428 F.2d 178, 179 (5th Cir. 1970)); *see In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 739 F. Supp. 2d 576, 610-611 (S.D.N.Y. 2010) ("It is axiomatic that juries are required to decide cases on the evidence introduced at trial.").

---

[2] As detailed in Lussier Decl. Ex. A, at ¶ 8 and Abuali Decl. Ex. B, at ¶ 6, the defense is aware that Juror No. 4 subsequently recanted and stated, to at least two people, that he did *not* speak to anyone during the trial.

Where, as here, "an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror." *United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2000) (quoting *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994)).  This test focuses on two factors: "(1) 'the nature' of the information or contact at issue, and (2) 'its probable effect on a hypothetical average jury.'" *Manley v. AmBase Corp.*, 337 F.3d 237, 252 (2d Cir. 2003) (quoting *United States v. Schwarz*, 283 F.3d 76, 99 (2d Cir. 2002)).  A court "may appropriately consider the circumstances surrounding the introduction of [the] information in making [its] determination." *United States v. Calbas*, 821 F.2d 887, 896 n.9 (2d Cir. 1987), *cert. denied*, 485 U.S. 937 (1988).

The extrinsic evidence that Juror No. 4 received from his brother—that the Charizard card was worth a half-million dollars—was highly relevant and likely to impact deliberations.  The value of the Charizard card was a core piece of evidence in the Government's case against Mr. Curcio, referenced repeatedly in both the Indictment and throughout trial.

A 1999 Pokémon Charizard card with a PSA grade of 10 featured prominently in the Indictment, with a picture of the card even included in the Indictment itself as a visual example of the fraud.  *See* Indict. ¶ 8.  The Charizard card was then referenced a total of nine times in the Indictment.

At trial, the Government spotlighted the Charizard card in its case-in-chief, exhibiting it five times to four witnesses and eliciting testimony from numerous witnesses regarding their estimated value of the card.  Tr. 335:24-336:4 (Mr. Dills); 515:3-6 (Mr. Jain); 515:7-13 (Mr. Jain); 718:18-19 (Mr. Adams); 1172:15-19 (Special Agent Campbell).  The trial witnesses placed the value of the Charizard card at the $100,000 to $250,000 range.  *See* Tr. 336:11-13; 344:13-24; 510:12-13; 717:10-11; 580:2-3, 16.  On one occasion, the Government introduced Government

8

Exhibit 1415 during Dills' direct examination, which was identified as a screenshot of previous sales of PSA 10 Charizard cards from August 3, 2018 to January 8, 2022, with the price of each previous sale. *See* Tr. 345:14-23; 368:15-18. This exhibit demonstrates that *before* the alleged fraud scheme, the Charizard card was valued as low as approximately $36,000 and as high as nearly $400,000. Dills explained that he sent the screenshot to Joey because Joey "was having a hard time figuring out a good value for that card." Tr. 345:11-16. Critically, no trial witness placed the value of the Charizard card *during* the alleged fraud scheme at even half of the half-million extrinsic estimate. The inflated valuation that Juror No. 4 received from his brother dwarfed the range reflected by witnesses' testimony and therefore materially affected the disputed issue of the value of a Charizard card.

The importance of this extrinsic evidence was amplified by the connection between the value of a card and the method of storage that the Government highlighted at trial. *See, e.g.*, Tr. 122:10-11; 242:20-243:8; 374:20; 436:13-14; 507:25-508:3; 559:22-23; 710:2-5; 1018:15-19; 1189:24-25; 1410:18-21. The Government elicited extensive testimony from Special Agent Campbell that Pokémon cards were found in binders or plastic bags on the floor of Mr. Curcio's house and that no card was found in his safe. *See, e.g.*, Tr. 1126:9-11; 1128:25-1129:1; 1136:6; 1142:1-2; 1163:23-25; 1152:20; 1157:14-21. Meanwhile, ten witnesses were examined concerning common practices for storing cards of value, with the Government arguing that legitimate collectors store valuable cards in vaults and safes but not on the floor. *See, e.g.*, Tr. 122:10-11 (Mr. Baudo); 242:20-243:8 (Mr. Ewald); 374:20 (Mr. Raynolds); 436:13-14 (Mr. McMillan); 507:25-508:3 (Mr. Jain); 559:22-23 (Mr. Trammell); 710:2-5 (Mr. Adams); 1018:15-19 (Mr. Greaney); 1189:24-25 (Mr. Grossbarth); 1410:18-21 (Mr. Bliss). In its closing and rebuttal arguments, the Government wove together these strands of evidence, urging the jury to

9

conclude that Mr. Curcio knowingly dealt in counterfeit grades based on the stark contrast between the purportedly high value of the cards and Mr. Curcio's alleged "haphazard way" of storage, especially when compared to other collectors, as well as the "extremely low prices he charged for the cards." *See, e.g.*, Tr. 1836:6-13; 1972:4-13. The Government's summation underscores the significance of these issues, particularly with respect to Mr. Curcio's knowledge of fraud, which the defense vigorously disputed.

Considering the surrounding circumstances, the half-million dollar valuation came from Juror No. 4's brother, who is purportedly familiar with cards. In light of the trusting, familial relationship coupled with knowledge of the subject matter, an average jury would perceive the source as particularly reliable and credible and would ascribe significantly more credibility to that extrinsic valuation than, for instance, a rumor or an anonymous tip. *See, e.g.*, *Loliscio v. Goord*, 263 F.3d 178, 185-86 (2d Cir. 2001) (extrinsic information in the form of rumors regarding prior bad acts by defendants); *Sher v. Stoughton*, 666 F.2d 791, 794 (2d Cir. 1981) (anonymous phone call to jurors essentially urging them to convict defendant and imparting little information beyond what was in the trial record).

Against this backdrop, Juror No. 4's receipt of an extrinsic valuation from a trusting source plainly went to the heart of the factual disputes: the market value of the card and, by extension, the plausibility of Mr. Curcio's misrepresentations and misconduct. That number, which is at least two times greater than the highest trial estimate by witnesses, would necessarily color a juror's assessment of why Mr. Curcio might sell the card for $125,000 or store it on the floor. It would also affect a juror's determination of certain witnesses' credibility, as the figure may bolster the testimony from potential buyers who deemed the transaction too good to be true or became "immediately . . . leery." Tr. 510:16-18. The extrinsic evidence would predictably make the

10

Government's arguments about method of storage more compelling and support a finding that Mr. Curcio fraudulently inflated the Charizard card's value because an ordinary collector would not treat a half-million-dollar card the way Mr. Curcio did.

Because the market value and storage method of Mr. Curcio's cards were central issues at trial, the extraneous input from Juror No. 4's brother satisfies the objective test articulated by the Second Circuit: it was both highly material and improperly influential to the average juror.

**B.      Constitutional Rights and the Interest of Justice Require a New Trial**

The Sixth Amendment guarantees a defendant the right to a verdict based exclusively on evidence admitted at trial. *See Turner v. Louisiana*, 379 U.S. 466, 472 (1965); *see also Loliscio*, 263 F.3d at 185 ("[A] criminal defendant's Sixth Amendment rights are implicated when a jury considers incriminating evidence that was not admitted at trial."). Due process similarly guarantees the right to have "a jury capable and willing to decide the case solely on the evidence before it." *United States v. Olano*, 507 U.S. 725, 738 (1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). Where, as here, the jury's deliberations were tainted by facts or opinions extrinsic to the trial record, those constitutional guarantees are violated.

The record here makes clear why. The extrinsic value provided was double the highest amount any of the witnesses testified to, and the defense was deprived of any opportunity to confront the extra-record evidence at trial through adversarial procedure—it could not offer contrary testimony, make legal arguments, or obtain a curative instruction. The defense, for example, could not cross-examine Juror No. 4's brother at trial. *See Turner*, 379 U.S. at 472-73 ("[T]rial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where

11

there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.").

Under Rule 33, a new trial is warranted if "it would be a manifest injustice to let the guilty verdict stand." *Sanchez*, 969 F.2d at 1414 (quoting *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989). Allowing this verdict to stand would be precisely the kind of manifest injustice Rule 33 prohibits, as the core issues of value and credibility were tainted by outside, untested information. Where jurors have disregarded the court's instructions and obtained outside facts on material issues, a new trial is the required remedy. *Castello*, 526 F. Supp. at 850-51.

Because the jury was exposed to, and an average jury would likely be influenced by, extrinsic, material, and prejudicial evidence, Mr. Curcio's constitutional rights were violated, and justice requires a new trial.

### C.    The Extra-Record Evidence Was Not Harmless

It is well-settled that any extra-record information of which a juror becomes aware is presumed prejudicial. *See Remmer v. United States*, 347 U.S. 227, 229 (1954). Prejudice exists even if only a single juror was affected. *United States v. Morrison*, 984 F. Supp. 2d 125, 132 (E.D.N.Y. 2013) (citing *Fullwood v. Lee*, 290 F.3d 663, 678 (4th Cir. 2002)); *see Sassounian v. Roe*, 230 F.3d 1097, 1110 (9th Cir. 2000) (collecting cases). This presumption may only be overcome if the government shows the error was harmless, *see Greer*, 285 F.3d at 173, and courts have declined to find extrinsic information harmless when it is relevant to disputed issues and there is even a small possibility of prejudice, *see, e.g., Schwarz*, 283 F.3d at 99-100 (finding prejudice where extra-record evidence bolstered testimony of government witness); *United States v. Camporeale*, 515 F.2d 184, 188-89 (2d Cir. 1975) (ordering new trial where extra-record evidence bore on defendant's credibility).

12

The Government will not be able to meet its heavy burden to show harmlessness here. As discussed above, the extrinsic valuation-related information Juror No. 4 received from his brother is highly relevant and material: it related directly to core factual disputes at trial and substantially inflated the value estimated by trial witnesses. There is a real possibility that it would lead an average jury to give disproportionate weight to the Government's theory that Mr. Curcio placed purportedly valuable cards on the floor because he fraudulently represented the grades of those cards. *See supra* at 9-10. It is therefore not harmless.

Nor was the extrinsic evidence cumulative. The view of Juror No. 4's brother introduced a new and distinctly higher valuation of the Charizard card, vastly exceeding the $100,000 to $250,000 range supported by witness testimony. There was no testimony or evidence at trial that remotely approached this benchmark during the time of the alleged fraud, nor was any such figure tied to the alleged fraud. Simply put, had such evidence been admitted at trial, the jury would have learned something new. Here, the extra-record evidence did not merely reiterate the record but fundamentally distorted it, rendering it not harmless.

### D.    At A Minimum, An Evidentiary Hearing Pursuant to Rule 606(2) Is Warranted

While the Federal Rules of Evidence generally shield juror deliberations from discovery, Rule 606(b)(2)(B) expressly authorizes such evidence where "an outside influence was improperly brought to bear on any juror." "[T]he decision of whether to permit discovery and conduct an evidentiary hearing remains within the sound discretion of the trial court." *United States v. Salameh*, 54 F. Supp. 2d 236, 248 (S.D.N.Y. 1999); *United States v. Sasso*, 59 F.3d 341, 350-51 (2d Cir. 1995). Where disputed issues of fact are involved, a hearing may be required. *See United States v. Siddiqi*, 959 F.2d 1167, 1174 (2d Cir. 1992). Here, there is evidence that Juror No. 4 sought out and obtained extrinsic information contrary to the Court's instruction regarding

13

disputed issues of fact at issue. At a minimum, the Court should convene a hearing to allow inquiry under Rule 606(b)(2) and provide the parties the opportunity to further develop the record.

## IV. CONCLUSION

For the reasons stated above, Mr. Curcio respectfully requests that the Court grant his motion for a new trial pursuant to Rule 33. At a minimum, Mr. Curcio respectfully requests that the Court hold an evidentiary hearing.

Dated: New York, New York
February 18, 2026

Respectfully Submitted,

*/s/ Martin S. Bell*

Martin S. Bell
Meredith Karp
Patrick K. Barry
Nicolas A. Lussier
Wendy Shidi Wu
Gineen K. Abuali

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000

*Attorneys for Defendant Anthony Curcio*

14