UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

24 Cr. 312 (RA)

ANTHONY CURCIO,
   a/k/a "Brendan Wooley,"

Defendant.

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT ANTHONY CURCIO'S RULE 33 MOTION FOR A NEW TRIAL**

JAY CLAYTON
United States Attorney
Southern District of New York
The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278

David R. Felton
Kingdar Prussien
Cecilia Vogel
Assistant United States Attorneys
- Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ............................................................................................................... 1

    A.   Charges and Trial.................................................................................................. 1

    B.   Facts and Evidence Presented at Trial ................................................................ 2

    C.   The Jury ............................................................................................................... 6

         1.   Jury Selection................................................................................................ 6

         2.   Jury Instructions............................................................................................ 7

         3.   Jury Conduct During Trial............................................................................ 8

         4.   Jury Deliberations and Verdict .................................................................... 8

    D.   Defense Counsels' Post-Verdict Conversation with Certain Jurors ................................... 9

    E.   Rule 33 Motion ................................................................................................. 10

ARGUMENT ................................................................................................................. 10

    A.   Applicable Law.................................................................................................. 11

    B.   The Purported Extrinsic Information Does Not Warrant a New Trial or a Hearing......... 14

         1.   The Nature of the Purported Extra-Record Information Was Immaterial and Duplicative.................................................................................................. 15

         2.   The Extra-Record Information Would Be Harmless Given the Overwhelming Evidence of Curcio's Guilt ....................................................................... 19

         3.   No Hearing is Needed.................................................................................. 22

CONCLUSION.............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Bibbins v. Dalsheim,*
   21 F.3d 13 (2d Cir. 1994) ...................................................................................... 12, 13, 24

*Busch ex rel. Estate of Busch v. City of New York,*
   224 F.R.D. 81 (E.D.N.Y. 2004) ...................................................................................... 23

*Daniels v. Hollins,*
   No. CV-02-4495 (FB)(LB), 2006 WL 47412 (E.D.N.Y. Jan. 9, 2006) ................................... 23

*King v. United States,*
   576 F.2d 432 (2d Cir. 1978) ...................................................................................... 14, 22

*Loliscio v. Goord,*
   263 F.3d 178 (2d Cir. 2001) ...................................................................................... 20, 24

*McDonough Power Equipment, Inc. v. Greenwood,*
   464 U.S. 548 (1984) ...................................................................................................... 11

*Remmer v. United States,*
   347 U.S. 227 (1954) ...................................................................................................... 12

*Sher v. Stoughton,*
   666 F.2d 791 (2d Cir. 1981) .......................................................................................... 13

*Tanner v. United States,*
   483 U.S. 107 (1987) .................................................................................................. 11, 13

*Taus v. Senkowski,*
   134 Fed. Appx. 468 (2d Cir. 2005) ................................................................................. 20

*United States v. Abcasis,*
   811 F. Supp. 828 (E.D.N.Y. 1992) ................................................................................. 23

*United States v. Baker,*
   899 F.3d 123 (2d Cir. 2018) ................................................................................. 14, 21, 22

*United States v. Bangiyev,*
   No. 07 Cr. 331 (NG), 2008 WL 4240005 (E.D.N.Y. Sept. 12, 2008) ................................... 11

*United States v. Costello,*
   255 F.2d 876 (2d Cir. 1958) .......................................................................................... 11

*United States v. Cote,*
   544 F.3d 88 (2d Cir. 2008) ........................................................................................... 11

*United States v. Cox*,
324 F.3d 77 (2d Cir. 2003)..................................................................................................... 25

*United States v. Farhane*,
634 F.3d 127 (2d Cir. 2011)............................................................................................ 12, 13

*United States v. Ferguson*,
246 F.3d 129 (2d Cir. 2001)..................................................................................................... 12

*United States v. Fumo*,
639 F. Supp. 2d 544, 552 (E.D. Pa. 2009) ............................................................................. 23

*United States v. Gambino*,
59 F.3d 353 (2d Cir. 1995).................................................................................................... 11

*United States v. Hillard*,
701 F.2d 1052 (2d Cir. 1983)................................................................................................. 20

*United States v. Ianniello*,
866 F.2d 540 (2d Cir. 1989)............................................................................................. 14, 22

*United States v. Jefferys*,
No. 20-3630, 2022 WL 9627085 (2d Cir. Oct. 17, 2022)........................................................ 12

*United States v. McCourty*,
562 F.3d 458 (2d Cir. 2009)........................................................................................ 11, 12, 20

*United States v. Menendez*,
763 F. Supp. 3d 538 (S.D.N.Y. 2025).................................................................................... 20

*United States v. Moon*,
718 F.2d 1210 (2d Cir. 1983)..................................................................................... 14, 22, 25

*United States v. Rosario*,
111 F.3d 293 (2d Cir. 1997)................................................................................................... 25

*United States v. Sanchez*,
969 F.2d 1409 (2d Cir. 1992)...................................................................................... 11, 12, 20

*United States v. Sattar*,
395 F. Supp. 2d 66 (S.D.N.Y. 2005)......................................................................... 13, 23, 24

*United States v. Schwarz*,
283 F.3d 76 (2d Cir. 2002)............................................................................................. 12, 14

*United States v. Snype*,
441 F.3d 119 (2d Cir. 2006)................................................................................................... 12

*United States v.Spano*,
  01 CR 348, 2002 WL 31681488 (N.D. Ill. Nov. 27, 2002) ....................................................... 21

*United States v. Stewart*,
  317 F. Supp. 2d 432 (2d Cir. 2004) ...................................................................................... 11

*United States v. Torres*,
  128 F.3d 38 (2d Cir. 1997)...................................................................................................... 12

*United States v. Weiss*,
  752 F.2d 777 (2d Cir. 1985)............................................................................................... 13, 14

*United States v. Yeagley*,
  706 F. Supp. 2d 431 (S.D.N.Y. 2010).................................................................................... 14

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum of law in opposition to defendant Anthony Curcio's motion, submitted pursuant to Rule 33 of the Federal Rules of Criminal Procedure, seeking a new trial or an evidentiary hearing to determine whether a new trial is warranted (Dkt. No. 102, the "Motion" or "Mot."). The Motion sets forth one ground for granting the requested relief: that during a post-trial conversation with two associates from the defense team, one juror purportedly stated that, at an unspecified point in time, he had discussed with his brother the potential value of a Charizard Pokémon card, and his brother told him that such a card is worth about half a million dollars. The juror then denied to lead defense counsel Martin Bell and a reporter "having engaged in any conversations concerning the subject matter of the case" before deliberations. (Dkt. No. 102-1 ¶ 8; Dkt. 102-2 ¶ 5.) The allegation that the juror considered this extra-record information does not meet the demanding standard for a new trial or for a hearing. Because the alleged conversation raises no concern that the defendant is innocent and that the jury wrongfully convicted him, a new trial is not justified under Rule 33. Accordingly, the Motion should be denied in its entirety.

**BACKGROUND**

**A.  Charges and Trial**

On May 20, 2024, a grand jury sitting in this district returned Indictment 24 Cr. 312 (RA), charging Anthony Curcio and co-conspirator Iosif Bondarchuk with violations of Title 18, United States Code, Sections 1349 (wire fraud conspiracy), 1343 (wire fraud), and 2 (aiding and abetting the same). (Dkt. No. 3, the "Indictment".) Each count related to Curcio's central role in orchestrating and executing a nation-wide scheme to trick buyers into paying inflated prices for sports and Pokémon trading cards by misrepresenting that the cards had received high-grade

1

ratings purportedly issued by a reputable card authentication company, Professional Sports Authenticator ("PSA").

Trial commenced on January 12, 2026. On January 28, 2026, following approximately two weeks of evidence, the jury convicted Curcio on both counts after deliberating for approximately four to five hours.

### B. Facts and Evidence Presented at Trial

The overwhelming evidence supporting the jury's verdict showed that Curcio was the central figure and leader of a scheme to defraud victims by selling sports and Pokémon cards with fake grades purportedly issued by PSA. Specifically, from at least 2022 to May 2024, Curcio sold and attempted to sell fraudulently labeled sports and Pokémon trading cards to victims across the country. The vast evidence of Curcio's guilt included: the testimony of ten victim customers (Tr. 107-205 (Joe Baudo), 306-373 (Ryan Dills), 373-430 (Luke Raynolds), 433-460 (Sean McMillan), 506-557 (Ashish Jain), 557-612 (Corey Trammell), 708-741 (Darren Adams), 1189-1202 (Michael Grossbarth), 1275-1305 (Brian Rzewnicki), and 1409-1431 (Dan Bliss)); representatives of PSA (Tr. 1432-1593, 1607-1658, 1699-1730), eBay (Tr. 959-1013), and the MySlabs online marketplace (Tr. 1015-1119), and his co-defendant and co-conspirator, Bondarchuk (Tr. 460-499, 612-687, 748-888, 919-958). The evidence also consisted of: Curcio's inculpatory phone messages (*see, e.g.*, GXs 3466-E1-E3, E5, E6 (messages with "Dennis Gym Owner"); GXs 2359-E1-E5, E7-E10, E12-E15, E17-E19, E21, E22, E24-28 (messages with Stephanie Brown); GXs 2360-E1-E4 (same)); physical evidence recovered from Curcio's home forgery workshop, such as loose labels with half the printed text removed, cracked open PSA cases, forgery tools, and cards with fake grades (*see e.g.,* GXs 1-77; GXPs 14, 17, 23-E2, 24, 26, 27, 30, 31; Tr. 637:14-18, 637:24-638:6, 814:20-22, 845:11-23, 1126:6-18); the templates on his phones and drives that he used to print fake labels (*see e.g.*, GXs 2195, 2224, 2227, 2232, 2262, 2263,

2270, 2286, 2296, 2300, 2304, 2325, 2331); and a detailed spreadsheet used by Curcio to keep track of his fraudulently labeled cards (GX 4159). Over a dozen of the label templates from his devices perfectly matched the cards with fake PSA grades he sold to victims. (*See e.g.*, GXs 2195, 2224, 2227, 2232, 2262, 2263, 2270, 2286, 2296, 2300, 2304, 2325, 2331.)

The evidence at trial established that sports and Pokémon trading cards can have considerable resale value depending on, among other things, their condition and authenticity. (*See e.g.*, Tr. 242:18-19 (Remington Ewald testified that cards can be worth "1.5 million a piece"); Tr. 440:3-6 (Sean McMillan testified that cards can be worth "millions of dollars"); Tr. 507:19-22 (Ashish Jain testified that he sold a card for $1.2 million).) For a fee, PSA verifies a card's authenticity, assesses its condition, and assigns it a numerical grade from 1 to 10, with 10 being the highest grade. (Tr. 1439:2-1440:9, 1442:17-1443:15.) After grading a card, PSA seals the card in a distinctive, tamper-resistant plastic case that encloses the card to preserve its condition and indicates its grade on an affixed label. (Tr. 1439:2-9.)

The card grade assigned by PSA can significantly impact the market value of the card. (*See, e.g.* Tr. 111:12-17; 508:22-24; 1411:20-1413:22, 1452:7-11.) Depending on the type of card, a card graded PSA 10 can sell for hundreds of thousands, or even over a million dollars. (Tr. 242:18-19, 243:16-244:12, 336:11-13, 440:3-6, 507:16-22, 508:17-24; GX 1415.) Indeed, the witness from PSA, Jackie Curiel, testified that the grade difference "from a 9 to a 10, for instance, can be tens to hundreds of thousands of dollars difference. So it can be a very huge valuation difference." (Tr. 1452:7-11) As another example, victim Darren Adams testified that a card graded as a 10 could be 100 times greater value than a raw card. (Tr. 710:12-22.) Victim Ashish Jain testified that for a valuable Michael Jordan card, a PSA 9 could be worth $25,000 and a PSA 10

3

of that same card could be worth up to $500,000. (Tr. 508:13-24.) Even Curcio acknowledged in his memoir that there were "cards that sold for over a million dollars." (GX 101; Tr. 94:18-19.)

Curcio sold his cards with fake PSA grades using online marketplaces like MySlabs, eBay, Mercari, and Goldin Auctions. (*See e.g.*, GXs 4430-E4, 4442, 2263, 5702; Tr. 376-378, 1575-1579.) Curcio also sold and attempted to sell fraudulently graded cards at in-person card shops and card shows. (Tr. 240-262, 708-741.) Curcio further sold and attempted to sell cards with fake PSA grades on consignment, using unsuspecting victims like Corey Trammell and Luke Raynolds, to sell his cards with fake PSA grades on his behalf. (*See* Tr. 394-420, 557-612.)

Among the fraudulent cards that Curcio attempted to sell was a 1999 Pokémon Charizard card graded PSA 10, which he sold to victim Darren Adams and attempted to sell to victim Ashish Jain. (Tr. 510, 515, 520, 524, 717-719.) The trial evidence established that high quality Charizard cards are frequently worth hundreds of thousands of dollars, with one sold for almost $400,000, for example, in March 2021. Specifically, Ryan Dills testified that, in or around March 2026, he valued a card of that type that had been legitimately graded as a PSA 10 at approximately $250,000. (Tr. 336:11-13.) In a screenshot taken by Dills from the PSA website of sales of PSA 10 Charizard cards, the records showed that between August 3, 2018 and January 8, 2022, PSA 10 Charizard cards sold for the following prices: (1) $40,000 on 8/3/2018; (2) $36,110.54 on 12/23/2019; (3) $295,300 on 11/26/2020; (4) $350,100 on 12/13/2020; (5) $399,750 on 3/7/2021; (6) $270,600 on 9/21/2021; and (7) $252,000 on 1/8/2022. (GX 1415; Tr. 345:3-24.) Dills testified that he sent the screenshot to Curcio because Dills believe Curcio "was having a hard time figuring out a good value for that card." (Tr. 345:11-16.) Dills further testified that the market price of a PSA 10 Charizard card fluctuates over time. (Tr. 368:19-21.)

4

Moreover, in a text message with Curcio (who was using the "Joey" alias at the time), Dills suggested $125,000 as a starting price for negotiations with another buyer, Ashish Jain. (Tr. 344:13-24.) Jain testified that Dills introduced him to Curcio, who was offering a Charizard card for $125,000, a price Jain considered "cheap" given his belief that it was "a 200 plus thousand dollar card." (Tr. 510:12-13.) Another victim witness, Darren Adams, testified that the Charizard card was worth "at least $200,000 current market value at the time." (Tr. 717:10-11.) And victim Corey Trammell testified that he priced the Charizard card based on the "going rate" in the market and Curcio's desired sale price and listed it for "probably 100-some thousand." (Tr. 580:2-3, 16.) Special Agent Chris Campbell clarified during his testimony that Mr. Trammell listed the Charizard card in summer 2023 for $140,000. (Tr. 1169:13-17.)

Among other evidence of Curcio's knowledge that the cards he was selling had fake PSA grades, the Government introduced evidence contrasting Curcio's practices for storing his trading cards with the practices of other collectors. At the time of the search of Curcio's residence, it was found that Curcio kept his cards—including numerous PSA 9 and 10 cards that would be valuable if authentically graded—strewn about the floor and desk of his forgery workshop. (*See, e.g.*, GXs 6 & 7; Tr. 1126:6-1127:8.) In contrast, the card collectors who testified uniformly safeguard their valuable cards, such as in safes, lock boxes, protective cases, or safety deposit boxes. (*See, e.g.*, Tr. 122:10-11; 242:20-243:8; 374:20; 436:13-14; 507:25-508:3; 559:22-23; 710:2-5; 1018:15-19; 1189:24-25; 1410:18-21.) The contrast suggested that Curcio knew his cards were not valuable because he knew the PSA 9 and 10 grades were fake.

In addition, to conceal his involvement in the fraudulent scheme, Curcio repeatedly used fake names and identities. (*See* GX 5710; Tr. 1734:12-1746:1.) For example, in May 2023, Bondarchuk falsely told Darren Adams that he was speaking to someone named "John Steele"

when it was, in fact, Curcio on the phone. (*See* Tr. 473:22-474:23, 628:10-629:10.) In April 2024, at a card show in New Jersey, Curcio gave a business card to Remington Ewald falsely claiming to be "Brendan Wooley" and listing, among other identifiers, a phone number and LinkedIn page purportedly belonging to "Brendan Wooley." (*See* GX 1603; Tr. 246:18-247:17.) Curcio created and operated the LinkedIn page and controlled the "Brandon Wooley" phone number. (Tr. 1206:11-1207:18; GX 4902, 4903, 4904, 4905; *see also* 285:24-287:14.)

In sum, the evidence at trial of Curcio's fraudulent scheme and that it was Curcio who created the fake PSA grades on the cards he sold was abundant and overwhelming. Bondarchuk's testimony provided a timeline and narrative for Curcio's role in the scheme, virtually all of which was corroborated by other evidence, including witness testimony, text and auto-deleting chat messages, digital records from certain of Curcio's devices, financial records, and physical evidence recovered from the defendant's residence or provided by victims to PSA or law enforcement.

## C. The Jury

### 1. Jury Selection

The Court and the parties engaged in a lengthy, methodical jury selection process. During a full day of *voir dire*, the Court individually questioned the potential jurors. (*See Voir Dire* Tr. 1-260.) The juror questionnaire asked potential jurors about their knowledge of the crimes charged, the defendant, and the trading card industry. (*See* Dkt. No. 97-1.) The juror questionnaire specifically asked: "Have you heard, read, or seen anything through the media, internet, or any other source that you think, for any reason, will affect your ability to be a fair and impartial juror in this case?" (*Id.* ¶ 2.) Ultimately, each member of the empaneled jury made clear through their answers that they could be fair and impartial, and the Court individually confirmed with the Government and defense that they were "satisfied with this jury." (*Voir Dire* Tr. 259:11-15.)

### 2.  Jury Instructions

During the course of the two-and-a-half-week trial, the Court instructed the jury every single day, sometimes more than once, to refrain from discussing the case with others and from reviewing outside material. (*See, e.g.*, Tr. 674:17-18 ("Have a nice evening. Just remember, don't discuss or research the case, and keep an open mind. Thank you."); 781:17-18 ("Remember, don't discuss or research the case and keep an open mind. Thank you."); 889:5-7 ("Remember, don't discuss the case. Don't research anything about the case or any cases that are similar. Keep an open mind and have a great weekend. Thank you."); 1054:5-7 ("Remember, don't discuss or research the case and continue to keep an open mind. Thank you."); 1119:23-24 ("Why don't we take a ten-minute break now. Just remember, don't discuss the case and keep an open mind.").) In total, the Court delivered the instruction to the jury at least 17 times during trial.

On January 27, 2026, after the parties' summations, the Court instructed the jury:

> Although during your deliberations you may discuss the case with your fellow jurors, you must not communicate with or provide any information to anyone else by any means. You, thus, must not use any electronic devices or social media platforms to communicate with anyone any information about this case or to conduct any research about this case until I accept your verdict.

(Tr. 2045:3-9.) Additionally, in its final jury charge, the Court instructed the jury that it had to base its verdict only on the evidence heard at trial and nothing outside the courtroom should influence the verdict. (Tr. 2045:13-14 ("You must base your verdict solely on the evidence or lack of evidence"); 2043:5-7 ("Your verdict must be based exclusively upon the evidence or the lack of evidence presented in this courtroom."); 2048:10-15 ("Do not do any research on the internet or otherwise. The reason for this, of course, is that should you be asked to participate in reaching a verdict in this case, the only information you will be allowed to consider is what you learned in this courtroom during this trial.").)

### 3.  Jury Conduct During Trial

During trial, it was apparent that the members of the jury took their obligations as jurors seriously. Throughout the entire trial, there was not a single instance of juror absenteeism or tardiness that delayed court. Indeed, the Court and parties all observed how the jurors paid extremely close attention to the evidence, often taking detailed notes on witness testimony. (*See, e.g.*, Tr. 1873:17-1874:3 (Defense counsel: "I want to thank you for paying such close attention over the last couple of weeks. You have been a remarkable jury in that sense. And even through the toughest parts of the case to listen to, you have paid remarkable attention. We have seen you taking notes. We have seen you keeping your eyes open, and we are grateful. Even during the parts that were really tough, you stayed in the game."); 1986:7-9 (the Government: "When the trial started, you were asked to do three things. The first was, pay attention to the evidence, and you have done that. Thank you."); 1987:1-3 (the Court: "You have paid careful attention to the evidence, and I am confident that you will act together with fairness and impartiality to reach a just verdict.").)

### 4.  Jury Deliberations and Verdict

On January 27, 2026, after the parties' summations, the Court proceeded to instruct the jury on the law. As noted above, the Court specifically reiterated to the jury in its closing instruction that it may not "do any research on the internet or otherwise" because "the only information you will be allowed to consider is what you learned in this courtroom during this trial." (Tr. 2048:10-15.) The jury began its deliberations later that same day.

During the jury's deliberations, it became readily apparent that the jury was diligently considering the evidence. On the first day of deliberations, the jury provided a note informing the Court and parties that it intended to stay late to deliberate until approximately 6:15 p.m. (Tr. 2053:20-23.) That evening the jury ultimately stayed even later to deliberate, until

8

approximately 7 p.m., and sent a note to the Court and parties "asking for a whole lot of evidence" to review in the morning. (Tr. 2054:3-4.) Specifically, the jury requested to review the testimony of four Government witnesses and some of the Government's most powerful evidence, including three different visuals of the creased Michael Jordan card that Curcio repeatedly sold or traded and Curcio's finished cards list saved in the "Ill Eagle folder (Exhibit 4159)." (Dkt. No. 97-5, Juror Note; Tr. 2054:12-21.) In the morning, on January 28, 2026, the jury sent another note requesting "all the digital evidence" introduced at trial. (Dkt. No. 97-6, Juror Note.) The jury's notes indicate that the jury engaged in a thorough deliberative process, focused on the evidence and testimony, prior to reaching a verdict.

### D. Defense Counsels' Post-Verdict Conversation with Certain Jurors

On January 28, 2026, the jury rendered a guilty verdict, convicting Curcio on both counts in the Indictment. Following the guilty verdict and immediately after the jury was dismissed, the defense spoke with several jurors outside the courtroom. The prosecution team did not speak with any jurors after trial.

According to the declarations filed by Nicolas Lussier and Gineen Abuali, two associates on the defense team, they had a post-trial conversation with Juror 4 during which he purportedly stated: (1) his brother had previously traded sports cards, (Dkt. No. 102-1 ¶ 6); (2) he had asked his brother about the value of "a Charizard Pokémon card," (Dkt. Nos. 102-1 ¶ 6; 102-2 ¶ 5); (3) his brother said the card was worth half a million dollars, (Dkt. No. 102-1 ¶ 7; 102-2 ¶ 4). The declarations do not indicate that Juror 4 specified the year or type of Charizard card that was the subject of this purported conversation, or the timing of that conversation, including whether it occurred before or after jury selection. Juror 4 then told lead defense counsel Martin Bell and a reporter, outside the presence of Mr. Lussier and Ms. Abuali, that he "denied having engaged in

any conversations concerning the subject matter of the case" before deliberations. (Dkt. Nos. 102-1 ¶ 8; 102-2 ¶ 5.)

### E. Rule 33 Motion

On February 18, 2026, Curcio filed the instant Rule 33 Motion, arguing that a new trial, or at a minimum a hearing, is warranted on the basis that Juror 4 purportedly received extrinsic evidence during the trial that a Charizard card can sell for $500,000. (Mot. at 1.) Curcio claims this purported extrinsic information is relevant to two evidentiary issues: (1) the market value of a 1999 Pokémon Charizard card that Curcio sold or tried to sell multiple victims; and (2) the fact that Curcio kept what should have been valuable cards based on the PSA grades scattered on the ground and desk instead of in a secure place like a safe. Defense counsel suggests that Juror 4's conversation with his brother could have impacted Juror 4's assessment of the credibility of witnesses who testified regarding valuations of Pokémon cards and supported the jurors' conclusion that Curcio knew the grades were fake and intentionally engaged in fraud because an ordinary collector would not have stored a valuable card the way Curcio did. (Mot. at 14-15.)

### ARGUMENT

Curcio's motion is meritless. The Court should deny the defendant's request for a new trial and a hearing. Even assuming the defendant's allegation that Juror 4 learned the purported extra-record information that a Charizard card was worth $500,000 during the course of trial or deliberations, that information presents no basis for overturning a jury verdict. The purported extra information was harmless given both the limited relevance and duplicative nature of the alleged extra information and the overwhelming evidence at trial of the defendant's guilt. Moreover, a hearing is not justified under the demanding standard for such a hearing, regardless of whether Juror 4 learned extrinsic information.

### A. Applicable Law

#### 1. Federal Rule of Criminal Procedure 33

A defendant "is entitled to a fair trial but not a perfect one, for there are no perfect trials." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 553 (1984).[1] Pursuant to Federal Rule of Criminal Procedure 33, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Courts "exercise Rule 33 authority sparingly" and only in "the most extraordinary circumstances." *United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008). "It is well settled that motions for new trials are not favored and should be granted only with great caution." *United States v. Costello*, 255 F.2d 876, 879 (2d Cir. 1958). "[A] strong presumption exists against setting aside jury verdicts based on charges of juror misconduct." *United States v. Bangiyev*, No. 07 Cr. 331 (NG), 2008 WL 4240005, at *7 (E.D.N.Y. Sept. 12, 2008) (citing *Tanner v. United States*, 483 U.S. 107, 120 (1987)); *see United States v. Stewart*, 317 F. Supp. 2d 432, 436 (2d Cir. 2004) ("[A] defendant who seeks a new trial based on allegations of juror misconduct faces a very high hurdle.").

Because "motions for a new trial are disfavored in the Second Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), a district court, after examining the totality of the evidence and considering objectively all of the facts and circumstances, should grant the motion only if the court finds "a real concern that an innocent person may have been convicted." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992); *see also United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) ("[B]efore ordering a new trial pursuant to Rule 33, a district court must find that there is 'a real concern that an innocent person may have been convicted.'" (quoting

---

[1] Unless otherwise indicated, case citations herein omit internal quotation marks, citations, footnotes, and previous alterations.

*United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001))). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33." *McCourty*, 562 F.3d at 475.

"Rule 33 motions are granted only in 'extraordinary circumstances,' and are committed to the trial court's discretion." *McCourty*, 562 F.3d at 475 (citing *United States v. Torres*, 128 F.3d 38, 48 (2d Cir. 1997)); *see also Sanchez*, 969 F.2d at 1414 (discretion to grant a new trial under Rule 33 should be exercised "sparingly"). The Second Circuit will reverse a district court's denial of a new trial motion only upon a finding that it abused its discretion. *See United States v. Farhane*, 634 F.3d 127, 168 (2d Cir. 2011). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134; *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006). In short, "[i]t is only when it appears that an injustice has been done that there is a need for a new trial 'in the interest of justice.'" *Sanchez*, 969 F.2d at 1414.

### 2. Extra-Record Evidence

The law presumes prejudice from a jury's exposure to extra-record evidence, *see Remmer v. United States*, 347 U.S. 227, 229 (1954), but that presumption may be rebutted by a "showing that the extra-record information was harmless," *Bibbins v. Dalsheim*, 21 F.3d 13, 16 (2d Cir. 1994); *see also United States v. Jefferys*, No. 20-3630, 2022 WL 9627085, at *3 (2d Cir. Oct. 17, 2022) ("Although a defendant's Sixth Amendment rights are implicated and prejudice is presumed when a jury is exposed to extra-record evidence, that presumption may be rebutted by a showing that the extra-record information was harmless."); *United States v. Schwarz*, 283 F.3d 76, 99 (2d Cir. 2002) ("[N]ot every instance of a juror's exposure to extrinsic information results in the denial of a defendant's right to a fair trial. Many such instances do not."). The necessary Rule 33 inquiry is "an objective test," *Bibbins*, 21 F.3d at 17, that focuses on two factors: "(1) the nature of the

information or contact at issue, and (2) its probable effect on a hypothetical average jury." *Farhane*, 634 F.3d at 169.

In making an objective assessment of possible prejudice, the "trial court should assess the 'possibility of prejudice' 'by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware." *United States v. Weiss*, 752 F.2d 777, 783 (2d Cir. 1985) (citing *Sher v. Stoughton*, 666 F.2d 791, 794 (2d Cir. 1981)). A court can conclude that "extra-record information was non-prejudicial if it determines that an abundance of properly admitted evidence relevant to this matter exists." *Weiss*, 752 F.2d at 783. The Second Circuit has long recognized that "[t]he touchstone of decision is thus not the mere fact of infiltration of some molecules of extra-record matter but the nature of what has been infiltrated and the probability of prejudice." *Bibbins*, 21 F.3d at 16.

As to evidentiary hearings inquiring into juror conduct, courts strongly disfavor such post-verdict inquiries. Where, as here, the defendant seeks an evidentiary hearing to determine whether a new trial is warranted, "[t]he standard for conducting a post-verdict jury inquiry . . . is . . . demanding." *United States v. Sattar*, 395 F. Supp. 2d 66, 72 (S.D.N.Y. 2005), *aff'd sub nom. United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009). As the Supreme Court explained:

> Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time . . . after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of post-verdict scrutiny of juror conduct.

*Tanner*, 483 U.S. at 120-21. While a trial court has "broad discretion in reviewing the issue of the prejudicial effect of the infiltration of extra-record evidence into the deliberations of the jury," *United States v. Weiss*, 752 F.2d 777, 783 (2d Cir. 1985), and may inquire into the "circumstances surrounding the jurors' exposure to the information," a judge "may not reach further to inquire

13

into the subjective effect of the information on jurors' mental processes or on the jury's deliberations," *id.*; *see also* Fed. R. Evid. 606(b).

The Second Circuit has cautioned that "post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting jury room deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989). Accordingly, courts should be reluctant to "haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983). A post-trial jury hearing should only be held in the case of "clear, strong, substantial, and incontrovertible evidence that a specific, nonspeculative impropriety has occurred." *Ianniello*, 866 F.2d at 543; *see also Moon*, 718 F.2d at 1234; *King v. United States*, 576 F.2d 432, 438 (2d Cir. 1978). In accordance with this strict standard for a post-verdict evidentiary hearing, district courts routinely deny defense requests for such hearings. *See, e.g., United States v. Baker*, 899 F.3d 123, 131 (2d Cir. 2018) (affirming district court decision to deny post-verdict hearing following juror's email to defense counsel alleging juror misconduct); *United States v. Yeagley*, 706 F. Supp. 2d 431, 435 (S.D.N.Y. 2010) (denying hearing based on "vague and conclusory" allegations of juror misconduct in juror letter).

### B. The Purported Extrinsic Information Does Not Warrant a New Trial or a Hearing

No extraordinary circumstances justifying a new trial—or a hearing—are present here. The Second Circuit has long recognized that "not every instance of a juror's exposure to extrinsic information results in the denial of a defendant's right to a fair trial" and, in fact, "[m]any such instances do not," as is the case here. *Schwarz*, 283 F.3d at 99. Even assuming that Juror 4 received extrinsic information that the value of a Charizard card is $500,000, the presumption of prejudice

is rebutted because the purported extra information was plainly harmless. First, this purported extra information was tangential, at best, to the question of guilt or innocence. Second, the purported extra-record information would have no effect on the hypothetical average jury given the overwhelming independent and corroborated evidence of the defendant's guilt. Lastly, the allegations regarding Juror 4 are ambiguous, and the jury's conduct and the instructions it received indicate the jury properly executed its fact-finding duties. These allegations do not meet the strict standard for a post-verdict hearing on this motion, let alone present a basis for a new trial.

Given the overwhelming evidence of Curcio's guilt at trial, there is no chance that the jury convicted an innocent person. Rather, the jury rightfully convicted the defendant, the mastermind and leader of a scheme to defraud victims by selling and trading sports and Pokémon cards with fake grades that he falsely claimed were issued by PSA. The Court should deny the motion without an evidentiary hearing.

### 1. The Nature of the Purported Extra-Record Information Was Immaterial and Duplicative

Curcio claims that the purported extrinsic information regarding the value of the Charizard card "bore directly" on the "core factual disputes at trial." (Mot. at 2.) On the contrary, the issue of the precise value of a Charizard card was immaterial to guilt or innocence. At no point was the jury required to decide the value of a Charizard card, let alone any other card at trial. The jury only needed to determine whether Curcio had knowingly made material misstatements about PSA's grading of the cards. On that point, victim after victim consistently testified that cards with high PSA grades sell for higher prices than cards with low PSA grades or without PSA grades, that it was material to them whether PSA had graded a card or not, and they would not have bought the cards for those prices if they had known PSA had not given the cards the purported grades. (*See, e.g.*, Tr. 111:12-112:22, 149:12-150:13, 154:12-157:19, 158:22-23, 194:1-15, 307:1-310:12, 321-

324, 379-381, 437-440, 525.) In short, there was no dispute at trial that, generally speaking, trading

cards can sell for significant amounts and sell for more if they receive higher grades from PSA.

Precisely how much any particular card could sell for was thus a tangential issue, at best, during

the trial.

Moreover, the alleged extrinsic information received by Juror 4 that the Charizard card can

sell for $500,000 was cumulative of, and no more prejudicial than, other evidence introduced at

trial regarding the value of the Charizard card. In particular, it was uncontested at trial that a 1999

Charizard card could sell for a substantial amount of money—hundreds of thousands—if graded a

PSA 9 or 10. As discussed above, *supra* at Background Section B, there was substantial evidence

that a 1999 Charizard card graded PSA 10 could range in value from tens of thousands to at least

approximately $400,000. Indeed, evidence at trial showed that not only had multiple witnesses

valued the Charizard card for hundreds of thousands of dollars, but that one had sold for almost

$400,000 in March 2021. (GX 1415; Tr. 345:3-24, 336:11-13, 510:12-13, 580:2-3, 508:16, 717:10-

11, 1169:13-17.) The alleged estimate of Juror 4's brother that a Charizard card could be worth

$500,000 is, accordingly, entirely consistent with the evidence at trial regarding the Charizard

card.[2] That $500,000 is slightly more than the highest recorded sales price is of no moment given

that the specific value of the Charizard card was not in dispute or at issue: rather, the primary

relevance of evidence regarding the price of a Charizard card was to show that, if graded a PSA

10, it was valuable, and that victims therefore were tricked into purchasing the card because of that

purported rating.

---

[2] Defense counsel argued during his summation that the evidence at trial showed the price of the 1999 Charizard card graded PSA 10 varied substantially and described the card industry as "volatile," which was undisputed by the Government. (Tr. 1929:18-1930:10.) Given the range in values in evidence for the 1999 Charizard card, $500,000 is within the range of volatility and is merely another consistent data point with the evidence at trial.

Moreover, the purported extra-record information that a Charizard card can sell for $500,000 was cumulative and less—or at least no more—prejudicial than other evidence at trial that trading cards graded PSA 10 can sell for over a million dollars. Indeed, there was no dispute that trading cards can range in price up to over a million dollars, depending on the card and the PSA grade, which Curcio acknowledged in his own memoir. (Tr. 94:18-19, 242:18-19, 243:12-244:12, 336:11-13, 440:3-6, 507:16-22, 508:17-24; GX 101, 1415). For example, Remington Ewald testified that the trading cards he transacts in range in value from "[a] penny to 1.5 million a piece." (Tr. 242:18-19.) Regarding a 1952 Topps Mickey Mantle card, Ewald testified that he knew that owners of PSA 10s have rejected "an offer for $50 million."

Despite Curcio's claim to the contrary, the Charizard card was not the "cornerstone of Government's case-in-chief" and was not a "core piece of evidence in the Government's case." (Mot. at 3, 8.) The Government introduced evidence of countless other types of cards to which Curcio gave fake PSA grades. Indeed, basketball cards, particularly Michael Jordan rookie cards, featured much more prominently than Pokémon cards during the trial. For example, the Government's summary chart listing the cards about which Jackie Curiel, the PSA witness, testified, explaining why each card does not have an authentic PSA grade, lists 42 cards, including 23 Michael Jordan (mostly rookie) cards, but *no* Charizard cards. (GX 5702.)[3] Notably, the word "Charizard" was not even mentioned in the Government's closing or rebuttal. In sum, the 1999 Charizard card was plainly not the core of the Government's case; the evidence regarding it could have been excised entirely and that would not have affected the outcome of the trial.

---

[3] The chart does include one other type of Pokémon card—a Venusaur card sold to Special Agent Campbell acting in an undercover capacity. (GX 5702.)

17

Curcio argues that the alleged extra-record evidence that a Charizard card can sell for $500,000 was relevant at trial to the inference, argued by the Government, that Curcio knew the grades on his cards were fake because he stored his cards haphazardly instead of securely, as one would be expected to do if one knew the cards were valuable. (Mot. at 9-11.) But the argument that this extrinsic information made the Government's argument meaningfully more compelling so as to render real doubts about the verdict is nonsensical given the evidence at trial. There was abundant evidence that trading cards can command high prices and that collectors typically store valuable cards securely. No less than ten witnesses testified that they store their valuable cards in a secure place like a safe, and that included cards ranging as low as several thousand dollars to hundreds of thousands of dollars. (Tr. 122:10-11, 161:16-162:2, 242:20-243:8, 436:8-14, 374:15-20, 507:11-508:3; 559:16-23, 710:2-5, 1018:15-19, 1189:21-25, 1276:13-1277:2, 1410:14-21.) For example, Brian Rzewnicki testified that, "[a]t one point [his] total collection was probably in the range of 15 to $20,000" and he stored his graded cards in a case to "[k]eep them protected" and "[k]eep them out of harm's way" because "they're worth a lot of money." (Tr. 1276:13-22.) It is common sense, as supported by the witness testimony at trial, that a collector safely stores a card worth even a few thousand dollars; it need not be worth hundreds of thousands of dollars to merit secure storage. The alleged extrinsic information regarding a Charizard card thus did not add anything material to the evidence or strengthen the inference that Curcio knew his cards had fake grades because he did not store them securely. Moreover, Curcio's haphazard storage of his cards was only one factor, among many, from which the jury could reasonably have concluded that Curcio knew the cards had fake grades. The Government mentioned Curcio's manner of storing the cards just once in closing and rebuttal among numerous other more compelling arguments—such as the many label templates on Curcio's devices matching the cards he sold—showing Curcio

18

knowingly sold cards with fake grades because he created the fake grades. (Tr. 1836:6-13; 1972:4-13) Accordingly, for all the reasons described above, the alleged extra-record information was largely irrelevant to the trial.

### 2. The Extra-Record Information Would Be Harmless Given the Overwhelming Evidence of Curcio's Guilt

The alleged extra-record information could not have affected the jury's verdict in light of the other independent overwhelming evidence against Curcio, and therefore the alleged extra-record information was, even if taken to be true, harmless. The trial evidence evincing Curcio's knowledge that the PSA grades on the cards were fake was staggering. Among other evidence, Curcio knew the PSA grades were fake because he printed the fake PSA grades for the very cards he sold. The trial evidence showed at least 17 different examples where Curcio used fake label templates for 17 different fake PSA-graded cards that he sold as part of the charged scheme. (*See* GXs 1407, 1429, 1905, 1912, 2107, 2142, 2195, 2224, 2227, 2232, 2262-63, 2270, 2286, 2296, 2300, 2304, 2325, 2331, 3202, 4430-E4, 4442.) Further, Curcio's text messages with Bondarchuk made clear that he was removing cards from PSA cases, altering PSA labels, and doctoring the cards themselves, such as trying to remove a distinctive crease from a 1986 Michael Jordan rookie card. (GXs 219, 229, 240.) In damning texts with "Dennis" the "Gym Owner", Curcio repeatedly discussed cracking open and resealing PSA cases and buying counterfeit PSA cases from China, and Curcio openly discussed in text messages with Stephanie Brown that he was engaged in "fraud" with trading cards. (GXs 2466-E2, 2359-E3, -E5, -E10.) In addition, Curcio knew that the PSA grades on the cards were fake because he resold the same fake PSA graded cards over and over again. One powerful example was the creased Jordan card, which Curcio variously tried to sell to three different victims as a PSA 9 on eBay, as a PSA 7 on MySlabs, and as an authentic altered card at a card show. (*See* GX 3113, 3301, 4524.)

19

In sum, the evidence that Curcio *knowingly* sold cards with fake PSA grades—the primary disputed issue at trial—was devastating and overwhelming, even considered entirely independently from any evidence related to the Charizard card. Even when a jury is exposed to extra-record information that is "critical to the government's case," which is not the case here, that exposure is not prejudicial "if it concerns a matter as to which there is abundant properly admitted evidence." *United States v. Hillard*, 701 F.2d 1052, 1064 (2d Cir. 1983); *United States v. Menendez*, 763 F. Supp. 3d 538, 548 (S.D.N.Y. 2025) (denying Rule 33 motion based on jury's exposure to extra-record information because there was "abundant properly admitted evidence on the points at issue"); *Loliscio v. Goord*, 263 F.3d 178, 190 (2d Cir. 2001) (citing "'overwhelming evidence'" in finding extraneous information harmless); *Taus v. Senkowski*, 134 F. Appx. 468, 470 (2d Cir. 2005) (summary order) (same). Given the overwhelming evidence of Curcio's guilt, there is no concern here that the jury convicted an innocent person, and thus no new trial is warranted. *See Sanchez*, 969 F.2d at 1414; *McCourty*, 562 F.3d at 475 ("[B]efore ordering a new trial pursuant to Rule 33, a district court must find that there is 'a real concern that an innocent person may have been convicted.'").

Furthermore, the Court's objective observations of the jury, the jury's deliberations, and the Court's instructions to the jury all point to the conclusion that the purported single extrinsic non-inflammatory, cumulative, and immaterial fact provided by Juror 4's brother regarding the potential value of a Charizard card could not have affected the jury's verdict. The Court and the parties noted at the close of trial that the jurors paid extremely close attention to the evidence. (*See, e.g.*, 1873:17-1874:3 (defense), 1986:7-9 (Government), 1987:1-3 (the Court: "You have paid careful attention to the evidence, and I am confident that you will act together with fairness and impartiality to reach a just verdict.").). The Court instructed the jury consistently throughout the

20

trial not to research the case independently. (*See, e.g.,* Tr. 674:17-18, 781:17-18, 889:5-7, 1054:5-7.) The Court reiterated this instruction during its jury charge. (*See* Tr. 2045:3-9, 2048:10-15.) The Court also explicitly directed the jury that it must base its verdict solely on the evidence presented in the courtroom. (*See, e.g.,* Tr. 2043:5-7, 2045:13-14, 2048:10-15.) It is presumed that "jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court." *Baker*, 899 F.3d at 134. In addition, the record shows that the jury followed the Court's directive and diligently considered the evidence during its deliberations. After a two-and-a-half-week trial, the jury deliberated for approximately four to five hours, staying until approximately 7 p.m. on the first day of deliberations. The jury sent two notes asking for substantial and central evidence from the trial, requesting initially eight different items that included the testimony of four Government witnesses, the three versions of the creased Michael Jordan card that Curcio repeatedly sold, and Curcio's finished cards list saved in the "Ill Eagle folder (Exhibit 4159)." (Dkt. No. 97-5.) The next day, the jury requested "all the digital evidence" introduced at trial. (Dkt. No. 97-6.) The diligence of the jury's deliberations show this was not a jury that "ignored the requirement of proof beyond a reasonable doubt, ignored the court's instructions of law, and went outside the evidence to reach an irrational conclusion," to base "its verdict on one irrelevant and extraneous piece of information." *United States v. Spano*, No. 01 CR 348, 2002 WL 31681488, at *8 (N.D. Ill. Nov. 27, 2002), *aff'd in part, vacated in part on other grounds, remanded*, 421 F.3d 599, 605-06 (7th Cir. 2005). Considered together, the overwhelming evidence of Curcio's guilt and the objective evidence that the jury diligently considered the trial evidence and based its verdict on that properly admitted evidence lead inevitably to the conclusion that Juror 4's

purported exposure to the extrinsic information about the price of a Charizard card was harmless, even if such exposure did occur during the course of trial or deliberations.[4]

### 3. No Hearing is Needed

No evidentiary hearing pursuant to Federal Rules of Evidence 606(2) is warranted.[5] The standard for conducting a post-verdict jury inquiry is demanding, and Curcio has failed to establish the need for such a hearing.

There should be no post-trial jury hearing because Curcio has not provided "clear, strong, substantial, and incontrovertible evidence that a specific, nonspeculative impropriety has occurred." *Ianniello*, 866 F.2d at 543; *see also Moon*, 718 F.2d at 1234; *King*, 576 F.2d at 438. The allegation concerning Juror 4's alleged conversation with his brother has multiple deficiencies that should preclude the Court from considering it "competent" and "incontrovertible" evidence of a "specific, nonspeculative impropriety." *Baker*, 899 F.3d at 130. The allegation consists of unsworn hearsay and double hearsay, and is vague, conclusory, and uncorroborated. Courts have

---

[4] The defense claims Juror 4 was likely affected by the purported information provided by his brother who had previously traded cards because of the inherent "trusting, familial relationship coupled with knowledge of the subject matter," *i.e.*, trading cards. (Mot. at 10.) This argument is not persuasive. Putting aside the defense's assumptions about the "trusting" nature of the brother's relationship and the extent of the brother's experience in trading cards, the fact that Juror 4 purportedly received the extrinsic information from his brother does not meaningfully change the analysis that the information is immaterial and harmless in light of the ample evidence at trial about card valuations, the minimal significance of the Charizard card at trial, the Court's instructions to the jury, the jurors' deliberations, and the overwhelming evidence of Curcio's guilt.

[5] Should the Court nonetheless hold an evidentiary hearing, the Government respectfully submits that, for the limited purpose of the hearing, Mr. Bell, Ms. Abuali, and Mr. Lussier should not represent Curcio—meaning not argue on his behalf or put on evidence—and that Curcio should be represented by other members of his legal team, including Meredith Karp, Patrick Barry, and Wendy Wu, who also represented Curcio at trial. Mr. Bell, Ms. Abuali, and Mr. Lussier are fact witnesses to the allegation that Juror 4 improperly relied on extrinsic information, and these three witnesses have conflicting information as to Juror 4's purported admissions about receiving extrinsic information, which would likely be relevant at a hearing. *See* N.Y. Rules Prof'l Conduct 3.7(a) (With certain exceptions, "a lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact").

repeatedly concluded that this type of second- and third-hand information does not meet the rigorous standard for a post-verdict hearing. *See, e.g.*, *United States v. Fumo*, 639 F. Supp. 2d 544, 552 (E.D. Pa. 2009) (concluding that defense counsel's "double hearsay" affidavit, which recounted reporter's interviews with jurors, did not meet standard for post-verdict hearing); *Sattar*, 395 F. Supp. at 77-78 (concluding that hearsay and double hearsay allegations did not warrant hearing); *Busch ex rel. Estate of Busch v. City of New York*, 224 F.R.D. 81, 97-98 (E.D.N.Y. 2004) (noting that trial court may deny claims of juror misconduct on "sole ground that the only proffer in support thereof" is "hearsay allegations"); *United States v. Abcasis*, 811 F. Supp. 828, 836 (E.D.N.Y. 1992) (holding that "frail and ambiguous showing" of "attorney affidavits based on hearsay allegations" can "hardly meet such a stringent requirement"). In other words, such hearsay allegations are not "competent evidence." *Daniels v. Hollins*, No. CV-02-4495 (FB)(LB), 2006 WL 47412, at *8 (E.D.N.Y. Jan. 9, 2006) (denying post-verdict hearing and contrasting with cases involving "affidavits by juror or other witnesses who could testify about particular juror misconduct that they had directly witnessed").

Even assuming the truth of all of the hearsay statements put forth in the declarations, Juror 4 apparently did not specify the timing of the purported conversation between himself and his brother and whether the conversation about the Charizard card took place before or during the trial. Indeed, as the declarants recount in the form of double hearsay, Juror 4 denied to Mr. Bell and a reporter "having engaged in conversations concerning the subject matter of the case before deliberations." (Dkt. 102-1 ¶ 8; *see also* Dkt. 102-2 ¶ 5).[6] In addition, Juror 4's alleged statements

---

[6] Of course, it is in fact unclear from the declarations whether Juror 4 denied having the discussion with his brother during the trial or *ever*. Notably, to bolster its request for a hearing, the defense appears to ask the Court to credit Juror 4's alleged statement about obtaining extrinsic information while implicitly asking the Court to discredit Juror 4's statement to two separate witnesses (including defense counsel) that Juror 4 did *not* obtain extrinsic information during the trial.

are vague as to what type of Charizard card he discussed with his brother, as there are many different types of Charizard cards for different years and with different variations (like holographic or first edition). (*See, e.g.*, Tr. 748:20-749:12; GXs 206 & 214.) In light of these ambiguities as to whether Juror 4 even had an extra-record conversation with his brother during the pendency of the trial, and about anything actually at issue in the trial, Curcio has not met the high standard required of establishing "incontrovertible" evidence of a "specific, nonspeculative impropriety."

Moreover, even assuming Juror 4 received the extrinsic information during trial about the same type of Charizard card about which there was evidence at trial, an evidentiary hearing would add little to the record because a juror can only testify at such a hearing as to whether he or she was exposed to extraneous information, and not regarding a juror's mental processes or deliberations or how the extra-record information affected the verdict, if at all. *See* Fed. R. Evid. 606(b)(1) ("a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment"); *Loliscio* 263 F.3d at 186 ("We then noted that although Federal Rule of Evidence 606(b) permits jurors to testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention, the juror may not go on to testify about the effect of that information on the juror's mental processes or the jury's deliberations."); *Sattar*, 395 F. Supp. 2d at 75 ("This exception is a narrow one, because even when a juror attests to outside information, 'the juror may not go on to testify about the effect of that information on the juror's mental processes or the jury's deliberations.'") (quoting *Bibbins*, 21 F.3d at 17). Juror 4 could clarify, at most, whether he in fact had the conversation with his brother and, if so, when it occurred. And for all the reasons stated above, even assuming the allegation is true, no new trial is warranted, so a hearing would be pointless.

24

Lastly, nothing in record suggests other jurors learned of or were impacted by the purported extra-record info. Indeed, the record suggests that they did not. The Second Circuit has instructed that "absent evidence to the contrary, we presume that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court." *United States v. Cox*, 324 F.3d 77, 87 (2d Cir. 2003) (quoting *United States v. Rosario*, 111 F.3d 293, 300 (2d Cir. 1997)). Thus, to hold an evidentiary hearing to ask whether any other jurors learned the information and to what extent would only be an impermissible fishing expedition. *See Moon*, 718 F.2d at 1234 (2d Cir. 1983) ("A hearing is not held to afford a convicted defendant the opportunity to "conduct a fishing expedition.").

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that Curcio's Motion is without merit and should be denied without an evidentiary hearing.

Dated:     New York, New York
           March 11, 2026

                          Respectfully submitted,

                          JAY CLAYTON
                          United States Attorney
                          Southern District of New York

              By:     _____/s/_____
                          David R. Felton
                          Kingdar Prussien
                          Cecilia Vogel
                          Assistant United States Attorneys
                          (212) 637-2299/-2223/-1084

25