UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 24 Cr. 312 (RA)

ANTHONY CURCIO,

Trial

Defendant.

------------------------------x

New York, N.Y.
January 27, 2026
9:45 a.m.

Before:

HON. RONNIE ABRAMS,

District Judge

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
BY: DAVID R. FELTON
CECILIA VOGEL
KINGDAR PRUSSIEN
Assistant United States Attorneys

SIMPSON THACHER & BARTLETT LLP
Attorneys for Defendant
BY: MARTIN BELL
MEREDITH KARP
PATRICK BARRY
NICOLAS LUSSIER
WENDY WU
GINEEN ABUALI

Also Present:

Angelica Coto, Paralegal Specialist USAO
Christopher Campbell, FBI Special Agent

(Trial resumed; jury not present)

THE COURT: All right. Good morning, everyone. I want to just talk for a minute or two about the conscious avoidance charge. I do think it's a close question for a number of reasons. And so, I will start with the government. I mean, I am fully cognizant of the fact that the government doesn't need to choose between an actual knowledge and conscious avoidance theory, and yet, this trial primarily appears to have been one where the government is alleging actual knowledge. And so I want to hear you out on why a conscious avoidance charge is appropriate here.

I don't know who is speaking to this issue. All right. Great.

MS. VOGEL: Thank you. We do believe it's appropriate here. I think -- you know, there's two criteria: First, that the defendant has asserted the lack of specific aspect of knowledge required for conviction. There is no question here that the defendant is disputing that he knew that the cards he was selling were in fake holders with fake grades and fake labels. That's the core of this case. And, yes, we have evidence that the defendant was creating those very same fake labels and fake holders, but in the alternative, we also have evidence, which I tried to outline in the timeline, that the defendant is constantly being put on notice that he is creating -- that he is selling holders that are fake and that

the grades are fake. And so, we can argue in the alternative that the jury doesn't necessarily need to accept that he is making these. It can be that he is sourcing them from somewhere else already together, but that he knows they are fake because he's put on notice by MySlabs, PSA, and numerous victims over time.

THE COURT: There is no question about that, about the notice. I think there is extensive evidence of the notice. I think the question is, what proof is there that he consciously avoided confirming the fact about which there was a high probability and is in dispute?

MS. VOGEL: So, there was substantial evidence during the trial, first, that -- with the very first incident, that MySlabs incident, May 2022, PSA invited him to send in the card for free for review when they temporarily deactivated the certification. He never did that. And subsequently as well. There is also evidence in the record, the finished cards list, which we admitted as an exhibit, which was taken from his devices; long list of cards. In the Notes column, it shows, and we highlighted some of these -- there are more for the jury to review -- he is noting that numerous certification numbers are deactivated. He obviously -- the evidence in the record is that he never at any point submitted any of his cards to PSA to be reviewed, and that's really in contrast with what all the other victims in the case did.

And I think this is a point -- the defense cited to Corey Trammell as an example of proxy for the defendant's state of mind. I mean, that couldn't be farther from the evidence in the case. Mr. Trammell testified that he learned about a problem with the card the first time. He did then sell one card shortly thereafter for Mr. Curcio, but he then learned about a problem with the second card, and he again notified Mr. Curcio, contacted the FBI immediately thereafter, notified the buyer to whom he just sold the card for Mr. Curcio, and submitted his cards to PSA for review.

So our position is that the record in the trial shows that he at no point took steps to verify the holders or the grades in his cards, which would be sending them into PSA for review or, really, showing them to anyone else, and he never did that. And the reholdering that they point to is not an example of him doing that. That was very early in the process of the charged conduct. It was October 2022. And, in fact, that is just another example of him being put on notice that there is a problem, because the cards are ultimately returned raw to him. So I do think there is evidence in the record showing that he took steps to avoid learning, confirming the truth, which is that there was a problem with the certification numbers and the authenticity of the holders.

THE COURT: OK. Thank you.

So, Mr. Bell, I am going to turn to you. So, in the

*Addario* case, the Second Circuit appeared to endorse the notion that an appropriate factual predicate to give a conscious avoidance charge is -- can be shaped in part by defense theory at trial. And here, looking at your letter, you say, among other things, that Curcio had no reason to doubt the authenticity of cards or holders obtained from a different source or at a different time. If that is -- I'm sorry, I didn't realize you are arguing. If that is the defense, or part of the defense, why is a conscious avoidance charge not appropriate here?

MR. LUSSIER: Your Honor, I think we focus on the deliberate actions, the lack thereof, of the defendant, in that he is engaging with PSA and the marketplace. I think Attorney Vogel referenced some decertification that happened. Well, those decertifications were only possible because Mr. Curcio was engaging in the market. He was posting cards on websites like eBay, for example, that have a PSA authentication mechanism. And that way, he is not avoiding or sticking his head into the ground or not following his natural curiosity. He is actively engaging with the very mechanisms in the market that will tell him whether or not something is fake or real or counterfeit.

In our view, the government has just simply -- lacks the evidence to show a deliberate action to avoid engaging with PSA. I think the reholdering example from October 2022 is just

one example, but we also heard testimony from Remington Ewald about how he wasn't allowed to inspect cards at a show. He actually testified about something happening in Chicago that was similar. And also testimony from Daniel Bliss who testified that he also had an opportunity to inspect cards of Mr. Curcio.

This is all to say that Mr. Curcio was not hiding from anything. He was going out and doing what collectors do; engaging with what we would contend is the big -- the elephant in the room, PSA, but also going to card shows, showing people his collection, and that just doesn't ring of avoidance, respectfully.

THE COURT: Thank you.

Ms. Vogel, do you want to respond to that?

MS. VOGEL: I think the key here is that he is avoiding PSA. It is PSA who is able to say that a specific holder is not authentic, and I think that's clear from the record. And other than the reholdering, he never sends in his cards to PSA to be reviewed, despite being notified by victims that there are problems. And, in fact, all of these victims have testified that when they learn there is a problem, they send in their cards to PSA. So, I mean, the fact that he is allowing others to see his cards, I mean, he is trying to sell them, so I don't think that goes to him deliberately engaging -- I don't think it's evidence that he is not avoiding

learning the truth.

MR. LUSSIER: Your Honor, I would just respond and say that this is not a case where Mr. Curcio, like, ran, for example, where Mr. Curcio is telling buyers not to engage with PSA. Quite the opposite. I believe the testimony came in with Mr. Trammell that he was going to be sending cards into PSA for reholdering. And Mr. Curcio did not say, Don't do that, don't engage with PSA. That is not what happened here.

And I would just again cite to the *Graham* case as an example, where there was a defendant who told people not to engage with title companies and not to go and follow their instincts, and confirm their suspicions. And this is not that case.

THE COURT: All right. Thanks.

Are there any other issues that you need any other -- anything you want to discuss about the charge that you need before summations?

I am going to give you a ruling literally in two minutes. I am going to take a five-minute break at most, or a three-minute break -- we are still waiting for a few jurors -- and then I am going to rule so you will know if I am giving the charge or not.

As I understand it, no one has sought for me to change the language of the charge, assuming I am going to give it.

MR. FELTON: No other objections from the government.

THE COURT: OK.

MR. BELL: I think we noted two small --

THE COURT: Yes. Let's talk about them here. Just remind me. Walk me through them.

MR. BELL: I think there was literally a pronoun change that was appropriate.

THE COURT: Yes. OK.

MR. BELL: Then I think there was a charge you had in brackets that would only be activated to the extent that there had been mention of an attorney's involvement in prep sessions.

THE COURT: Right.

MR. BELL: We confirmed that that happened enough that it makes sense to have.

THE COURT: So we are going to have that in. But nothing that affects -- OK.

So, let's just take two minutes. We are going to check on the jurors. As I said, we are missing four a few minutes ago, but I am hoping they will be here shortly. Thanks.

(Recess)

THE COURT: All right, folks. Are you ready?

So, I do believe that a conscious avoidance instruction is warranted. As I said before, based on the government's case, I was skeptical that a conscious avoidance charge was appropriate because so much of the evidence here has

gone to Mr. Curcio's actual knowledge. But that said, given the arguments advanced not only in Mr. Curcio's letter of January 25 and this morning, as well as, you know, some of the cross-examination, I think a conscious avoidance charge is appropriate.

I take Mr. Curcio to be advancing an argument that at least with respect to some transactions, he unknowingly received cards in inauthentic folders from third parties and resold them to his alleged victims without knowing that they were counterfeit. I am looking, for example, at his opposition letter at page 2 that I am quoting: "Mr. Curcio had no reason to doubt the authenticity of cards or holders he obtained from a different source at this time." So I don't think he is -- I think that is -- remains part of the argument that he is making and part of his defense, in addition to what appears to have been part of his defense that he lacked the specific intent to defraud because he acted solely to embarrass or harm PSA.

But, given that Mr. Curcio's theory is at least in part that he unknowingly resold counterfeit holders, and there is an appropriate factual predicate, as noted by the government, to call that theory into question, a conscious avoidance charge is appropriate here. Among other things, the government has pointed to at least one instance in which Mr. Curcio resold a creased Michael Jordan rookie card to Brian Rzewnicki which had previously been rejected by eBay's

authentication program. For the reasons articulated by the government, I think this transaction alone provides a sufficient factual basis for a conscious avoidance charge in that Mr. Curcio made a decision not to investigate further by, for example, sending the card in question and holder to PSA for a final authoritative determination of its authenticity. So that's just one example.

So, for these reasons, I will include the conscious avoidance charge that you have seen in the jury charge.

How many jurors are we still waiting for?

OK. We are still waiting for two jurors. So, unless there are any other issues we need to discuss -- no? OK. All right. So, we will let you know as soon as they get here. Thank you.

(Recess)

THE COURT: Just to confirm, folks, do you have a copy of the witness list and exhibit list to send back?

We are not sending all the exhibits back, but we will make clear that they will all be available to them, including the electronic ones, on a clean computer.

(Recess)

THE COURT: Is everyone ready for the jury?

All right. I think you can bring them in. Thank you.

(Jury present)

THE COURT: Good morning, everyone. Thank you for

braving the traffic and snow. Everyone can be seated. Thank you.

So now, as I noted on Friday, we are going to hear the closing arguments, the summations of the parties. The closing arguments, or summations, are not evidence, but nonetheless, they are important. It's the opportunity for the lawyers to sum up, you know, what they represent the evidence in the case has shown.

Mr. Felton, you may begin.

MR. FELTON: The evidence is now in. It points overwhelmingly to one conclusion: The defendant, Anthony Curcio, is guilty. The fraud is simple. To make money, he lied to victims about what he was selling them. As victim after victim told you, they were paying for PSA's grade on the cards. They told you they wanted the PSA grade because it made the card more valuable and because they trusted PSA's evaluation of their authenticity and the condition of the card. But what the victims got were fake PSA grades.

Curcio lied to victims about the PSA grades on the cards. He made the grades up. He did so by printing fake PSA grades on the labels. By faking the grading, he dramatically increased the value, or the perceived value, of the cards by many thousands, even hundreds of thousands of dollars. So, Curcio came up with the grades. He printed the grades on what looked like PSA labels, and he put the cards in fake or

tampered cases. He sold these creations, his own creations, with fake PSA grades to victims. In short, he ripped them off. For two years, he tricked victims into giving him vast amounts of money based on his lies about the grades. Again and again, he sold these cards with the fake PSA grades. He also conspired -- that just means he agreed with others -- to commit this fraud.

You have heard from ten of his many, many victims, and you have seen evidence of countless more; innocent people to whom Curcio lied about what he was selling them; victims whose money Curcio took based on lies. You have seen Curcio's forgery lab in his home, the loose labels with half the text removed, cracked-open PSA cases, and the templates of the photos that he used to print the labels. Many of these templates perfectly match with the fake PSA grades he sold to victims. This leaves zero doubt that he knew he was selling cards with fake PSA grades because he created the fakes that he sold. And you have seen his text messages which show that the whole operation was a fraud. All of this evidence overwhelmingly proves that the defendant is guilty.

The defendant's scheme was simple: Step one, print fake grades, fake PSA grades; step two, sell cards with the fake PSA grades that he created; step three, make money; step four, when confronted by buyers and card marketplaces, keep lying. Make stuff up. Blame someone else. Play dumb.

Pretend to be a victim yourself. Sometimes, even manipulate the victims and accuse them of being the criminals.

Ladies and gentlemen, this closing statement is our opportunity to walk through the key evidence you have seen and heard over the last two weeks. You have seen lots of evidence that was published only briefly, and at times we have pointed out just a few dozens of clear examples of the fraud. So this is my chance to explain how it all fits. And when you put the pieces together, the picture is clear and it's devastating. The defendant is guilty.

I will spend the first part of today showing how the evidence supports several of the elements of the charged crimes. Then I will spend the rest walking through the overwhelming evidence of Curcio's fraudulent intent; in other words, his intent to lie to people about what he was selling to get money from them.

Let's talk a bit about the charges. Now, Judge Abrams will give you detailed instructions later, and you should follow her instructions on the law. If anything I say differs from what Judge Abrams says, follow her instructions. Let me briefly go through just some of the highlights of what I expect she will tell you.

The defendant is charged with two offenses that all relate to the same fraud scheme: Wire fraud conspiracy and wire fraud. Let's take Count Two, wire fraud, first. It has

two elements -- or three elements to prove beyond a reasonable doubt: First, a scheme to defraud others of money or property by materially false statements; two, the defendant knowingly participated in the scheme with the specific intent to defraud; and three, use of interstate or foreign wires. I will get to these in more detail in a bit. For Count One, wire fraud conspiracy, first, the defendant agreed with at least one other person to commit wire fraud, and two, the defendant knowingly and willfully became a member of the conspiracy with the intent to commit wire fraud.

There is no real question that the third element, the use of interstate or foreign wires, is met here. I expect Judge Abrams will instruct you that a wire includes a wire transfer of money, phone calls, e-mails, or text messages. You saw plenty of those throughout this trial, such as Curcio's messages about ordering counterfeit PSA cases with Jack Zhu in China -- that's Government Exhibit 2390 -- or following the card sale to Ashish Jain in the Chase Bank in Texas, Curcio's texts to Jain, threatening him with violence when he said that the head of the Hells Angels, Rick Fabel, owned the cards and that Fabel had no concern about crossing any rule, law, or boundary. So there's no serious question that interstate or foreign wire element is met here.

The next element, the scheme to defraud others of money or property by materially false statements, is also

easily satisfied here. Here is how it worked in four simple steps: One, print the fake PSA grade on the card; two, lie about the card's grade to the buyer to get more money; three, take the victim's money; and four, if the victim asks questions, play dumb or make something up, and if that fails, threaten and discourage them from telling the police. Curcio knew it would make a big difference to card buyers if PSA had graded a card and, in particular, if it had assigned a high grade. That's why Curcio specifically lied to his victims that his cards had received high PSA grades, because he knew his victims would pay more based on the lies. So that's the scheme to defraud. I am going to break this down a little further.

For step one, printing the fake PSA grade on the card, here is what Curcio did: He made realistic-looking, fake-graded cards. He created and altered and doctored card cases, card labels, and the cards themselves. He made sure to primarily list older cards that largely did not have pictures online in the PSA database. I am going to run through the three categories of evidence that he created and altered and doctored one by one the cases, the labels, and the cards. This is how Curcio deceived buyers by making his fake PSA grades look realistic, allowing him to sell the fake PSA-graded cards for six-figure sums.

First, you saw all of the evidence of Curcio cracking open old PSA cases and buying fake PSA cases from China. Right

here, in Curcio's own words, is Curcio in late November 2023, near the end of the fraud, texting Dennis, the gym owner, one of the people Curcio used to commit this fraud. You will see on top in the green, Curcio writes: "No, I wish. These are cracked off cards, sanded down from 400 to 10,000 grit, then buffed with tiny ass machine." Here is Curcio admitting to experimenting with cracking open the card cases, sanding them down, then using a tiny machine to buff them.

Then below, he admits that this approach of cracking open old PSA cases differed from his other approach of buying counterfeit PSA cases from China. You saw those messages. Those are in evidence as Government Exhibit 2390, where Curcio asked the counterfeiter to make him fake versions of the old PSA case.

Curcio continues in the second message in green: "Yeah, wasn't like that when I started. Used shit from China, which is nearly identical match, but they assembled team and were able to identify some differences. Most of them I know, but high dollar at auction, big money, can have no issues. But it's not easy. Takes me sometimes days to get one good enough to attempt. Then when I do, the welder becomes another issue. Start again. Repeat and repeat. I'll get it right, I always do, just takes time."

Here, Curcio again comes out and flat out admits it: I used to buy fake cases from China. Now I crack off old PSA

cases, sand, buff, and weld them. Sometimes takes days to do this. High dollar at auction, big money, can have no issues.

For the second part of how he executed his fraud, Curcio printed labels, lots of them. He took an old label from a different card, removed all the information except the PSA logo, then printed himself fake high ratings on the scrubbed PSA labels, along with other fake information, and then he put this forged label on the card cases.

Now, this is key, and I will go through this in depth a little bit later, but Curcio printed from templates on his phones and drives the very labels on the fake PSA-graded cards that he later sold to victims in this case. This shows that his fake printing activities were done to sell fake PSA-graded cards to victims, and not for any other purpose.

On the left, Government Exhibit 1429, that's a Michael Jordan card that Curcio traded to Ryan Dills. You will remember him. He was the collector from Georgia who lost around $30,000 because of Curcio's fraud. That card that Curcio traded to Dills has cert number 24489417, PSA 10. On your right is the template from Curcio's phone, same cert number and grade, that he used to print the label on the fake PSA-graded card that he traded to Dills.

For the third part of how he executed his fraud, Curcio altered and doctored cards to make them look higher quality, and even discussed printing fake cards himself. Doing

so allowed Curcio to pass off lower-graded cards or even fake cards as more valuable, higher-graded cards. In Government Exhibit 240, Curcio texts Bondarchuk about the Jordan PSA 7 card: "The thing killing it is this crease, and I think I can get it out." There he is, clear as day, telling Bondarchuk, his coconspirator, that he is going to try to remove a crease on a Michael Jordan card.

Government Exhibit 2466-E6, Curcio texts Dennis, Gym Owner, another coconspirator, that he, quote, "can fix" chipping on the blue part of Pokemon cards if they are, quote, "right on edge." There he is, again, clear as can be, telling a coconspirator that he is going to fix chipping on the edge of a Pokemon card.

Government Exhibit 214 Curcio texts Bondarchuk, "I want to get some card stock and straight up make a card."

Government Exhibit 2366 from September 25, 2023, from Curcio's phone, he had a to-do list, priority list, and that included "test print" a 1951 Mickey Mantle card. This shows another way Curcio intended to carry out his fraud was to print fake cards and sell them too.

Finally, turning to this bottom bullet in red, to execute the fraud, Curcio mainly listed older cards that didn't have pictures on the PSA database. This was by design. This way, victims couldn't compare the fake PSA-graded cards that Curcio sold or tried to sell them with pictures of the real

ones since there wasn't a picture online. This was an important step that Curcio took to make it harder to catch him. Curcio admitted to his coconspirator, Dennis, that we have seen before from the gym sale, and we will keep seeing him, in a text of February 11, 2024, Government Exhibit 2466-E7, quote, "Got it made, not sealed, but all elements finally done. They are going for around 260 to 280 now and I have serial number of one I think is perfect, but checking all sites to guarantee photo does not exist anywhere, if that makes sense."

Here, clear as can be. Curcio says that he is spending a lot of time doing this, making sure, guaranteeing that a photo does not exist anywhere of a card he is looking to sell for 260 to $280,000. If the grades weren't fake, if the product he was selling was real, why would he need to guarantee that a photo doesn't exist? It's obvious. The grades were fake and Curcio knew it. Curcio didn't want his victims to be able to compare his fake PSA-graded cards to pictures of the real thing online. This was all so it would be harder to catch him, to reduce the chances of him sitting in this courtroom today.

Dennis responds in blue: "So if they were to look up the serial number, it's in the system, right?" And Curcio responds in green below: "Of course, all that is covered, but it's going one step further and guaranteeing that no matter how much looking someone did, there is no history of it."

Again, couldn't be clearer. Curcio didn't want his victims to be able to compare his fake PSA-graded cards to pictures of the real ones online. He did so to make it harder to catch him.

This wasn't a small thing. The top left, Government Exhibit 2132, this is from one of Curcio's phones. Curcio created a job for someone to pull all PSA certification numbers from 20,000,001 to 29,999,999. And the bottom right, Jackie Curiel from PSA testified, that range is an early range of certification numbers before images or photos of the cards were taken. That is exactly what Curcio and Dennis, the gym owner, were talking about earlier.

Step two of Curcio's scheme occurred in every card sale in this case. He lied about the card's grade to sell the fake PSA-graded card for more money than the buyers otherwise would have paid. You heard from countless victims that they would have valued the cards dramatically lower if Curcio had disclosed that he, and not PSA, had printed the grade on the card. One by one, each victim told you how important PSA's authentication and grade was to them. It's obvious, they depended on the PSA grade to determine whether the cards were real and how much they were worth. The higher a card's grade, the more money the card's worth and could sell for.

Darren Adams, the card store owner in Washington State, he explained that a card graded as a 10 could be 100

times greater value than a raw card. Ashish Jain, the card collector in Texas who had that transaction in the Chase Bank, he testified that for a valuable Michael Jordan rookie card, even the difference between a PSA 9 and 10 could be significant. A 9 he estimated could be worth $25,000, and a 10 of that same card could be worth up to $500,000, showing the significant differences in value for premium cards especially. Jain explained that it could cost between 10,000 and $15,000 alone just to get a PSA 10 of that Michael Jordan card graded. This is important. It shows that the fact of the grading itself has its own independent value, up to 10 to $15,000. Curcio never told the victims that he, and not PSA, had given the grades on the cards. Curcio knew that PSA's grades drove the value. That's precisely why he printed a PSA grade on the cards rather than selling them raw or as an Anthony Curcio graded card.

Of course, Curcio knew this. In his autobiography, he explained exactly how he knew how important PSA's gradings were to the value. That's the whole reason he carried out the fraud. Of course, he knew that the lies he told about the grades supposedly given to these cards by PSA mattered to buyers.

On your screen is Government Exhibit 101, an excerpt from Curcio's autobiography, which goes directly to Curcio's knowledge and intent. Again, when evaluating Curcio's

knowledge and intent, this couldn't be clearer. The grade, his words, "determined everything." The grade, his words, "determined the worth of the card."

That's why, to take just one example, Government Exhibit 1703, when Curcio was selling cards, like he was here to Michael Grossbarth -- you might remember him. He was the witness who testified remotely from Alabama towards the end of the trial. Curcio specifically referred to the PSA 10 grade in describing what he was supposedly selling, and commanding a $34,550 price for Michael Jordan, John Elway, and other cards. Like every other victim in this case, Grossbarth testified that it was important to him that PSA had authenticated the cards and given the assigned grades. And like the other victims, Grossbarth testified that he wouldn't have paid as much money if he had been told that the cards were not graded or had received lower grades.

Step three of the scheme is self-explanatory: Get money for trading cards in exchange for the fake PSA-graded cards that Curcio sold and traded. We will discuss this in greater detail later when discussing the defendant's fraudulent intent, but for now, there is no real question that Curcio was paid lots of money and received valuable trading cards in exchange for fake PSA-graded cards that Curcio sold and traded.

On top of the slide here is Government Exhibit 1202. That's a $65,000 check that victim Joe Baudo sent for fake

PSA-graded cards. Baudo was the first victim to testify in this case. He was in the steel business and from Ohio. He got into trading cards as a kid with his dad. Curcio lied to Baudo, claiming he was gravely ill. You will recall that Baudo lost over $160,000 from Curcio's fraud and never received a refund.

On the bottom of the slide is victim Ryan Dills' testimony. You might remember him. He was the collector from Georgia who testified about having lost nearly $30,000 on cards he traded as part of Curcio's fraud.

You also saw plenty of step four, and it was at times painful to watch. If a victim asked any questions, Curcio would play dumb or make something up, and if that failed, threaten and discourage the victims from telling the police. We will again get to this later. For now, remember his threats to Ashish Jain, absurdly claiming that the violent and dangerous head of the Hells Angels gang was, in fact, the true owner of the cards and was getting upset with Jain. You will also remember his various lies about where he got the cards from and what he knew about the cards to hide the fact that he printed the fake PSA grade on the cards in order to reduce the chances of victims going to the police. So, the scheme to defraud element is also easily met.

That just leaves the final element: That the defendant knowingly participated in the scheme with fraudulent

intent. I am going to spend a good chunk of time covering this one after I address the agreement element of the conspiracy count. Here, it says, "The defendant agreed with at least one other person to commit wire fraud." A conspiracy just means an agreement to do something criminal. Here, the crime is wire fraud, which we just covered. There is plenty of conspiracy evidence connecting Curcio and Joe Bondarchuk, which we will discuss in detail.

I expect that Judge Abrams will instruct you that to prove a conspiracy, the government is not required to show that a bunch of people sat down at a table and entered into a solemn pact, stating that they formed a conspiracy and spelling out its details and plans. Again, listen to Judge Abrams. Her instructions are what control.

I also expect that Judge Abrams will instruct you in part that different members of a conspiracy can play different roles. Some could be big roles; others could be minor roles. An equal role is not required, but again, as always, listen to Judge Abrams.

Over the next series of slides, I am going to focus on this first element, whether Curcio agreed with anyone to commit wire fraud. He did, with Joe Bondarchuk, with Dennis the gym owner, and Stephanie from the New Jersey card show, though only one other person is needed. Let's start with Bondarchuk, who himself pled guilty to wire fraud conspiracy and wire fraud for

his role in the scheme.

The evidence is clear that at Curcio's direction, Bondarchuk traveled to Texas to sell fake PSA-graded cards to Ashish Jain at a bank, met Ryan Dills at the airport to trade fake PSA-graded cards, and went to Darren Adams' card store to sell fake PSA-graded cards. With Jain in Texas, Bondarchuk got on an airplane from Seattle to Dallas specifically for the purpose of selling fake PSA-graded trading cards together. At Curcio's direction, Bondarchuk went inside the bank to complete the sale while Curcio drove around and checked his phone to respond to any questions that Bondarchuk couldn't handle. In all three instances, with Jain and also with Dills and Adams, Curcio and Bondarchuk agreed to and did commit wire fraud.

Darren Adams, the Washington State card shop owner, you will remember him. He dealt with Bondarchuk in person and Bondarchuk's partner, someone supposedly named John Steele, over the phone. Adams accurately explained their respective roles from his observations of each of them. He said, "Well, Mr. Bondarchuk basically was, I guess, a mule, to use the term. He would be the front guy to go and sell the cards at different shops, or whatever." Adams hit the nail on the head. Curcio used Bondarchuk as a front guy. That's what they agreed to. That's more than enough for a conspiracy.

Adams continued: "He then got John Steele on the phone and referenced to me indicating that he was an attorney.

I looked at the phone. I saw it, that he was his partner, and that he was selling the cards for John Steele. John Steele came across a lot more savvy. He was -- for a person being accused, I was impressed at his response. He handled himself very well, very convincingly in his approach. Definitely the man in charge." You sat through two weeks of this trial. There is no question about it. Bondarchuk was not the man in charge of anything; it was John Steele. Once again, Adams nailed it. Curcio was in charge of the scheme.

Here, on cross-examination, Bondarchuk testified to exactly what Adams said on the prior slide. Bondarchuk agreed to let Curcio use his name, essentially as a front, and his address and his eBay account. Ladies and gentlemen, that's a conspiracy.

You also saw numerous messages between Curcio and Bondarchuk making clear that they agreed to work together to carry out the scheme. You saw Curcio checking on the money time and time again, and Curcio telling Bondarchuk to get ready to join a phone call where he would use a cover story about who he was. It's simple. They talked all the time about their scheme because they agreed to and did work together.

Here, for example, in Government Exhibit 201, is Curcio on the left directing Bondarchuk on the right what to do with their shared pooled set of criminal funds. The top left, Curcio tells Bondarchuk, "Please use my portion." No doubt

what's going on here. Bondarchuk has the funds, the PayPal account. They are sharing a pool of money, and Curcio tells him what to do with it. Bondarchuk sends Curcio a screen shot of the available PayPal funds or, in other words, one member of the conspiracy, Bondarchuk, keeping another member of the conspiracy, Curcio, up to date about the status of their shared pool of money.

Here, for example, Government Exhibit 204, Curcio was on the left, again, directing Bondarchuk what cards to list at what price and what to say about their card inventory. Again, two members of a conspiracy working together, each playing their part.

And by the way, the card in this photo that Curcio sends Bondarchuk, that's a fake PSA-graded card, because in Government Exhibit 4159, that's the finished card tracking spreadsheet that you have seen that Curcio maintained on his computer drives. It shows that despite the PSA 10 grade, Curcio wrote that that card had a print defect.

Here are two more messages showing their criminal agreement. Up top, Government Exhibit 212, Curcio refers to his and Bondarchuk's efforts to sell fake PSA-graded cards to victim Joe Baudo. Again, that's the first victim that testified. That's a joint enterprise. Curcio says, "We wouldn't have gotten more cash from him on initial deal." Couldn't be more clear. "We." It's their joint effort to rip

a victim off and get as much cash as possible for fake PSA-graded cards.

Then lower down in Government Exhibit 228, Curcio writes, "In terms of tomorrow's check clear, let's talk. If your business account is also at BECU and you can transfer there first, then do that and avoid savings altogether. Then, yes, wire out and keep yours out of account it went into."

Curcio is directing Bondarchuk to move money; an example of each of them playing their roles: Curcio in charge, Bondarchuk doing as he is told in order to get his cut of the money.

Here is another message showing their criminal agreement. Up top in Government Exhibit 229, Curcio writes to Bondarchuk: "I may need you for something else. Just looking at scenarios here" -- and they are talking about Joe Baudo -- "him reaching out to PSA or to SGC, the SGC is one I think he'd have heard back from. So, be Ryan Jones if I have to call you. You and I bought the card 50/50 from a guy who had purchased from Golden Auctions. You have been helping me sell my cards."

This is Curcio telling Bondarchuk to hop on a call with Joe Baudo and use a fake made-up story about who he was, that's Ryan Jones, and some card he supposedly owned, but didn't. Then again, this is one more example of Bondarchuk and Curcio agreeing to and, in fact, working together as part of the scheme. Bondarchuk allows Curcio to make up a story to

tell Baudo to further their fraud. And in Government Exhibit 1220T -- that's the transcript of the long, recorded phone call Curcio had with Baudo -- Curcio brings up the name Ryan during the conversation. He is seeking an opening to make the call to Bondarchuk to try to further defraud Baudo. That's 1220T.

Here is a final message showing their criminal agreement, but, of course, there's plenty more. In Government Exhibit 240, Curcio writes to Bondarchuk: "So that Jordan 7 is on its way back to you," which was a break even as it was, "except the thing killing it is this crease, and I think I can get it out."

Once more, Bondarchuk is playing his role as a front for Curcio, receiving a fake PSA-graded card in the mail, here, the creased Jordan that Curcio sold on MySlabs and had to refund. And we will discuss that card a lot later. It shows their mutual trust. Curcio writes to Bondarchuk. He will try to get the crease out of the card to more convincingly sell it to the next victim, and not have a repeat of this failed transaction.

The evidence of Curcio and Bondarchuk's agreement is overwhelming, and this agreement by itself is enough to satisfy the conspiracy count, but I will just quickly note, Curcio agreed with others too as part of the conspiracy, including Dennis the gym owner and Stephanie from the New Jersey card show. You saw the text messages. There is nothing unclear

about it.

Like the messages with Bondarchuk, the messages between Curcio and Dennis are explicit that they agreed to carry out the scheme. In the top message, GX 2466-E6, Curcio tells Dennis that he needs to send him a burner phone to further their agreed-upon work together. In the next series of messages, Curcio in green writes, "Where I got the cards may or may not come into question, but if it does, I need you prepared with same story you said in car. You do that, excellent $$$."

Like Curcio's message to Bondarchuk, where he instructs him to pretend to be someone named Ryan Jones and give an elaborate back story about where he got the cards, here too, Curcio asked Dennis to make up a story, a lie, about Dennis giving Curcio the graded cards that, in fact, Curcio graded himself.

These messages also show their profit motive, with Curcio promising excellent money if Dennis makes up the, quote, "same story he said in car." Curcio also writes about making, quote, "some quick money" by selling fake PSA-graded cards at a card show that Curcio can make with quickness. The messages also show their mutual trust, with Curcio writing to Dennis that he cracked cards out of their cases and sanded and buffed the case to reduce their chances of getting caught. That's Government Exhibit 2466-E6 and E2.

As for Stephanie, Curcio and Stephanie planned trips

to various trading card shows around the country to sell fake PSA-graded cards, and she helped develop cover stories for how Curcio acquired the fake PSA-graded cards, to make it seem like Curcio didn't know the grades were fake, or even was some kind of victim himself. The top message, this was after Stephanie encouraged Curcio to develop a fake hard-to-disprove cover story about where he got his fake PSA-graded cards from, as opposed to the truth, which is that he printed the fake PSA grades himself. Stephanie writes to Curcio: "If you can pull that off without being connected/detected, it's your get-out-of-jail-free card." The reference that Curcio needs to concoct such a lie to get out of jail makes clear their criminal agreement. Likewise, in the bottom two messages, Curcio writes to Stephanie that his frauding skills is high and that he would like to renovate an RV into what he calls a traveling fraud center. These messages also leave no doubt as to Curcio's criminal intent, his agreement with Stephanie to commit this scheme. So the agreement with at least one other person element of the conspiracy count is also met.

As with the regular wire fraud count, that just leaves the intent element. All of the overwhelming evidence you have seen and heard points to a single conclusion: Curcio had fraudulent intent when he sold fake PSA-graded cards to victim after victim. There was a mountain of evidence introduced at trial over the last two weeks. I am going to give you five

additional reasons that you know that Curcio had fraudulent intent. One, he knew the grades were fake. Two, he made even additional lies to buyers beyond just the grade of the card. Three, he resold the same fake-graded cards over and over. Four, he tried to hide his role in the sales. Five, he ripped buyers off to make money or, in other words, he lied to buyers about what he was selling to get money from them.

Let's take number one first. A clear reason that he knew the grades were fake was that he printed the fake PSA grades for the very cards he sold. To be clear, he knew the grades were fake because he printed the labels. This has two parts: First, he had and used PSA grade label templates; and second, he used those very same templates on the fake PSA-graded cards that he sold to buyers. The connection between the two is important because there is no serious dispute that he had the PSA templates all over his home and electronic devices, and that he sold cards to buyers.

As I am about to show, and as the evidence showed throughout this trial, the fact that he had and used PSA grade label templates on the very same fake PSA-graded cards that he sold leaves no question that he knew the grades were fake. It also shows that the purpose of his fake grade printing operation was at least in part to sell fake PSA-graded cards to buyers, and not for some other purpose, such as a vague documentary or some lawsuit.

Now, as Judge Abrams has instructed during this trial, and I expect Judge Abrams will instruct you during the jury charge -- but, of course, listen carefully to Judge Abrams, as always -- a specific intent need not be the defendant's sole or even primary purpose. The defendant may have the requisite intent to defraud even if the defendant was also motivated by other lawful, proper, or neutral purposes or reasons for his actions.

I am now going to walk through 17 different examples where Curcio used label templates for 17 different fake PSA-graded cards that he sold as part of the scheme. So, on the left, Government Exhibit 1429, that's a Michael Jordan PSA 10 card that he traded to Ryan Dills, again, the collector from Georgia who lost about $30,000 as part of the scheme. Dills tried, but never got a refund from Curcio and Bondarchuk. The card traded to Dills has a cert number on your screen here. Dills testified that he valued this card in the 20,000 to $25,000 value range based on the PSA 10 label; that he wouldn't have done this trade if it didn't say PSA 10.

On your right, Government Exhibit 2262, is the template from Curcio's phone; same cert number and grade that Curcio used to print the label on the fake PSA-graded card that he traded to Dills. Again, the fact that Curcio had and used grade label templates on the very same cards that he sold and traded to buyers leaves no doubt that he knew the grades were

fake. It also shows that the purpose of the fake grade operation was at least in part to sell or trade these fake graded cards to buyers, and not for some other purpose.

Here is another example. On the left, Government Exhibit 1407, that's an Akeem Olajuwon PSA 10 card that Curcio also offered to Ryan Dills. On your right, Government Exhibit 2270, that's the template from Curcio's phone. Again, same cert number and grade Curcio used to print the label on the fake graded card he offered to Dills.

MS. VOGEL: On the left there is a third example, Government Exhibit 1912. This is the Michael Jordan PSA 10 card that he sold to Ashish Jain. We mentioned him before. He is the guy that met with Bondarchuk in the bank in Texas. Jain was able to cancel an over $260,000 wire transfer he made to complete this transaction. You see the card on the left that Curcio sold Jain. You see the cert number and the grade.

On the right, Government Exhibit 2227, that's a template from Curcio's phone. Same cert number and grade Curcio used to print the label on the fake PSA-graded card that he sold Jain. This also shows that Curcio was behind the Jain transaction since he had the label template on his phone, even if Curcio sent Bondarchuk to be the front and meet with Jain in person at the bank.

On the left, Government Exhibit 1905, that's another Michael Jordan PSA 10 card that Curcio sold to Ashish Jain.

See the cert number and the PSA 10 grade. On your right, that's the template from Curcio's phone. Same cert number and grade that Curcio used to print the label on the fake PSA-graded card he sold to Jain. Again, the fact that Curcio used grade templates on the very same cards he sold to buyers leaves no doubt he knew the grades were fake.

On the left, Government Exhibit 3202, that's a Stephen Curry PSA 10 card that Curcio sent to Corey Trammell. He was another collector from Georgia who wanted to collect cards for his kids, and he helped sell cards for Curcio and never got a refund. That card Curcio sent Trammell has a cert number on your screen. On your right, Government Exhibit 2107, that's a screen shot on Curcio's phone of a physical label taped down. You see a barcode is missing in 2107, showing Curcio's manipulation of it.

Here on your left, Government Exhibit 4430-E4, that's a Michael Jordan PSA 10 card that Curcio sold on MySlabs to victim Adam De Lee. That card that Curcio sold has a cert number on your screen. See on the bottom right, Government Exhibit 2263, that's a template from Curcio's phone. Same cert number and grade that Curcio used to print the label on the fake PSA-graded card that he sold on MySlabs in the name of Joe Bondarchuk. Again, the fact that Curcio had and used grade templates on the very same cards that he sold to buyers leaves no doubt Curcio knew the grades were fake. This also shows

that Curcio was behind the Bondarchuk-MySlabs transactions since he had the label template on his phone, even if he used Bondarchuk's name on the website.

For this particular victim, Adam De Lee, you might recall Matt Greaney from MySlabs, he testified that De Lee couldn't get a refund from his payment processor or anyone else, so MySlabs ended up refunding his $11,000 for this fraudulent transaction.

On the left, Government Exhibit -- also from Government Exhibit 4430-E4, this is a Michael Jordan PSA 9 card that Curcio sold on MySlabs to victim Jack Zarin Rosenfeld. You see the cert number on your screen. On your bottom right, Government Exhibit 2325, that's another template from Curcio's phone. You know it. Same cert number and grade that Curcio used to print the label on the fake PSA-graded card he sold on MySlabs.

So, when compared to the fake PSA-graded cards that Curcio sold reflected in Government Exhibit 5702, there are ten additional loose labels or templates on Curcio's phone for ten different fake PSA-graded cards that he sold as part of the scheme. You see two of the cert numbers on your screen here, Government Exhibits 2142 and 2195. Three more on the next slide, Government Exhibits 2232, 2286, and 2296. Two more on the next slide, Government Exhibits 2300 and 2304. You will see in 2304, the template only has a barcode and a

certification number. It doesn't have the card description or grade. And then three more on the next slide. Again, the fact that Curcio had and used PSA grade templates on at least 17 of the very same fake PSA-graded cards he sold to buyers leaves no doubt that he knew the grades were fake.

So, how else do you know that Curcio knew that the grades were fake? When you are assessing Curcio's knowledge and fraudulent intent, Curcio's own writings in his autobiography, Government Exhibit 101, are informative. They show that he possessed the necessary knowledge and skill set to alter cards, open and reseal card cases without detection, and change the printed grade on card labels while also updating the barcode on the label. As Curcio himself wrote, he could regrade a PSA 4 Mantle to a PSA 7. That's our case.

Curcio continued. These methods allowed him to improve the grade on quite ordinary cheap cards. Curcio's own prior writings are powerful evidence when assessing Curcio's criminal intent and whether he knew the grades were fake.

How else do you know that Curcio knew the grades were fake? Because he made the fake labels and cases. Again, in his own text messages with Bondarchuk on the screen, Government Exhibit 2119 and 229, Curcio makes clear that he was removing cards from PSA cases, altering PSA logos, and doctoring the physical cards themselves. And you will recall the text we showed earlier, Government Exhibit 240, where Curcio texts

Bondarchuk about trying to get the crease out of that Jordan card they sold on MySlabs. You will also recall the text with Dennis the gym owner where Curcio repeatedly discusses cracking open and resealing PSA cases and buying counterfeit PSA cases from China. That's 2466-E2.

You also know from Jackie Curiel at PSA's extensive testimony that the cases and the labels were, in fact, inauthentic. There is no serious dispute about that. As Government Exhibit 5702, Curiel's chart, makes clear, of the 42 Curcio fake PSA-graded cards, 37 of them had the wrong PSA logo on the holder, or the case, that's a logo that didn't even exist, that the card was most recently put in a case, showing that the cases had to be fake. That's a smoking gun, ladies and gentlemen. That information regarding when the card was put in a case by PSA, that's not publicly available, so Curcio couldn't use it in designing his fake cases.

Likewise, as Curiel testified at length, virtually all of the 42 cases had common defects; a misaligned border texture issue she covered at length. They didn't have crush ribs, which she also discussed, confirming that the holders were fake. Here, Curcio, having pretty much the same issues with around 40 different cards, reveals what's obvious: He knew the grades were fake.

As Curiel also testified, all eight of Curcio's labels that attempted to replicate fugitive ink, which you will

remember was PSA's special fraud detection ink on its labels, had flagrantly counterfeit and poorly done fugitive ink. You see it on your screen. On your right, Government Exhibit 3610, that's authentic fugitive ink, PSA label, zoomed in on. You can see the blue coloring, slightly teal, a regular spacing pattern of the distinct dot matrix. It almost looks like you are picking seats out online for a movie or a sporting event. Each dot is distinct. In contrast, Curcio's effort at fugitive ink on the left, that's Government Exhibit 3614, that was recovered from his home during his arrest. It looks nothing like the real thing. It's black or gray, not blue or teal. The pattern isn't regular or consistent. It's smudged, fuzzy, and blurry, as Curiel testified and you can plainly see.

As for the cards in October 2022 that Curcio did submit for reholdering to PSA, which, to be clear, he didn't try to sell to victims in our case -- these are just cards he sent to be reholdered at PSA -- Curiel confirmed that she reviewed photos of seven of these eight cards and observed, even on those cases, evidence of tampering, the wrong PSA logo, the misaligned border texture problem, and a lack of crush ribs, confirming the inauthenticity of these cases.

As it says on the top of your screen, in Government Exhibit 4159, that's the finished card tracking spreadsheet that Curcio maintained on his drives. He even wrote about one of the PSA reholdered cards that BGS, a different card rating

company, had previously graded the card as a 5.5. Curcio claimed to PSA in the reholdering that this was a PSA 10, yet, in his own records, he noted that this was a BGS 5.5. This right here exposed Curcio's lie. The card was not previously graded a 10 by PSA.

And I want to address the metadata for the finished card tracking spreadsheet. That's 4159-M on your screen. This information, which at first blush is kind of a long string of characters, we submit, this also shows Curcio's lack of good faith. Check out the file path of this spreadsheet where he saves the finished card tracking spreadsheet in a folder titled "Ill Eagle." Two words. He may have spelled it in a clever way, but say it aloud a few times. Ill Eagle. Ill Eagle. Ill Eagle. It's clear that Curcio isn't referring to a sick bird, but rather, his illegal conduct, the charged fraud.

Curiel also testified that she was easily able to determine from photographs that the May 2022 Michael Jordan MySlabs card that you heard so much about at trial, that that card was in an inauthentic holder too because of the poor quality of the fugitive ink on the PSA-graded card label and that same logo problem. Like the others, the logo on the case didn't even exist at the time the card was most recently put in a case. This confirms that the case was inauthentic.

And when PSA offered for Curcio to send the card in for free to resolve any questions about the Michael Jordan

MySlabs card, Curcio refused to do so, just like when Ashish Jain offered to send another Michael Jordan card in for free from the Texas sale and Curcio likewise refused to do so. This shows that he knew the grades were fake. He didn't want PSA to see.

Now, you also know that Curcio knew that the grades were fake based on the haphazard way he stored his cards on the floor in his home and paraded his cards around card shows, and the extremely low prices he charged for the cards. The card collector witnesses testified across the board that they stored their valuable cards in safes and banks, a far cry from the scattered collection of cards on the floor you see on your screen and saw in some of the other search photos.

Remington Ewald, who encountered Curcio at card shows in Chicago and New Jersey, he noted that he was surprised that Curcio was trying to sell Michael Jordan rookie cards, premium vintage cards, for 10 percent of their value. That's not 10 percent off; that's 90 percent off. He was especially surprised that Curcio was doing so in Chicago where Ewald memorably put it: Michael jordan is more popular than Jesus there. He further noted that if Curcio's cards were real, a single binder that Curcio was parading around at the card show, that he was carrying around without any security, that binder would have been worth between 3 and $5 million. Use your common sense. Curcio knew the PSA grades were fake. His

behavior confirms it. He wasn't walking around with a binder worth $5 million.

How else do you know that Curcio intended to trick people to get their money? He made all sorts of additional lies to buyers beyond just the lies about the card's grade. He lied about his experience and sophistication with the trading cards, and where he got the cards from, to hide the simple fact that he printed the fake PSA grades for the card. In other words, he played dumb. I am going to touch on five of these many additional lies.

Here is one example.

(Audio played)

MR. FELTON: This is Government Exhibit 1220. When Curcio was confronted by victim Joe Baudo, again, the victim from Ohio who lost over $160,000 as part of Curcio's fraud, Curcio absurdly claimed that he didn't know enough about PSA's labels. It's preposterous. It's hard to think of anyone outside of PSA who knew more about PSA's labels than Anthony Curcio. His home was full of them; erased, altered, half empty. His computer was full of PSA label measurements and templates. You just saw countless examples of PSA label templates -- I am not going to go through all 17 of them again -- on his phones that he used to print fake labels, that he used to sell fake graded cards to victims. The lie that Curcio didn't know enough about PSA's labels exposes his

consciousness of guilt and the fraudulent nature of the scheme.

Here in Government Exhibit 2101, it's just one more image from his -- one of Curcio's phones. This is his actually printing a label on one of his label printers at his home. Ladies and gentlemen, of course, he had knowledge of PSA's labels. Here is a second lie, again in Government Exhibit 1220.

(Audio played)

MR. FELTON: When Curcio is confronted by Baudo, he again gives one of his most common lies about where he got the cards from; that he supposedly got the fake PSA-graded cards from some guy Dennis as part of a gym sale. Curcio tells this lie to multiple people to hide the fact that he was printing the fake PSA grades.

Here he is, Government Exhibit 3201-E17, telling the same lie to Corey Trammell, another collector from Georgia who helped Curcio sell cards. He also told Bondarchuk the same thing. In Government Exhibit 1101-E8 he tells the same thing to Luke Raynolds from Florida. He got these cards from a gym sale a few years ago. In other messages, he refers to a gym sale in 2018.

You know where I am going with this. You have seen the chats with Dennis the gym owner. You have seen them today. You have seen them throughout this trial. That story is a made-up lie to hide from buyers that Curcio printed the fake

grades on the cards. By lying about where he got the cards, Curcio claims that he is a victim to hide his role printing the PSA grades. He also uses this gym story as part of a brazen fraud on PSA in which he attempts to use this made-up lie about getting cards from Dennis, supposedly PSA-graded cards that he got from Dennis in a gym sale. He weaponizes this lie to try and get PSA to pay him as part of PSA's guarantee policy. The chats with Dennis expose that not only does Curcio use this made-up story to try to hide from buyers that he put the fake grades on the cards; it's also the fraudulent foundation of his effort to defraud PSA and trick PSA into paying him as part of its guarantee policy.

You have seen some of these before in 2466-E2 and E6. I will walk you through these. Curcio starts the conversation by saying, flat out, "I can make up all the stuff. They aren't going to check." There he is referring to bank documents. He then turns to the lie about where he got the cards, saying, "I need you prepared with same story you said in car. You do that, excellent money." We have seen that one before. Again, this couldn't be more clear. He is paying Dennis to make up a story, his words, about a fake card transaction as part of the gym sale.

2466-E6, Curcio leaves no doubt. This is a total lie. He asked Dennis if he has, quote, "that story down, or you want sent to you just in case?" Curcio offers to send the, quote,

"story" to Dennis. That shows what you all know; that it's a lie. When Curcio sees that Dennis may be reluctant to lie like this, he tries to reassure him, writing, "It won't be shown to anyone without me asking you FYI," and noting that he won't give anyone Dennis' name. As Curcio said, he just needed to have an event that took place which made sense. Again, this is a money grab to scam PSA.

In Government Exhibit 2466-E5, Curcio wrote the following to Dennis: "I need to finish the documents from deal or back-date, just simple contract between us or something to go along with. I may need that anyway as part of guarantee PSA has. Despite all PSA knows I'm behind, they will be forced to pay on that guarantee as long as you exist and are stating you had traded cards to me for two-thirds value of gym."

The supposed 2018 gym sale is a sham. In December 2023, Curcio is writing that he needs to finish documents from a supposed 2018 deal or back-date it as, his words, "something to go along with." Curcio confides that with this lie, if Dennis exists, PSA will be forced to pay Curcio as part of PSA's policies.

As Curcio texted Stephanie a few months later in Government Exhibit 2359-E12, Curcio's plan was to -- this is a quote from that exhibit -- "reek havoc, threatening the company on every front." And that's the business model. "Pay and we go away. We will see how we do against PSA and then

reevaluate." That's exactly what Curcio was doing with Ha, what he and Stephanie discussed. "Reek havoc, threatening the company on every front. Pay and we go away."

A third additional lie is one that Curcio told over the phone when he was pretending to be John Steele. That's the phone call to Darren Adams that you have seen the video and audio of, when Adams confronted Bondarchuk in the store about the PSA grades being fake. That's Government Exhibit 1017T. In that exhibit, Curcio lies. He says that he had a, quote, "receipt" from getting 80 cards reholdered at PSA in 2015. Another lie. PSA never reholdered 80 of Curcio's cards in 2015. The defense's own Exhibit A112, November 8, 2021, was the first transaction between Curcio and PSA. Jackie Curiel testified as much on cross-examination. By lying about this, Curcio again tries to hide his role printing the fake PSA grades by making it seem like PSA had previously authenticated the cards when it had not.

A fourth lie, you will probably remember this one, was when he told Joe Baudo that he was very sick and death was imminent. Curcio lied about this for obvious reasons; to foster trust and earn sympathy from Baudo as part of Curcio's scheme to persuade him to pay even more money and be even less likely to be suspicious of Curcio. It worked. Baudo lost over $160,000, never received a refund. As Bondarchuk testified, Curcio was not gravely ill during this period. It's a lie.

Fifth additional lie that Curcio told a buyer is when he told Ashish Jain in March 2023 that he had never ran into an issue before or an issue before with cards. That's Government Exhibit 1916. You know that's absurd. By this point, in March 2023, he had been blocked by PSA. That was February 2023. EBay, that was November 2022. And MySlabs, that was May 2022. Just a flat-out lie to make Jain less suspicious of him by falsely claiming that he had never had an issue with cards before.

The next reason you know that Curcio didn't somehow have good faith when he sold fake PSA-graded cards to victims is that he resold the same fake PSA-graded cards over and over again. You have seen this one before. This is the creased Jordan card. You have seen it multiple times throughout this trial. Frankly, it obliterates any suggestion that Curcio was acting in good faith. Here it is on the left in Government Exhibit 4524. This is when Curio tried to sell this card on eBay as a PSA 9. Then in the middle, 3113, he tried to sell it on MySlabs, this time as a PSA 7. And then on the right, Government Exhibit 3301, when he sold it to Dan Bliss, the collector from Vegas who testified near the end of the trial, this time he tried to sell it as an authentic altered card.

Here is how the two-year timeline of this creased card began. On October 18, 2022, there was a $14,000 eBay sale of the creased Jordan as a PSA 9. On Curcio's finished cards

list, Government Exhibit 4159 that we have talked about, the spreadsheet, Curcio included a note, "eBay sale $14,000 (discounted for surface condition)." There is a label template for this card on Curcio's phone. Here is that template. On the left, the card sold on eBay, Government Exhibit 4524. On the right, the template on Curcio's phone, Government Exhibit 2257. The fact that Curcio had and used the PSA grade template on this card, which he sold on eBay, leaves no doubt that Curcio knew the PSA grades were fake.

The two-year timeline continues. Now we are in November 15, 2022. Following the eBay sale, the creased Jordan was returned to Curcio and the buyer was refunded. And this was around the time that his eBay account was shut down, but the card was rejected by the eBay verification program.

Now, February 19, 2023, a few months later. This is the $4,000, approximately, MySlabs sale to Brian Rzewnicki, this time where the creased Jordan is a PSA 7. You will remember Brian Rzewnicki. He is the fire protection worker who lives outside of Chicago. He testified near the end of the trial. He bought a card with one certification number from the card listing, but then the same card with the same crease arrived with a totally different cert number. He was livid.

On the left is the card Rzewnicki saw and bought from MySlabs. You see that certification number. On the right is the template from Curcio's phone, Government 2224. Again, this

is now a second template for this -- different iteration of this card. Again, that Curcio had and used the PSA grade template on a card which he sold on MySlabs leaves no doubt he knew the grade was fake.

This two-year timeline continues. So now we are on May 2, 2023. Curcio and Bondarchuk refund Rzewnicki, and Curcio texts Bondarchuk. You have seen this one earlier today: "So that Jordan 7 is on its way back to you. The thing killing it is this crease, and I think I can get it out." Curcio was, clear, he was going to physically doctor the card to try and sell it for money.

September 20, 2024, Dan Bliss ultimately gets this creased Jordan in a trade at the Palm Springs card show, but this time graded as an authentic altered. If Curcio had good faith, how could he sell the same card with four different purported certification numbers and three different ratings over the course of two years?

Jackie Curiel testified that a card with a crease like that shouldn't get a PSA 9 or 7. And here, you can see that the creased Michael Jordan card and the different labels and holders is, in fact, the same card. Whether it's the PSA 9 on the left or the PSA 7 on the right, same crease. Likewise, here, you have got the PSA 7 on the left, the authentic altered on the right. You can actually see, if you look closely on the right, the authentic altered one, this is after Curcio texts to

Bondarchuk that he thinks he can get the crease out, you can see there is a little more blue there. I think it's a fair inference that that reflects Curcio's efforts.

Now, this is a new line of topics on the fake graded cards over and over. This is the first of three; more series of cards in which Curcio resold the same fake PSA-graded card multiple times. So, you have got the same card in both pictures here, same certification number. On the left, on September 11, 2023, Curcio sold this card to Michael Grossbarth. That's the remote testimony guy from Alabama. Grossbarth returned it to him.

On the right, just 17 days later, September 28, 2023, Luke Raynolds from Florida buys from Curcio this card on Mercari. This card's case was confirmed and authentic by Jackie Curiel. That's Government Exhibit 5702. Seventeen days after he refunds Grossbarth and receives the card back, he sells it again.

This card here, you have got the same card on the left, Government Exhibit 1703, and Government Exhibit 1226. On the left, this was also from that September 11, 2023 Michael Grossbarth transaction. On the right, this same card, Curcio actually sent it to Joe Baudo on April 27, 2023, and Baudo gave that card to the FBI. So let me be clear about what this means. On your screen, you have got two different transactions with what Curcio claims is the same PSA-graded card. Do the

math. He can't possibly have good faith if he engaged in two transactions with the same fake PSA-graded card five months apart. There is only one real card. It's impossible for there to be two authentic PSA-graded cards with the same certification number. Curcio can't have good faith while selling to Michael Grossbarth a card he already sent to Baudo five months earlier, which Baudo gave to the FBI. Use your common sense.

The final example of this behavior, you have got the same card on the left and the right. It's a PSA 8 Bird/Julius Erving/Magic Johnson. On the left, again, it's the card he sold to Michael Grossbarth, and ultimately Grossbarth returned it and he was refunded. That was on September 11, 2023. On the right, this is from May 18, 2023, from Darren Adams, the shop owner in Washington. Adams returned this card to Curcio. So Curcio sold to Grossbarth four months later, after being confronted by and refunding Adams, the same fake PSA-graded card. You remember that confrontation with Adams. It was heated. Four months after that, he goes and sells the same card to Michael Grossbarth.

The next reason you know that Curcio didn't have good faith is that he used fronts, made-up identities, and at least eight different phone numbers to try to hide his role in the card sales. He did so to hide that he was the one selling the cards with the forged grades.

Now, among the many fronts Curcio used to try and hide his role, Iosif Bondarchuk, you know him. The lawyer, John Steele, with Darren Adams, you know him. His friend's dangerous dad, Rick Fabel, Hells Angels fame, from Ashish Jain, you remember him. And Brendan Wooley, you saw the evidence on his phone, and you saw he used that name and had the business card and had an elaborate LinkedIn page that he used at the Edison, New Jersey card show. You also saw Government Exhibit 5710, at least eight different phone numbers the defendant used to hide his connection to these various identities.

Now, Curcio used the many fronts and made-up identities to hide who he was, not because, as he might argue, he was blacklisted from the card market and had no choice. Not so. The only entities to ban Curcio were PSA, which isn't even a card marketplace, MySlabs, and eBay. So there was nothing preventing Curcio from selling anywhere else in his own name or privately in his own name. In fact, he could and he did sell in his own name, such as when he transacted with Michael Grossbarth and Dan Bliss in September of 2023. Curcio pretended to be Bondarchuk and other people because he knew he could get caught selling these fake graded PSA cards, as it happened with PSA, MySlabs, and eBay, and he didn't want to get caught.

Let's just take the Ashish Jain and Darren Adams in-person transactions as examples. The fact that Curcio used

Bondarchuk, multiple phone numbers, and the fake names John Steele, in the case of Adams, and Rick Fabel in the case of Jain, as fronts when no part of those transactions happened online shows that the use of other identities wasn't about being blocked from doing sales. It's about hiding who he was.

Finally, the evidence overwhelmingly shows that Curcio lied to buyers about what he was selling in order to get money from them. The autobiography, Government Exhibit 101, makes clear that he had prior knowledge of how lucrative trading card fraud could be, and this provided a financial motive for Curcio to engage in the fraud. The end of the first excerpt: "No matter what happened in the economy or stock market, the collectors bought cards. Vintage cards were where the money was." Likewise, Bondarchuk explained that there were times when Curcio brought up that he was short for cash, finances are low, and he was struggling financially. All of that gives him a powerful financial motive to commit the crime.

Another reason you know that Curcio lied in order to make money is that he kept the money from at least six of the victim buyers who never received refunds from Curcio. That includes Joe Baudo, Ryan Dills, Sean McMillan, Corey Trammell, Dan Bliss, and Luke Raynolds.

Curcio's texts with Dennis the gym owner also confirm what you know: His intent was to make money from the fake PSA-graded card sales. In 2466-E2, he says, "We can go make

some quick money." That's Curcio. "At a card show." Clear as can be. His intent was to make money from the fake PSA-graded card sales.

2466-E6, he writes, "We all could use the money." This is Curcio texting Dennis. Again, zero doubt, Curcio lied to buyers about what he was selling to get money from them.

Likewise, in Government Exhibit 219, he tells Bondarchuk to move money quickly out of his account. "Keep eye on account and do not wait for anything once it posts. Move all but 2K or something over to savings or your other BECU account, fast/immediate transfer, etc." Once more, this shows Curcio's intent was to make money, not some other purpose.

In 2359-E9, Curcio, in the green on the right, describes Pittsburgh as a place to make, quote, "good card money even if it's a bad area," in his judgment, and thus, given his clear intent to make money from the scheme, unsurprisingly, he writes to Stephanie, "I am all in though since it's a place to make good card money." In short, there is no question that Curcio lied to buyers about what he was selling in order to get money from them. And so we have got the intent element for wire fraud, that's met, and for wire fraud conspiracy.

Now, in addition to the elements I expect Judge Abrams will instruct you -- and again, listen to Judge Abrams -- that you must also decide whether it's more likely than not with

respect to venue, which is a lower burden of proof as to venue only, but again, listen to Judge Abrams -- whether it's more likely than not that any act in furtherance of the activity occurred in the Southern District of New York, which includes Manhattan. That's called venue, and it's easily satisfied here.

On the top left of your screen, you see the $10,500 wire payment that FBI Special Agent Chris Campbell made as part of the undercover Pokemon purchase he made from Curcio. You see that that wire was sent from Manhattan to Curcio's company, Sportiva LLC, in Washington. That's Government Exhibit 3903. On the bottom of your screen, Chris Efstratiou, the banker at Signature Bank, he explained that he sent the wire from Manhattan. That right there, by itself, easily proves venue for both counts. You also have on the top right that Curcio himself mailed the card to a law enforcement controlled address in Manhattan. That's Government Exhibit 3908. That's further venue proof for the conspiracy.

Now, there's plenty of other venue evidence. I am not going to cover it all, but I do want to cover from Matt Greaney's testimony, the CEO of MySlabs, you heard that MySlabs was based in Manhattan and that's where its registered headquarters was. On your screen, Greaney explained that on at least a dozen occasions he spoke to one of the MySlabs founders, Mr. Masci, about Curcio's harm to MySlabs. During

those calls, Masci was in Manhattan. That right there by itself also proves venue for both counts.

Another category of venue evidence for the conspiracy is the New Jersey card show. That was where Curcio pretended to be Brendan Wooley. On your screen, in 2373 on the left, it shows that Curcio flew into JFK. 2418 in the bottom middle shows at the time he is searching for a Manhattan train station. Then 2372 on the top right shows he went to the trade show in New Jersey. You heard from Special Agent Chris Campbell that any route from JFK to the card show requires traveling through the Southern District of New York. So there is no serious question that venue is satisfied here too.

Now, I am about to sit down. We told you at the start of this trial that this was a case about lies, about deceiving victims, and about making money. You know that the defendant's crimes had a significant cost. Numerous victims lost hard-earned money. Joe Baudo from the steel business in Ohio lost over $160,000. Ryan Dills from Georgia, he lost around $30,000. Corey Trammell, who texted Curcio multiple times, "You alive," and got no response, he lost money as well. Dan Bliss, the collector from Las Vegas who testified at the end of the trial about the Jordan creased card, he never got his money back. Luke Raynolds from Florida who helped sell cards for Curcio, he didn't get his money back either.

Sean McMillan, he was a card collector from San

Francisco who loved trading cards as a kid. He didn't get a response from Curcio or Bondarchuk. He was left to his own devices to try to get his money back. You heard from Adam De Lee, how MySlabs had to reimburse him out of their own pocket.

Ladies and gentlemen, this is not a close case. All the evidence that you have seen points to one and only one conclusion: The defendant is guilty. He tried to cover his tracks to avoid getting caught. He tried to pull the wool over everyone's eyes. He tried to perfect his fake labels and cases and hide behind a maze of fake, made-up identities until he had gotten as much money as he could. At the end of the day, he couldn't outrun the law. He can't duck responsibility, try to claim he was selling cards in good faith, that he couldn't possibly have known something was wrong with the cards. That's ridiculous.

Ladies and gentlemen, every case is important, but not every case is hard. You can see the evidence of the defendant's lies and deceit. You can and must hold him to account. There is one way to do that. When you go back to the jury room, when you look at the evidence, when you use your common sense, you will reach the only verdict that's consistent with the evidence, the law, and your common sense, and that verdict is guilty.

THE COURT: All right. Thank you.

Why don't we just take a very short five-minute break,

and then we will proceed. Thank you. And you are not yet to discuss the case, even with each other.

(Jury not present)

THE COURT: All right. See you in five.

MR. BELL: Judge, may I raise one quick issue?

THE COURT: Sure.

MR. BELL: There is a question, I respectfully submit, of whether Mr. Felton's argument that the absence of a refund in some instances tends to negate good faith, which he offered, I think, in the last 15 or so minutes of his summation, opens the door to some reconsideration of the scope of your Honor's ruling with respect to the refund argument.

I am noting that just because I am a little surprised as to that information being used in that way and given our inability -- and we recognize that, obviously, we are working within the strictures of your Honor's ruling that refunds on their own can't be, you know, sort of -- erase what happened prior, but there is a difference between that and being able to look at the refund as evidence of intent within the overall scheme, which Mr. Felton avails him of -- or avails himself of with that argument.

THE COURT: Let me stop you. Are you talking about where he says numerous victims lost hard money, and then he lists each of them?

MR. BELL: No.

THE COURT: You are talking about further back?

MR. BELL: And I'm sorry I didn't pause the Live Note when it happened just to take advantage of the opportunity to get a closer cite. It wasn't that point, Judge. And, obviously, Mr. Felton has a printed copy of his remarks.

THE COURT: "That's another reason you know that Curcio lied in order to make money is that he kept the money from these six victim buyers who never received refunds from Curcio"?

MR. BELL: That's closer to the whole. I think that's it, yes. And my associate confirms that's exactly what I am referring to there.

So I would just ask your Honor to consider over our pending five-minute break what that does with respect to opening the door to that -- to some version of that argument, not arguing that the mere fact of a refund, obviously, negates what happened earlier, but with respect to, I think, the flip side of what Mr. Felton is arguing.

THE COURT: Mr. Felton, do you wish to be heard?

MR. FELTON: Your Honor, as part of wire fraud charges, the government is required to show that the defendant obtained money or property by means of the material misrepresentations, and I think whether he obtained money -- it was his intent to obtain money or not is something that's hotly contested, and the fact that he kept the money, I think, is

probative of that. I don't think that then opens the door to an argument that because he returned, refunded money to some customers that he didn't have criminal intent. I don't think it works that way, respectfully.

THE COURT: I am inclined to agree with the government, but I will let you know momentarily. Why don't we just take a couple-minute break.

MR. BELL: Very good, Judge. Thank you.

(Recess)

THE COURT: All right, folks. So I am going to bring the jury back in. I do want to note that I am overruling Mr. Curcio's objection with respect to refunds. You know, as I explained previously, the alleged fraud was completed the moment Mr. Curcio received money from his victims, to the extent that that's proven to the jury. That is to say, whether or not he actually kept the money or refunded the money has no bearing on the intent element of the crime. But that being said, as I noted in my endorsement of defense counsel's letter yesterday, Mr. Curcio may use evidence of the refunds for other purposes as outlined in your letter.

MR. BELL: And we appreciate that, Judge. We will do that. I think just to perfect the record with respect to what the objection is, I think it's a matter of just sort of noting that we cannot, I think, as I understand it right now, argue the flip side of Mr. Felton's argument, the one that your Honor

identified. I think that that's a particular restraint -- I think that is largely the reason why we made that in limine motion in the first place, but I certainly take your Honor's ruling. We will abide by it. We will stick to those other purposes.

THE COURT: Again, what he said is that -- and I just want to make sure this is the language we talked about earlier. "Another reason you know that Curcio lied in order to make money is that he kept the money from at least six of the victim buyers who never received refunds."

MR. BELL: That's right, Judge.

THE COURT: And what I am going to instruct the jury, and have already instructed the jury, is that the crime is complete whether or not you give a refund later on.

MR. BELL: I think that's fine. I think the issue is, I don't think I can further add that the fact that he did give a refund later on in some instances bears on intent, the same way that Mr. Felton is able to argue that the ones in the other category do bear on intent, and that's sort of the issue. This is why we made the motion in the first instance, not to sort of bolster the legal fiction that the crime isn't completed, but rather, because despite that fact it is possible, you know, for what happens afterwards to still bear on intent or good faith. That is why we made the motion. I think that Mr. Felton has sort of dropped the rubber to the road in that sense.

THE COURT: What would I even instruct them? I mean, are you disputing that what I said is true?

MR. BELL: I am not, no.

THE COURT: OK. So then tell me exactly what you are asking me to do.

MR. BELL: I think that you would couple your Honor's instruction and highlight the point about how the presence of a refund doesn't make -- doesn't, sort of, void whether a fraud took place, but you can use a later refund as evidence of overall intent with respect to the conduct being discussed. That's essentially what we were looking for later on. And we are not looking to get out from the reach or impact of your Honor's ruling with respect to the completeness of the crime, which is accurate, but these things can still bear on intent in the way that I think we tried to get across in the in limine stages. And we now can't argue the flip side of Mr. Felton's argument.

Mr. Felton didn't need to argue that, obviously, because, again, the crime is already completed, but he has, and he is. And now there is, like, an equities issue. That's all I was trying to note. And I think I have noted my objection for the record. I think there is an instruction or a tweak to that instruction that your Honor can give that still emphasizes the fact that the crime is -- that the crime, if proven, is completed at that point. But this is the point that we were

trying to raise.

THE COURT: And just one other question. Just distinguish for me, because, again -- you agree with me that a refund does not void whether a fraud took place?

MR. BELL: As a factual matter, Judge, it does not. I agree completely.

THE COURT: So tell me how you intend to argue that the refund -- you said it will affect his overall intent. What does that mean?

MR. BELL: I think the idea, Judge, is that you can, for example -- to the extent that somebody follows up a completed fraud with making you jump through a whole bunch of hoops in order to get your money back, or doesn't allow you to get your money back, that that argument is permissible argument, and it's akin to one Mr. Felton just made, in demonstrating that person's intent overall within the scheme. But, likewise, I think there is a flip side of that which you can argue, which we now can't, which is that the occasional presence of those refunds goes and suggests things about their initial intent or overall intent with respect --

THE COURT: But you just said a minute ago that you agree with me that a refund doesn't void the intent at the time a fraud took place.

MR. BELL: But it can provide a window into whether that fraudulent intent existed in the first instance. Both of

those things are true. This is one of those "two things can be true" type things. It absolutely is the case that, assuming for the moment the requisite mental state, the absence of good faith for a completed fraud, then, yeah, the crime is completed. But determining what that mental state was can be a product of looking at evidence of intent that comes afterwards. Those are perfectly compatible sentiments, I would argue here. And we are essentially being barred from being able to argue the back half of that prospect.

THE COURT: Does the government want to respond at all?

MR. FELTON: Your Honor, the government --

THE COURT: I am not sure why you needed to use the word "refund" in the summation, but in any event, just --

MR. FELTON: There are all kinds of, you know -- loss amount is not an element, but the government also introduces the element of loss amount in -- while in communications in fraud cases, if the victim does things after the crime is technically complete are often relevant, you know, aggravators or worthy of the jury's consideration.

I don't think the fact that certain customers got refunds being mentioned during defense's summation, the government wouldn't object to that, but any suggestion that it bears on the defendant's intent is where I think would be inconsistent with the Court's instruction and the law.

And so, I don't know -- you know, if defense counsel can be very careful to just point out the fact of the refunds, but then not take the extra step and argue, And either way, this shows he had good faith and didn't have fraudulent intent, we wouldn't oppose to the bare mention of it without connecting it to intent, but I am a little concerned that the implication will be it goes to his intent.

MR. BELL: So, I will be as careful as I can, Judge, within the room that your Honor's rulings have given us. I do think that your Honor appreciates the issue here that sort of opened up by what Mr. Felton has been able to do because he doesn't have a similar constraint, but there is a difference, I would respectfully submit once again, between arguing as a legal matter if it's a refund, that's it for --

THE COURT: Look, you can argue, obviously, that he didn't have the requisite intent at the time, right, at the time he committed the fraud.

MR. BELL: Correct.

THE COURT: Can you print me the refund instruction that I gave previously. Just give me one second.

(Pause)

THE COURT: I don't think anything that was said during the government's summation changes the instruction that I gave the jury, the limiting instruction.

MR. BELL: I don't think it does, Judge. I am trying

to remember it too.

THE COURT: I am getting it. I am going to read it to you.

MR. BELL: Sure.

THE COURT: What I said is that, "You are about to hear testimony that Mr. Curcio offered and gave a refund to a customer who expressed concern about the card he had purchased from Mr. Curcio. I am instructing you that the mere fact of such a refund cannot be considered evidence of Curcio's good faith, and you cannot use it in determining whether Mr. Curcio intended to defraud the government in the first place or not. This is the case because under the law, if an individual convinces someone to buy something with the intent to defraud them, their subsequent willingness to give a refund does not change the fact that they acted with intent to defraud in the first place. You can continue to use other evidence and testimony to determine whether Mr. Curcio acted in good faith when he sold these items." And that's still the case. I don't think anything Mr. Felton said changes that.

MR. BELL: So, with respect to the parts that follow, "This is the case because under the law," that is essentially untouched by anything that's happened today. I agree with that. I do think that Mr. Felton has been able now to effectively use the mere fact of the absence of a refund after the fact to go to the same issue of intent, and it creates a

one-sided dynamic that we were trying to avoid in filing this motion in the first instance.

MR. FELTON: Your Honor, there's evidence in the record, and the government has elicited it from certain victims, that there were refunds, and pointing out that evidence in the record the government has no issue with, but your Honor's instruction is an accurate statement of law. And so I think that accurate statement of law should be provided to the jury. And I am not sure why it would open up new arguments for defense counsel.

THE COURT: But you are objecting, as I understand it, to their argument that the fact that he did give refunds on some occasions actually does bear on his intent. Is that right?

MR. BELL: I think -- sorry.

MR. FELTON: We are objecting that it negates his intent.

MR. BELL: So, here is perhaps a better way to put this, your Honor. I think that your statement of the law here is correct, that as a matter of law, the presence of a refund does not undo a completed fraud, period. And I think that in any instruction you were to give to the jury, that would remain the bedrock. But that's distinct from saying that the defendant's subsequent actions, including refunds, can't demonstrate the defendant's earlier intent. That is really the

nub. Those are two different things. And we would ask, once again, particularly since Mr. Felton has now been able to avail himself of the other side of that argument, that we be able to do the same.

THE COURT: So, just one more minute, Mr. Bell.

Look, the logic of why a refund can't undo the earlier intent is because it doesn't have bearing on it. You can have intent at the time you do something, but then you can still give a refund later on. Right?

MR. BELL: That's correct.

THE COURT: So tell me how the fact you can argue that the fact that he refunded people affected intent. Just walk me through this a little more clearly.

MR. BELL: So maybe the best way to put it would be this way: Once established by competent evidence, the fact of a completed fraud is not reversed by a subsequent refund, but in determining the intent behind that refund, you can look at the remainder of the scheme, including events that happened afterwards. Events that happened afterwards are, on a multitude of levels, often instructive of what the person's intent prior to the offense was. We see that on a most elemental level when it comes to the cover-up of certain crimes. The crime is already completed, but whether or not there was a cover-up or whether or not somebody was open and notorious about their early actions can be a very important

window into intent.

The refund issue, I would respectfully submit, is just an expression of this same issue. Of course, it's the case that the mere fact of a refund on a completed fraud does not vitiate that completed fraud, but in order to know whether a fraud has been completed, you need to be able to assess evidence of what the person's intent was, and that evidence can take place both before -- can be from before and after in the way that I just suggested.

I worry, Judge, that I am going to go around in circles for you --

THE COURT: I know. There are cases, and I know I cited *Bankman-Fried* when we talked about this before, but Judge Kaplan noted that it's immaterial as a matter of law whether the defendant intended to repay the misappropriated funds because a wire fraud is complete, where, as alleged here, there is an immediate intent to misapply and defraud. Then there are other cases going further back like *United States v. Sindona*, holding that in a bank fraud case, evidence of later refunds is irrelevant because the offense occurred and was complete when the misapplication took place. What might have happened later as to repayment is not material and cannot be a defense.

So, again -- go ahead.

MR. BELL: All of those rulings, Judge Kaplan's ruling in *Bankman-Fried* and others, go to the first part of the

two-step that I am attempting to illustrate. If you have otherwise proven the fraud, it is immaterial that there was later an effort to refund. I agree with that, but you have to go with it as far as it goes.

The question, though, is whether, setting that aside in order to make the determination of what that intent was and whether it was a completed fraud, you can use actions afterwards in order to be able to tell, and this is where I think --

THE COURT: I just don't -- I mean, just given the law I read you, I mean, what are you -- are you citing any cases in support of that statement of the law?

MR. BELL: I have tried, Judge, to -- it's somewhat -- as I noted during our final pretrial conference, Judge, it's a little bit of a bespoke and specific pattern, right, because we are talking about whether, you know, somebody made somebody go through hoops to get their money back in the context of determining, you know, whether they were committed to what they were doing as a fraud in the first instance.

It's a little bit different, and I am not sure -- look, I don't fancy myself a metaphysical pioneer here, but I am not sure -- I haven't been able to find a case that has either taken this up and supported us or taken it up with respect to this specific argument and turned this position down. I don't mean to suggest that it's sort of a, you know, a

first impression type thing, but I do think that there are other cases, analogous cases, that allow in what would otherwise be irrelevant actions or events afterwards in order to establish intent.

*United States v. Seabrook*, which is close to my heart because once upon a time I prosecuted it myself, went to the question of whether the loss after a completed fraud, the subsequent loss that -- or, rather, the subsequent loss that owed to an arrangement reached by bribery, whether that subsequent loss was ultimately admissible. Judge Hellerstein allowed it in as evidence of intent prior to the crime, and the Second Circuit affirmed it. This is at least an analogous case to what I am talking about. Again, the crime was committed. Nobody disputed that. Judge Hellerstein recognized it in -- within that framework. The Circuit recognized it within that framework. But at the same time, it was relevant to the determination of what the intent was prior to the crime.

THE COURT: Look, I am looking at a number of cases here, not just the ones that I cited, but there are others that make clear that in the Second Circuit, facts occurring after an alleged misstatement are not probative of fraudulent intent at the time the statement was made. And here, the fact of later refunds -- and again, I am, you know, now looking back at the *Sindona* case -- is "irrelevant," is the word that the Circuit used, because the offense occurred and was complete when the

misapplication took place. So what happened later as to repayment is not material and could not be a defense.

MR. BELL: The problem, though, is that Mr. Felton has now made half that equation relevant, and we are stuck here behind a wall where we are very limited in our ability to rebut that claim. That is the issue, and that's why I am rasing this again now, because I was prepared to operate within the contours of your Honor's ruling as delivered, but this creates an asymmetry that, you know, given the urgency of this for my client, I have to raise.

THE COURT: Sorry, I am just looking again at the language used.

I am not going to alter my ruling. We are going to bring the jury in. Again, you can talk about refunds, but I think, again, the law that I instructed the jury on previously is still the law, and I don't think that what was said changes that.

MR. BELL: I understand, Judge. Our objection is preserved. We are good to go.

THE COURT: Yes, of course.

(Jury present)

THE COURT: All right. I know that was longer than five minutes. I apologize. We are trying our best, and we really do value your time.

All right. Everyone can be seated. Thank you.

Mr. Bell, whenever you are ready, if you would like to make a closing argument.

MR. BELL: Thank you very much, your Honor.

A. Good morning. We have been around together for a couple of weeks now. They have been action-packed weeks, and we have all, to the extent that we are allowed to, explained to our relatives what we have been up to over the last couple of weeks. Because I am not a juror, I have been able to tell my folks a little bit more than you have been allowed to tell your folks. When people ask me, "Well, what's the defining moment of the trial been?" I have started here:

"In any event, Mr. Bondarchuk, you can only answer the questions you are asked, right?" Mr. Bondarchuk's answer was, "Correct."

This wasn't a sexy detail about cards or serial numbers. This wasn't a matter of equipment being whipped out. This wasn't a flashy moment, but thematically, I submit, it was incredibly important. Throughout his direct testimony, Mr. Bondarchuk had asserted that he had assisted Anthony Curcio in knowingly selling misgraded cards. He asserted that it was a scam, and that the U.S. Attorney's Office, which, of course, had prepped him for weeks and met with him over a year, didn't really ask questions that went any deeper than that.

But when we started asking him questions, more truth, the truth started coming out; that Bondarchuk didn't know it

was a scam at the beginning, that he had reached that conclusion himself, prompted not by anything that Mr. Curcio had told him, but from the complaints from buyers and by his own intuition as the cogs slowly turned. But he hadn't, didn't, in fact, have a factual basis beyond his own surmising to believe that Curcio knew that the cards were misgraded. And sure enough, even after the government examined him again, Bondarchuk did not offer a single statement, a single account of Curcio ever saying as much, that the cards were misgraded, that this was an attempt to defraud customers. It was a whopping departure from what you were promised from Mr. Bondarchuk early on, that he would essentially give you, as a cooperating witness, an insider's view of the conspiracy from his role as front man. But again, Mr. Bondarchuk could only answer the questions that he was asked.

If that was the defining moment of this trial, the strangest moment of the trial happened just a few days later when Special Agent Campbell took the stand. We went through the various and sundry items that had been seized from Mr. Curcio's home back in May of 2024, and there was a note, this note, a note that had been taken from amidst those cards and holders and tools that for some reason the prosecutors only asked Mr. Campbell to read this half of, and he did. And it was interesting enough stuff, I guess. "Submission cards, original grade info." But they completely ignored the other

side of the card -- the other side of the note, the one that confirmed Curcio's plans for a lawsuit, notes that further confirmed that the lawsuit involved PSA, confirming what he had, in fact, told other people, and which we had made great pains to try to prove.

We had to get Agent Campbell to read it. We had to deliver it to you. We literally had to ask the question, then pass the note around so you could see it yourselves. Special Agent Campbell, of course, wasn't able to communicate what was on the other side of the note before we got involved because, again, you can only answer the questions that are asked. The government quite literally wanted to focus on just one side of things.

I don't know why our friends at the Justice Department made their decisions that way in this particular case. I don't know why the Justice Department does a lot of things. I do know that the investigation they did of Anthony Curcio, the process that led to the evidence that you have been shown, focused an awful lot on matters that were never really in dispute, and way too little on key matters crucial to determining Mr. Curcio's innocence or guilt.

They spent a lot of time proving that the cards had been tampered with in ways that PSA could detect. We don't dispute that. They spent a lot of time proving that once PSA deactivated Curcio's account, Curcio and Bondarchuk worked

together to deceive victims about who they were. We don't dispute that either. They spent an awful lot of time eliciting that all of the victims stored their cards in safes, that none of the victims were featured by name in the planning stages of Mr. Curcio's documentary pitch, which not only do we not dispute, but we respectfully submit isn't terribly meaningful, which is fine. These are the questions they asked. These are the answers they got. OK. But they spent precious little time or effort developing or even cracking the seal on the issues that matter the most in this case.

Let's be blunt. This trial is and always has been about Anthony Curcio's intent, period. Full stop. It's about whether Anthony Curcio knew what he was selling when he sold it. And there are issues crucial to that determination that the Justice Department's case has barely touched, that are severely underbaked. Here are three of them:

Were the cards misgraded when Anthony Curcio acquired them, and did he know? How did Anthony Curcio use the tools and for what purpose? And why, not whether, but why were he and Bondarchuk pretending to be other people?

The closing remarks that you heard from Mr. Felton just now were well done. They were polished. They were well organized. They were exactly what you would hope for and expect from a veteran prosecutor. But they also follow the contours of what questions the government actually asked.

Mr. Felton is a very good prosecutor, but he is not a magician, and the remarks are only based on the evidence that you have already heard. Again, there was precious little proof on these scores, the ones that matter most. Again, you can only answer the questions that you are asked.

There was lots of proof that Curcio was using aliases and intermediaries, but very little on why. There was lots in the tools found in the basement paraded in front of you, but -- and I will show why this is the case -- very little that really proves how they were used, especially in light of the fact that Curcio was actively trying to work on ways to tinker with PSA's product and prove it could be beaten in order to embarrass them. You can only answer the questions that you are asked and you can only prove what you have evidence to prove.

We understand that in trying to successfully defend Mr. Curcio at trial, we are attempting to do something improbable. The government gets to choose its cases. Why would they choose a loser? But when something improbable happens in life, it's easier to understand if you know the reasons why and how.

During our time together here in these scrambles that we make to get lunch and to get back in through security, some of you may have become familiar with the Burger King over on Broadway a couple blocks from here. If someone told you that they went to Burger King to get a hamburger, and they came back

because they couldn't get one, you would find it hard to believe. Their very purpose is putting hamburgers in your hands. But if somebody told you the how and why -- they didn't get their delivery of beef because of the snowstorm, or because the truck crashed, or because there was a fire -- well, it's a lot easier to swallow what happened.

Sometimes there are cases where the government simply fails to meet their burden of proof. You don't know why, and why isn't explained to you, and it may be hard to believe, but this is a case in which you are going to know and you are going to know why, because the government failed to develop the areas of the case concerning Mr. Curcio's intent, because they outsourced too much of their investigation to PSA, and, most importantly, because they failed to ask the right questions.

So, this is Mr. Curcio's closing statement. This is his opportunity, our opportunity, to show you what the evidence and lack of evidence tell you about this case. I want to thank you for paying such close attention over the last couple of weeks. You have been a remarkable jury in that sense. And even through the toughest parts of the case to listen to, you have paid remarkable attention. We have seen you taking notes. We have seen you keeping your eyes open, and we are grateful. Even during the parts that were really tough, you stayed in the game. You stayed in the game during Jackie Curiel's testimony at the end of a long week, where she spent a day, essentially,

putting together that chart. Your eyes didn't glaze over as you were shown your ninth or tenth 1986 Michael Jordan rookie card, and you all took notes. We want to thank you for that and, indeed, we want to reward you for that.

Throughout this closing, we are going to do the thing that rewards a jury that pays attention. We are going to include citations to the record in little yellow bubbles that you will see in our presentation. We want to encourage you to take advantage of it, to write notes where you feel compelled. I say this because you will be able to get the trial transcripts in your deliberations. You will be able to get testimony in your deliberations, but you are not going to be able to get my arguments. You are not going to be able to get this PowerPoint presentation, so when you do see something, please take notes.

Here is how we are going to proceed: First, I am going to go through what the evidence shows actually happened and didn't happen in this case. Second, we are going to go through ten sources of reasonable doubt. These ten sources are free-standing, but they also interlap. Any one of them, I respectfully submit, is sufficient for you to find Mr. Curcio not guilty. The government faces a high burden here, and there are reasons why you should doubt Mr. Curcio's guilt, doubt based on reason. We will outline those arguments for you here. And third, we will leave you with some parting words before the

deliberations.

But before we get started, I want to say a couple of words about some of the folks involved in the case. First, a word about the government. I want to make clear, ladies and gentlemen, that the government is not on trial here.
Mr. Curcio is. You shouldn't be finding Mr. Curcio guilty or not guilty based on whether you like the tools or methods or decisions that the government did or did not use or make. You should make it just based on whether the proof they have given you demonstrates guilt on every element beyond a reasonable doubt. But understand that the reason why there are certain deficits in the proof is because of focuses the investigation didn't have, because of assumptions it made, because of blind spots that it developed. We will be talking about them so that you can understand them. Just realize as we do so that we are not putting the government itself on trial. That's not the question you are meant to determine.

Second, I want to say a word about the victims in this case and the people adjacent to those victims. Ladies and gentlemen, I do call them victims: Mr. Baudo, Mr. Raynolds, Mr. Jain, Mr. Grossbarth, Mr. McMillan, Mr. Rzewnicki, Mr. Adams. We can go down the list. We say their names, and we call them victims because they are. They purchased misgraded cards. We don't dispute that. We credit their testimony likewise as far as it goes. We were particularly

cautious and respectful in questioning them because they have undergone something and because we honestly don't take issue with their credibility on any score. You can appreciate hearing them, how all of this affected them.

You can appreciate the incandescent rage of Mr. Baudo who had befriended the seller, or thought he had, and sent him a video of his child, who it turns out was somebody whose real name he didn't even know. You can also appreciate his rage even more, knowing, as we learned later, that he has a financial stake in MySlabs, and that the Curcio case has not been good for business for MySlabs.

You can appreciate, likewise, the righteous anger of Mr. Jain. His anger manifested in sort of a combative front, where he only really answered the questions he really wanted to. And you can likewise appreciate the studied calm of Mr. Dills, the testimony of Mr. Grossbarth over the remote. We believe that each of these men testified truthfully about what they experienced, but I respectfully submit that the evidence has shown that these men were downstream victims, downstream from Mr. Curcio, who himself unknowingly bought misgraded cards initially. We will say more on that in a little bit.

Finally, ladies and gentlemen, I want to say a word about Mr. Curcio, my client. And I will be blunt about this. Look, even viewed in the most flattering possible light, Mr. Curcio made some terrible choices over the course of the

period that we have been talking about. He was desperate not to get locked out of the card game by PSA, and he lied to people in order to make that happen. The very fact of enlisting Joe Bondarchuk was essentially in support of a lie.

And, ladies and gentlemen, anybody who knows -- anybody who has lived out there in the world, even a little bit, knows what happens with lies. They lead to other lies. Pretty soon, in order to keep up your front, in order to maintain what you have built, you are flying to Dallas, pretending that your friend from the charity basketball circuit is you, in order to keep your name from filtering back through the buyers of PSA.

And, yes, I will also note that Mr. Curcio had a criminal conviction, that he used language in his private conversations you probably didn't find endearing, and that he had confessed to a number of misdeeds in his earlier book. But, ladies and gentlemen, the question isn't whether you like Mr. Curcio. The question isn't whether you would trust him with respect to your own affairs. The question is whether the government has proven he knowingly, knowingly sold misgraded cards with an intent to defraud beyond a reasonable doubt. As you will see, they haven't.

So with that mind, let's go to the heart of things here. First of all, let's talk about what happened. In order to really understand this case, we have got to go back. How

far back? Way back, way back to prior to the 2009 period, and to Mr. Curcio's memoir. What does that memoir or autobiography, or whatever you want to call it, actually tell us? Well, certainly, it does tell us that he had manipulated cards in the past, and that at one point he had an interest in doing so. It demonstrates that he had a history of tinkering with cards in holders. He was a tinkerer. And even before he was directly at odds with PSA years later, the last couple of years, he was somewhat consumed by this. It shows you that too. And as you will see, he later started to tinker with more of a purpose: To find ways to undermine and embarrass PSA. We all get that.

But I submit that the most important things you can take from that memoir are the following: First, and maybe most importantly, by 2009 he already knew that if you do something that might attract law enforcement's attention, you don't do it in your own name. This is Government Exhibit 101. He discusses his interaction with Detective Bell, no relation. And he says the following: "Anthony was reminded of one thing that day: Never to do anything in his own name again." This was something that he clearly recognized and, in fact, that most people of common sense recognize. Keep it in mind as we go through what happened more recently.

You also learned that he had experience getting burned by people in the card industry who reversed transactions as

soon as they got what they wanted. Keep this in mind too. Remember later on, when Mr. Curcio and Bondarchuk were talking about trying to avoid reversals? This is the series of text messages that Mr. Prussien went through with Mr. Bondarchuk while he was on the stand. "Well, you know that they didn't know who they were dealing with. You know that you have the possibility of getting burned when you don't know who you are dealing with. It would have been a constant concern." And it's a concern that Mr. Curcio knew about firsthand in 2009.

The government tries to suggest that the only reason there is evidence of reversal is to demonstrate that this was done for financial motive or perhaps to suggest a general sort of sneakiness and wanting to move money, or to demonstrate that Mr. Curcio was the one directing Mr. Bondarchuk to move money. We don't take issue with, we don't contest the last thing. Mr. Bondarchuk was largely, so far as we can divine, acting at the direction of Mr. Curcio. But the significance of the reversal awareness here helps to explain why they were looking to move that money before anyone could reverse the transactions.

So, let's fast forward now. Mr. Curcio has had some adventures in the intervening years. He got convicted of a crime that got some notoriety. He's come back out. He's written his book. He has tried to put his life back together again. And some years later, the pandemic hits, and as

Ms. Karp mentioned at the beginning of the trial, it is a major event for the card industry. After Mr. Curcio had done some time in jail, after he had been sobered enough by the experience to write and publish this confessional about his bad decisions in life, he gets back into something he cared about before; his cards.

By the way, ladies and gentlemen, it's worth noting that Mr. Curcio of all people would have been aware that he owed up to his past misdeeds in the most public way possible, that there was already a record out there of his having done unfortunate things with cards. Keep that in mind as well.

In any event, you know that Mr. Curcio had gotten some notoriety about that conviction and that he had acquired in the years since a decent-sized card collection. What you don't have a lot of understanding of is where those cards actually came from. You have got some records of transactions over time, but there are none that are complete on their own terms. The government has given you no real answer as to precisely where the cards came from or in what condition they were in, or what Mr. Curcio knew about their condition with respect to being graded at the time.

There is no exercise that Mr. Felton went through that takes account of all of those cards. And besides, you have also gotten what I would call other accounts of this. You have heard, by the way, that Mr. Bondarchuk said his understanding

was that the cards had come from two sources: First, that Mr. Curcio had just collected a number of cards piecemeal over time; and second, that they had come in through some version of this gym deal. The government has suggested that the gym deal is a complete farce. They haven't proven what actually happened, how the cards came into Mr. Curcio's hand, and whether he knew at the time that there were grading improprieties.

Now, ladies and gentlemen, I do find it interesting that Mr. Curcio within his phone refers to Dennis as "Dennis gym owner." That's not something he is putting out into the public. That's not a reason why there would be a need to construct some sort of artifice. And so it does breathe life into that story, but all we can do is speculate because the government hasn't filled that void. I respectfully submit that these cards were misgraded beforehand, and that Mr. Curcio didn't know it because otherwise, ladies and gentlemen, what happens later makes very little sense.

So let's talk about that. The pandemic hits in 2020. You remember it. We were all inside. And the card market skyrockets because all of a sudden a bunch of bored people, nostalgic for simpler times, are getting into the hobby. If you had a reasonably valuable card collection, as Mr. Curcio thought he did, it's suddenly insanely valuable.

And then, here is Mr. Raynolds on that, the way a

number of people testified to: "What happened to the price of trading cards during the pandemic? Basically, all prices jumped up significantly. Then in 2022, the market returns to earth." Mr. Raynolds told you about that too. As the pandemic ended, people walked away from the hobby. The market was slightly suppressed. And it's that event, the market coming back to earth, that prompts Mr. Curcio to do what a lot of investors do with assets that they own. He wants to sell while the selling is still high.

There were a lot of questions in Mr. Felton's address about, why is it that Mr. Curcio is selling at a discount? Understand that all of that happened inside of a context. And I would submit that that happened inside of a global context, and a context individual to Mr. Curcio. The global context is, you are selling to get what you can get because you know that the market is coming down. Individual collectors have their own notion about just how far down that market is going to go. But with respect to Mr. Curcio -- and we will get to this further in just a minute -- there was a more particular understanding that would prompt him to sell at a substantial discount. He had no idea how long PSA was going to allow him to continue to have access to the market, period. And he wanted to avoid a scenario in which he was stuck with all those cards and no way to sell them.

You know, as some of the victim witnesses testified,

that PSA basically had a monopoly over the market. If you are squeezed out, you are done. Done. And so it makes sense to recoup what you can before you are not able to sell anything at all. There is not that much of a mystery as to the discounts. But I am getting ahead of myself.

So Mr. Curcio has the cards to sell. This is from Mr. Bondarchuk. Bondarchuk said that Mr. Curcio mentioned that some of the cards he's had in his collection, he's collected over time. And the other cards, he stated, he had acquired in the sales transaction of a gym he owned. By the way, in terms of that gym story, there is no particular reason for Mr. Curcio to fool Mr. Bondarchuk, his supposed partner in crime, as to the origins of the cards. Think about that. You can understand how the government thinks that that might be something of a contrivance when presented to outside people, to victims, but why would that be a lie as presented to Mr. Bondarchuk? What would the sense of that be? What would the gain of that be? Why would you lie to your supposed partner in crime about the history of the cards that the two of you are trying to sell to each other? That, at the very least, gives some more air to the gym theory.

Let's move on. "He told you his belief that he had amassed a pretty valuable collection that had become more valuable during the pandemic, right?"

"Correct," says Mr. Bondarchuk.

"And as with any other investment, you want to sell high, right?"

"That's correct too."

But nobody else really tells you much of anything about where the cards came from. Ms. Curiel didn't and couldn't testify to the origins of the cards and their holders.

"So just to be clear, with respect to all of the cards that are at issue with this chart" -- remember the chart was Government Exhibit 5702" -- you have no personal knowledge of where Mr. Curcio obtained these cards in the first place, right?"

"Correct."

"And you have no personal knowledge of the condition in which he received those cards when he received them, right?"

"Correct. Likewise, the buyers had no particular insight into where the cards had come from."

So this is, just by way of example, Mr. Dills and Mr. Trammell.

"Mr. Dills, you don't know in whose hands these cards were before they reached the seller, right?"

Mr. Trammell. "And in that same vein, you don't know where Mr. Curcio got the Venusaur card, right?"

"Correct."

"Putting aside what you've been told, you have no personal knowledge in what condition Mr. Curcio received either

card in right?"

"Right."

Ladies and gentlemen, none of the victims presented by the government had that personal knowledge. And, in fact, none of the witnesses that the government paraded up here had that knowledge either. That's all stuff that is entirely foreign to you, foreign to us because it has been unexplained.

What else do we know about the origins of the cards, about whether there were grading issues at the time, about whether there were circumstances of the acquisition under which Mr. Curcio would have understood that fact? Not much. There is really no proof regarding the condition of these items at the time of their acquisition. The government offers no proof of what Mr. Curcio knew or understood of the cards' or holders' condition prior to his starting to sell them. There is not much to say about that.

Now, I would submit that the reasonable conclusion is that Mr. Curcio doesn't know that there are problems with the holders. He sells a number of them at once, or tries to, for a substantial amount of money, but knowingly selling cards with falsified grades doesn't just create a chance of trouble with law enforcement; it is a certainty. Mr. Bondarchuk for his part testified that he only got involved because he did not know that there were problems with the grades.

So, what actually happens here? Mr. Curcio puts up

that first Jordan card, the one you have heard so much about, on MySlabs. A buyer approaches, but the deal is ultimately scuttled when PSA inserts themselves into it and says they think there is a problem, not with the card, not with the holder, but with the label. By the way, it's important to note that PSA didn't identify a problem with the holder because, as Ms. Curiel testified -- and we will get into this more -- Ms. Curiel doesn't believe that it's actually possible to make a holder that can withstand PSA's scrutiny just using equipment you have at home. We will get back to that in a little bit.

So, there wasn't a problem with the card. It's real. There is a problem with the label. And this, as you can imagine, is news to Mr. Curcio. Now, you know by now, ladies and gentlemen, that Mr. Curcio had a lot of reasons to be skeptical of PSA and its findings. He has long been of the belief that PSA is deeply fallible. You understood from an excerpt of his memoir that he generally had a suspicion of the grading companies because of some of their more dubious practices, because he had learned over the years that they had exhibited signs and instances of bias. He thinks the label is fine. He believes in his purchase, but he and the buyer talk, and by way of a means of conflict resolution, he agrees to refund the money, and the card is returned. That deal is scuttled.

I want to emphasize this because it's so important.

The fact that PSA ended the deal doesn't necessarily mean that Mr. Curcio believed that PSA was right about the cards. He had been skeptical of PSA's accuracy, its fallibility, its integrity, and all of those considerations are relevant here. But one way or the other, Mr. Curcio has a problem now.

"He told you, in sum and substance" -- this is Bondarchuk -- "that the PSA had gotten involved, that they had made a finding that he disagreed with," again, emphasizing the idea that Mr. Curcio resolved the problem, but didn't necessarily credit the idea that something was wrong with the card. He thinks, I know my card, I know what I have put into the market, I have had it for years. There isn't an issue there. And this is PSA being PSA.

"He told you, in sum and substance, that PSA had gotten involved, had made a finding that he disagreed with, and had essentially caused that sale to end, right?"

"Correct."

"And he had indicated that it was a valuable card, right?"

"He did."

"And that he was out a buyer for a valuable card, right?"

"Right."

But now, Curcio has got a problem. He starts to sense that regardless of the merits of PSA's determination, he is on

the wrong side of PSA. He really doesn't want to deal with them anymore, but he still needs PSA in order to sell those cards. Again, you can't really access the market, certainly not with your highest value cards, without a PSA grade. The whole exercising, this whole juncture is frustrating to him. So what does he do? He is tired of PSA's crap, frankly, but he wants to be able to sell cards in a way that doesn't run afoul of them. So what does he do? He tries to get their endorsement. He sends a handful of his most valuable cards to PSA for what's called reholdering. And you heard about this process over the course of the trial. And that makes sense. You get PSA's blessing on the cards to make sure before offering it to a customer that there isn't a repeat of that embarrassing incident that could dirty his name within the market.

And also, reholdering may have made sense for another reason. You heard testimony that people like to have the most recent labels, and that the grades, of course, would be the same. I shouldn't have to tell you this, but the fact that Mr. Curcio sent the cards to PSA for reholdering is incredibly important. For starters, had Curcio known that the cards had fake grades, this would have been a profoundly stupid move. At this point, although his relationship with PSA was flailing after blocking the one transaction, it was one transaction. They hadn't cut him off. They hadn't deactivated him. They

hadn't canceled his account. If he did more to aggravate them, he might get cut off entirely and be stuck with the cards, and that would result in a substantial loss of money.

Sending in misgraded cards for reholdering wouldn't have been like trying to get the cards past some random collector out there. He was sending PSA's own product to PSA for inspection. Jackie Curiel helped to illustrate the difference in this part of her testimony, and it shouldn't be a surprise. She's asked:

"As part of that process, do they reevaluate the grade?"

"I don't think they reevaluate the grade, but they make sure it's authentic."

"So they look at the case, right?"

"Yes."

"They look at the label, right?"

"Yes." This is common knowledge among collectors.

And ladies and gentlemen, if you are going to sell a card that you know is misgraded, you don't send it to PSA first. They are the people best equipped, best positioned, best able to determine that a holder or a label isn't authentic. Mr. Curcio not only does so, but he does so under his own name. As he mentioned, it makes no sense -- and Mr. Curcio specifically knows this -- to send something under your own name that could get you in trouble.

The only way that makes sense to have sent eight holders to PSA and for seven of them to have holder problems is if you didn't know there were holder problems. And that, ladies and gentlemen, is, I submit, the one really unlucky thing that happened to Mr. Curcio to set this entire sequence of events in motion. Maybe it was because a lot of Mr. Curcio's most valuable cards had come from one source. You don't know much about that source because the government hasn't told us anything about that source. Or maybe it was just a matter of unfortunate luck.

Jackie Curiel testified that the industry is rife with counterfeiting, but that ever since PSA and other graders got into the business, the business has also been rife with counterfeiting of their holders and labels. It causes a danger, a potential problem, to every potential purchaser, and Mr. Curcio is just one of those potential purchasers. But the fact that Curcio willingly sent those labels and holders in to PSA, where he knew that they would be reviewed, under his own name, should give you a significant moment of pause.

In any event, PSA red flags the items sent for reholdering. Ladies and gentlemen, if you were willfully and deliberately doing this, you would know that that would happen. Ms. Curiel describes how.

"Noticed the tampering of legitimate holders, as you can see in this picture, frosting around the edges, stuff of

that nature. And then there were also some counterfeit holders as well, and the labels, from my experience, they were cleaned or manipulated in some way."

This happens in October of 2022. So what happens? For a time, PSA holds Mr. Curcio's items without explanation.

"So just to be clear, Mr. Curcio submitted these reholdering requests in October of '22; isn't that right?"

"Yes."

"And then it's your testimony that PSA returned seven of his cards raw in February of 2023. They returned them raw because there wasn't an issue with the cards."

"Correct."

"So there are months between the date of submission and the date that the raw cards were returned, correct?"

"Correct."

You have got a gap of time now between October and February in which Mr. Curcio doesn't know why his items haven't been returned.

"And PSA held onto his cards despite his objections; is that fair?"

"We held onto the cards during the investigation, yes," said Ms. Curiel.

"And it's correct that Mr. Curcio was complaining to PSA throughout that process, right?"

"He was inquiring originally regarding the status of

the orders."

Now, ladies and gentlemen, you can imagine how this made Mr. Curcio feel, somebody who was already deeply skeptical not only of PSA's basic accuracy and integrity, but whether they might challenge him. After all, Mr. Curcio, number one, had a criminal record, apparent when you Google him. That's the notoriety bit that would make it relatively clear that if PSA decides he is not somebody to be trusted, he is not somebody to be trusted. But number two, he had already taken shots at the grading industry in a published book.

Curcio knew all of that, concluded that he is not getting things back with any explanation, which is supposedly the finest customer service that you could get in the grading industry, without any explanation, meant that somehow he had been targeted. Somehow he personally had fallen victim to the various flaws and problems with PSA that he had identified for years.

You know what happens next. By the way, although the card grading process was blind, anybody who knows anything about reholdering knows that the reholdering process itself was not blind with respect to who is sending in the cards. More reason for Mr. Curcio to be deeply skeptical about why they weren't being returned.

Here is Ms. Curiel:

"How, if at all, did PSA maintain a fair and impartial

process for evaluating the holders of those cards that were received from the FBI?"

"We did our normal process in terms of checking the holder and label, and we provided documentation as we do for other customers that are defrauded, so we provide probably the general documentation."

"Was that process blind?"

"We knew who they were coming from, so it wasn't blind in that respect."

In other words, the determinations that they were going to make in the reholdering process, they would make fully aware that Anthony Curcio, aggravating figure within the industry, and, yes, a person with a criminal record, would be the person who had submitted these things for reholdering. Mr. Curcio knew that.

"So just so I have it straight, with respect to cards and holders that you received from the FBI in connection with the investigation, PSA was aware at the time that it was performing its review that those cards had been received from the FBI, right?"

"Yes."

"And that those cards belonged to Mr. Curcio, correct?"

"Yes."

There is significant bias within this process, just as

Mr. Curcio might have imagined.

You also -- and this was surprising, ladies and gentlemen -- have heard the fact that PSA just straight out is not aligned with Mr. Curcio. They don't like him. They view him as a bad actor. It's a relatively rare thing that when you ask somebody, a witness, Do you have a stake in this trial, do you have a stake in what happens to this man, that they would say, Yeah, we do; yeah, we want him convicted. But that's essentially what Ms. Curcio said. She gave a big, long speech when asked this question, and it culminated in, "I do believe that it would be important for us to see someone like that removed from operating in that." This is basically the corporate equivalent of Samuel L. Jackson in A Time To Kill saying, "Yes, they deserve to die, and I hope they burn in hell."

MR. FELTON: Objection, your Honor.

THE COURT: Sustained.

MR. BELL: It's a remarkable thing, and you should keep in mind whenever you consider PSA's role in this case that answer from Ms. Curiel.

What eventually happens? PSA terminates Curcio's account. They blacklist him, essentially, from the card trade because PSA, as some of the victims testified, basically has a monopoly over the higher end of it. You are not going to be able to move cards without getting PSA's blessing. So that

happens in February of 2023. There is no explanation. There is no opportunity to appeal. You saw Government Exhibit 389. That's the rather bare-bones communication that they sent to Mr. Curcio to that degree.

And at that point, ladies and gentlemen, Mr. Curcio is both frustrated and angry. He is frustrated because he doesn't have a mechanism with which to get rid of his cards, and he is angry because he feels that he has been mistreated. At that point, ladies and gentlemen, Mr. Curcio dedicates himself to two courses of action: The first of these is to look to getting around PSA's blocking him by using aliases and ultimately a front man. And you know who that front man was. It was Joe Bondarchuk. And you know what the aliases were. They were Brendan Wooley and John Steele. We don't deny that. It's not a contested fact. He also commits to getting back at PSA by exposing them, considering both documentaries and a lawsuit as a way to lash back out.

Let's talk about the latter of these things first, so getting back at PSA. That the documentary plan was real is something that I think is beyond real dispute at this point. You heard it, among others, from Joe Bondarchuk.

He testified:

"And he told you about a number of things that he wanted to do with respect to a documentary that may touch on his problems with PSA, right?"

"Correct," Bondarchuk says.

"Among the things that he wanted to do was to show documentarians how easy it was to manipulate the PSA process, right?"

"He did mention this, yes."

"He wanted to demonstrate to anybody who would listen, including documentary filmmakers, that PSA was not a sound company with sound processes?"

"That's fair to say, yes."

"He wanted to do it with actual examples, right?"

"I believe so."

Now, ladies and gentlemen, I want you to consider what those last two screens just showed you, because the import here isn't just that Mr. Bondarchuk is mad. He is mad, but he wants to find a way to show a documentarian actual evidence that PSA's systems, that PSA's product isn't worth anything.

"Not those exact words, but in sum and substance, he wanted to make PSA hurt, right? Or perhaps a better term, he wanted to get back at them?"

"Correct."

"And the way that you get back at a corporation is to hit their market share, right?

"I suppose."

Now, the best way to hit PSA's bottom line would be to get at their product, to show that their systems were not all

that they were touted to be. And as Ms. Curiel testified, PSA's holders and labels, those are its product, the fact that they can't be tampered with, the fact that they are supposedly secure. You saw that at page 1439 of the transcript in Ms. Curiel's testimony. So a documentary getting at the idea that those systems could be beat, that those holders and labels could be duplicated at home would have been a disaster, a disaster for PSA.

And so, it may not be how you deal with your anger. It's probably not how I deal with my anger, but the evidence shows that it's definitely how Mr. Curcio dealt with his anger. Mr. Curcio starts amassing tools, cards, holders, and labels. And you saw some of these from the fruits of the search that Special Agent Campbell and his colleagues conducted. One of the important things to realize about this process of trying to manufacture these items at home is that it's relatively unlikely that he would ever actually succeed. Ms. Curiel again told you that.

"To your knowledge, is it possible to print a convincing duplicate of a PSA holder using a 3D printer?

"I think that there are examples that look like the PSA label very closely, but there are identifying factors that we can distinguish the counterfeit from the authentic one."

What's important here, ladies and gentlemen, is that, recognizing that Mr. Curcio had a specific reason at this

point, as supported by Mr. Bondarchuk's testimony and other people's testimony, to try to tinker with and duplicate PSA's technology, that created a responsibility within the government at this trial. Ordinarily, it might be enough to sort of take the various things they found at the search warrant, the acetone, the holders, the labels, copies of those labels, parade them here before you as if they were on sale at QVC, and for Mr. Campbell to essentially testify, Look, tools, and have that be the end of it. But if you understand that Mr. Curcio had another reason to have those tools, to tinker with manufacturing cards, it creates an obligation on the part of the government to do more, to actually demonstrate that the use of those tools was to manufacture cards in service of the fraud that they alleged.

Now, here at least, unlike with the origins of the cards, unlike with their, you know -- the state of the grade at the time they were acquired, here, at least, the government tried. You saw Mr. Felton go through 17, and it was 17, I counted, different instances in which Mr. Curcio had a template that matched one of the cards involved in the case and one of the cards that was physically present at his home. And the conclusion, I think, the government wants you to take from this is that, Oh, well, why would it need to be the exact cards -- why would it need to be the exact cards that exist in reality?

Ladies and gentlemen, one thing they told you nothing

about was, which came first? Did the template come first? Did the card come first? And relatedly, and as importantly, was the purpose to duplicate cards that already existed because that's how you know whether you are putting together a good product? That's how you know whether you are actually making something worthy of putting in a documentary, worthy of embarrassing PSA with.

In other words, ladies and gentlemen, if you were trying to put together the type of PSA mock equipment, mock product that is worthy of potentially fooling top end buyers, the way that you do it is to model it on your top end cards. And so it makes absolute sense, I would respectfully submit, that these cards were based on cards that actually existed in the world, that he had access to because he was involved in transactions concerning those same cards.

There is no great revelation in the fact that there is a corollary between the individual cards that passed through his hands and the individual templates that made their way in. You saw the Google results, and I suspect it was only a portion of the Googling that he did over time, where he would almost obsessively Google fake PSA, PSA templates, as a way to try to manufacture these items. But when you actually get the templates, what you want to be able to do, as a matter of common sense, is compare them, is look at them side by side to figure out whether you have done a good job. So it only makes

sense, ladies and gentlemen, that these correlate to real cards that exist in the universe.

The same thing, ladies and gentlemen, can be said of the templates, the, sort of, little, swirly lines that existed in the background of those labels. Ladies and gentlemen, I take two things from these. Just as was the case with the other templates, he sought to find ways to produce a good product, to essentially build a better mouse trap, the sort of thing that could actually work because he wants to embarrass PSA and wants to eat into their bottom line. He wants to create a case that is bad for business and put it up on Netflix or Hulu, or whoever is going to take it. But ladies and gentlemen, because of this, the fact that that template doesn't really tell you much, other than he had the template, he was using it for that purpose.

I want to mention something important: The government hasn't given you a single witness who, whether as a matter of forensic expertise or whether as a matter of having seen them used, could actually trace, could actually trace a single piece of equipment to a single actually sold card. This is a part of the case that the government completely underbaked. They felt -- this could be understood, I suppose -- that the scene that they came across in Mr. Curcio's basement was sufficiently compelling that they could lay it out in front of you, shrug, and go, Tools. But it's not sufficient, not in light of what

you know about what Mr. Curcio was trying to do, not in light of the fact that Mr. Bondarchuk testified that he was looking to have physical examples to embarrass PSA with. And that's just what he was trying to do, to undermine their brand, to get his revenge. Again, not necessarily the way I would have dealt with being frozen out of the industry by PSA, but I hadn't been frozen out, and it's not my money we are talking about that was invested in those cards; it was Mr. Curcio's money. The problem, of course, is that the government could give you nothing on this.

Here is Special Agent Campbell:

"You don't know when these tools were used, or at least you have no direct knowledge of when these tools were used, right?"

"I don't."

"But you have no idea what sort of quality plastic objects it can print compared to other 3D printers, do you?"

"No."

"And you don't know whether, for example, any 3D printer is capable of printing a PSA grade holder, do you?"

"No."

Now, I should note, ladies and gentlemen, there may have been missed opportunities in that regard. You saw this thumb drive, which was in a, we will now call it, a tan container, that had -- and take a look at it in the jury

room -- an actual designated compartment in the foam for this thumb drive, along with items that, at least by the government's suggestion, were implicated within the fraud. This would have been a pretty good item to take a look at. Maybe there is something that could distinguish this purpose from the purpose of getting back at PSA. But, as Mr. Campbell told you, not only were there no forensic tests performed on any of the equipment, but in this case, nobody bothered to take a look at the thumb drive.

"Now, do you have any familiarity with the contents of that thumb drive?"

"Of the one you're holding, no."

"The one I'm holding."

"No."

"To your knowledge, and you are the case agent, did the FBI look into what's in this thumb drive?" They didn't.

They didn't ask the questions, and you can only answer the questions that are asked.

Likewise, Mr. Bondarchuk, despite his earlier attempts, really can't tell you how the tools or cards or labels were used. He, in this sense, to the extent that he dabbled in this, acted at Mr. Curcio's direction, but can't actually tell you what the purpose was.

He was asked -- this is pages 814 and 15 of the transcript:

"You do not have direct knowledge of what happened with any of these specific cards that you saw Mr. Curcio manipulating; is that correct? In other words, you didn't see directly what he did with them, did you?"

"With the cards?"

"With those specific cards."

"I didn't see what he did to the cards."

"You are saying that with respect to various Michael Jordan cards, you saw Mr. Curcio go right from modifying a card to sending it somewhere out of the warehouse; is that your testimony?"

This was the strongest statement he was able to make:

"I saw it leaving the warehouse in his possession after being modified."

"But you can't account for exactly where it went after it left the warehouse?"

"That's correct."

"And you can't account for any specific Michael Jordan card?"

"That's correct."

A word about the warehouse, ladies and gentlemen. Mr. Bondarchuk testified that he has basically never been in Mr. Curcio's house, so he hadn't been in any of the rooms where this equipment was ultimately found. He did testify that he had been in the warehouse a handful of times, which is where

the interactions that he described with equipment supposedly took place. But understand that in order for, for example, any of this equipment, including for any particular Jordan card, to get from the warehouse to his home, it has to get outside. It has to move from one place to the other. You don't have a record, as it sits right now, of from when to when the warehouse was used, whether the warehouse was still in service at the time that the search took place. You don't have any real evidence of how the warehouse was used beyond Mr. Bondarchuk's very limited testimony. You don't know much about it at all. And I would submit that Mr. Bondarchuk's testimony on this score doesn't close the massive hole in this part of the evidence in terms of what was actually done with this equipment and these labels.

So in light of the fact that Mr. Curcio clearly had another project going on with respect to these items, the government has given you practically no proof of how they were used. The evidence is clear that as part of his plan to get back at PSA, Mr. Curcio looked for homemade ways to show that PSA's systems could be fooled. That, we respectfully submit, is what the tools, the cards, and the labels were for. And there is not a single bit of evidence, no forensic evidence, nothing that conclusively shows that this was used for this, and then this went out the door and was sold; nothing that actually demonstrates anything to the contrary.

Now, I mentioned that Mr. Curcio had committed to getting back at PSA by exposing them, considering the documentaries and the lawsuit. So check mark on that. He also looked to get around PSA, not just get back at them. And he did so by using aliases and ultimately a front man named Joe Bondarchuk.

Now, the Justice Department spent a lot of time proving issues that weren't really contested. We all know, ladies and gentlemen, that Anthony Curcio used the name Brendan Wooley and John Steele, and Joe Bondarchuk served as a front. But the purpose of these shenanigans, I respectfully submit, wasn't to defraud customers; it was to work around PSA. How do we know that? For starters, Anthony Curcio only used Joe Bondarchuk once PSA became a problem.

You heard testimony, I think it's essentially undisputed, that at first Mr. Curcio went through these transactions using his own name. That was true of the '86 Jordan that started all of this. This was also true with the eight items he sent for reholdering.

"These are cards that he had earlier, as you understand it, been selling under his own name, but he couldn't do that anymore, right?"

"Correct."

"And so he needed somebody to serve as a front, and that somebody was you, right?"

"Yes."

"So when you initially got involved," Mr. Bondarchuck was asked, "you didn't believe or understand that any crimes were being committed, right?"

"Yes."

"At worst, you were serving as a front for Mr. Curcio, but it didn't go any further than that, right?"

"Correct."

Here I should say something obvious, and it's something that will ultimately be underscored, I anticipate, by Judge Abrams' instructions on the law. The mere fact that Mr. Curcio and Mr. Bondarchuk deceived victims about who they were does not make them guilty of the crime charged. I am going to say that again. The mere fact that Mr. Curcio and Mr. Bondarchuk deceived victims about who they are does not make them guilty of the crimes charged. The crimes charged involve a specific scheme not to make false statements, not to make false statements, but rather, a scheme to defraud. The purpose of the scheme charged was to -- the thrust of the scheme charged was to defraud people by knowingly using misgrading information to induce them to pay more for these cards than they otherwise would. That's what the government has to prove beyond a reasonable doubt.

So, ladies and gentlemen, your inquiry can't just stop with, well, OK, they lied to these customers, that's bad, and

they are guilty. To be clear, it is bad. It's not great. It is an embarrassing set of conduct on the part of Mr. Curcio. It's something that he deeply regrets, but it's not something that makes him guilty of actually defrauding people, because he had a different purpose, because the purpose was not to commit fraud, but to duck PSA; not to inflate those prices, but to duck PSA. And what underscores that is the fact that Mr. Bondarchuk initially didn't understand the scheme to involve a fraud either, and that's what he says here.

One thing to note, by the way -- so over the next few months, you know exactly what happens. Mr. Curcio, aided by Mr. Bondarchuk, sells a number of cards, and a number of those cards come back, one way or the other, in the form of complaints by buyers or others, depending on those particular facts, because somebody thinks that there is a problem. "I have a friend who is an expert who looked at this and said it's not PSA 10," or, "I took a look at this and -- a closer look at this, and there is a problem." There were so many permutations of this, and I don't have to go over them in detail because Mr. Felton listed a number of them out.

The important thing to realize is this: Those different transactions all went differently. Sometimes the transactions were reversed; sometimes they weren't. Sometimes the parties met in person with Joe Bondarchuk appearing in person in order to transact business. Sometimes they didn't.

Sometimes Mr. Bondarchuk knew that something was coming because of what he had been -- his personal involvement in the deal, and sometimes Bondarchuk didn't know of a transaction until something showed up at his home.

But the common threads were these things: One, when Curcio -- and by the way, there were cards, the evidence showed, that he never heard back on. But the common thread is this: Curcio remained deeply skeptical of PSA and uncertain as to whether individual cards were OK as to individual -- as to whether individual cards had grading problems. The evidence shows that sometimes he reached that determination, and he offered a refund. Other times, he didn't. But I am pointing out all this diversity of the transactions to demonstrate that it undercuts the idea that this was some sort of common or coherent scheme, number one.

Now, you also heard that after a time, Mr. Bondarchuk and Mr. Curcio started to also tell the purchasers -- basically tried to get the purchasers from going to police. That wasn't necessarily what they set out to do, but they realized something that this case has made ultimately very clear; that any police involvement could have gotten PSA involved. That in and of itself became something to avoid. Let's talk about when that actually happens, because there are other nuggets to be mined from this.

We asked Mr. Campbell about the point at which the

investigation went overt, that is to say, when it becomes somewhat more public, when there is a possibility of -- the fact of an FBI inquiry getting back to Mr. Curcio.

"Do you recall when you interviewed your first two or three persons, potential victims in connection with this investigation?"

Special Agent Campbell says, "I remember the general timeframe. I don't remember the order of the victims."

"That's fine. Can you give me a general timeframe?"

"I believe the case was opened in February or maybe March of 2023. So it would have been shortly after that."

And, in fact, ladies and gentlemen -- pardon my chicken scratch lines here -- we have ways of knowing exactly when Mr. Curcio would have been noticed -- on notice that the FBI was asking questions. Let's talk about Mr. Jain first. Mr. Jain texts him on March 22 of 2023, and says, "I am canceling the wire and contacting the FBI." And there would have been no reason for Curcio to doubt that he was contacting the FBI. We met Mr. Jain. He is a pretty determined guy. He is a pretty serious guy. If Mr. Jain tells you he is calling the FBI, you probably know that's true.

Then on May the 4th, "Mr. Baudo, after the recorded phone call, you sent the seller a few e-mails, right?"

"Yes."

"You let the seller know that you intended to escalate

to authorities; is that correct?"

"That's correct."

We saw that e-mail. That e-mail was dated May 4 of 2023.

On Friday, July the 7th of 2023, Mr. McMillan sent an e-mail, which you saw, it's Government Exhibit 2822, notifying Mr. Curcio that he was calling the FBI. And then there is Mr. Dills on August 8 of 2023 saying, "Well, yep, the FBI is involved, this is unfortunate," in his typical very understated way.

What's the point of this? Mr. Curcio was on notice multiple times that the FBI was getting involved, and in order to find Mr. Curcio guilty, the government needs you to believe that people who were fully aware of a unified common scheme to defraud people reacted not at all to notice that the jig was up and the FBI was involved; that they kept on selling in essentially the same constellation of ways. But that is what happened here.

And you have to wonder, why wasn't Mr. Curcio afraid that FBI contact could get him in serious trouble? There is an answer to that, and the answer is, Mr. Curcio doesn't know that what he's been doing has been in the service of moving compromised fake PSA product. He thinks that he has just been ducking the PSA. And as mad as the customers are, ducking the PSA is not against the law.

With some of these instances, the FBI has been contacted because the cards -- the card holders were actually bad. On those occasions, there is a refund offered, but that's not what happened across the board. And the diversity in what happens with respect to the refunds is one thing that cuts against the idea of there being some sort of common, coherent scheme to defraud.

So what happens? Mr. Curcio's home is searched. Mr. Curcio's home is searched, and there is no real additional follow-up from that point. You heard no evidence of a warehouse being searched. You heard no evidence of there being any sort of study or examination of the equipment in order to determine what precisely was done with that, but you can kind of understand from the government, because the government doesn't necessarily know all of the other things that Mr. Curcio is doing with that equipment.

And by the way, there are also lots of other things that Mr. Curcio could be doing with that equipment. You heard testimony from Mr. Bondarchuk that that equipment was by and large something that you could get at a Home Depot or a Staples or someplace that sells, maybe, business machines in some circumstances, but nothing that exotic. So, they arrest Mr. Curcio on May the 24th of 2023 -- 2024, rather, and the rest is essentially history.

Ladies and gentlemen, that's what the evidence shows

happened. None of the evidence submitted by the government actually disproves any of that account. To be clear, it's an account that features a lot of embarrassing, even shameful mistakes and errors by Mr. Curcio. That's that whole thing about how lies, even if they are not fraud lies, are still lies and they compel other lies, and some of those lies were shameful. They were truly messed up, but they don't make him guilty of fraud.

This account, although it features a number of embarrassing, even shameful mistakes, is not an account in which Mr. Curcio is actually guilty of the crimes charged. This case isn't about false statements made to purchasers. It's about actual fraud with actual intent, and that hasn't been established here.

So, we have shown you what the evidence shows happened. Now I think it makes sense to discuss ten specific sources of reasonable doubt. Some of these will be deeper dives than we have been able to do in an overall description.

The first source of reasonable doubt will start at a high level: The alleged scheme charged made absolutely no sense, absolutely no sense. Recall the exchange with Mr. Bondarchuk. What they did made sense only if the only purpose of making false statements to these customers was to hide Curcio's involvement in the transactions from PSA. But if the purpose was to defraud people of tens of thousands of

dollars, if both men knew that the cards were misgraded at the time, this would be a recipe for jail. This would be a recipe for jail. It makes absolutely no sense that Mr. Curcio would have entered into that scheme as alleged. The only reason you heard from Mr. Bondarchuk that Mr. Bondarchuk entered into the scheme is because he didn't understand anything to be wrong with the grades or the cards or the holders. But for Mr. Curcio, how would it have made sense for him? And it's not like he was doing much in the way to obscure his path to this stuff, because he already started selling cards in this sequence under his own name.

Curcio had been trading long enough to know that cards in the high end card industry are often resold or they are shared or they are reexamined in the reholdering process by people who can tell what a fake holder is.

This is Mr. Bondarchuk. "And people, even when they are not reselling them, show them to other people who are able to identify and separate high quality cards from mid level or lower level cards, right?"

"That's correct."

"There are people out there who feel at least individually that they know what a PSA 10 is, right?"

"That's correct."

And Bondarchuk wasn't, you heard, given any sort of special plan. He wasn't given any sort of special plan in case

law enforcement showed up. Curcio didn't tell him, By the way, when the police come, this is what I want you to do that presumably won't lead to me. He said that if anything like that happened, he would take care of it. That doesn't make sense if there is tens of thousands of dollars worth of fraud happening here. It does make sense if Curcio thinks that he can talk around the relatively benign conduct that he thinks he's engaged in, the relatively benign conduct of trying to duck PSA by obscuring his identity. But actual fraud? This was always going to happen. Why would it make any sense to get involved?

At the beginning of this case, the government asked you to do three things. You may remember what the third thing was. The third thing was, use your common sense. You didn't check that at the door today. And this, ladies and gentlemen, I respectfully submit, is where common sense kicks in. Common sense dictates that you don't get involved in a scheme that is destined, if not mandated, to end with this sort of attention, and nothing separating the police from looking at you. This is why you don't have many instances of people robbing banks and then looking up at the security camera and waving and showing two forms of ID, because it's going to get you caught.

It makes even less sense for this to be a conspiracy in which Mr. Curcio had brought as his primary, maybe exclusive partner, Joe Bondarchuk. Realize, you heard Mr. Bondarchuk

testify at length about the relationship that he had with Mr. Curcio. You know that they had no special relationship of trust. They were barely friends.

"And you knew each other through youth basketball circles, right?"

"Yes."

"But he wasn't a person of trust in your life, was he?"

"Not initially."

"Not initially, right?"

"Correct."

"And you weren't a person -- you didn't consider yourself a person of trust in his life, right?"

"Not initially also, yes."

"As you sit here and think about it now, there is no particular reason why that you can think of that Mr. Curcio would have recruited you, right?"

"That's fair to say."

"There is no special skill or ability relevant to this endeavor, right?"

"Correct."

He didn't know anything about cards before he got involved.

"There is no particular knowledge you had relevant to this endeavor, right?"

"That's correct."

And I asked Mr. Bondarchuk at a point that you probably remember: "Am I right in saying this sounds like an incredibly stupid plan?"

"Well, it's fair to say now, yes."

"Was it fair to say then?"

"Looking back at it, yes."

"The whole thing would be a ticket to jail, wouldn't it?"

"Potentially, yes."

Why only potentially? Because, as we will get into in a moment, Mr. Bondarchuk explained it wasn't a stupid crime to him because he didn't know it was a crime at all, because he didn't know that what he was peddling was -- what he was helping to peddle was misgraded material.

So, again, you are allowed to use your common sense. Common sense tells you that people who aren't completely brain dead don't enter into impossibly stupid schemes. And the scheme alleged was, in fact, that. And if that part bothers you, if that part of what's been sold to you by the government gives you even the slightest bit of doubt based on reason -- and I suggest it's fully based on reason here -- you could acquit Mr. Curcio for that reason alone. There is a lot more to talk about. Suffice it to say, though, Mr. Curcio's actions begin to make sense only if neither of them knows that the

cards are misgraded.

It also, by the way, would have involved an unsensible doubling down at the end. Think about it. The FBI is coming back saying -- through various people, saying, We are looking at you, we are looking at you, we are looking at you, and they do the exact same thing over and over again? They don't stop? In order to find Mr. Curcio guilty, you would have to believe that he was the dumbest man alive. He may not have been the most appealing man alive, he may not have had the best judgment, but you have read enough of his e-mails to understand that that wasn't the case. This is, once again, the FBI notice that we talked about.

Next source of reasonable doubt: Bondarchuk's testimony was mainly notable for what he didn't know. Let's pause for a moment. How do you assess Joe Bondarchuk's credibility? Bondarchuk clearly shaded the truth on at least some subjects. There was this whole thing about razor blades. He was asked: "What tools were used to modify the cards?" Note the convenient passive voice there, but whatever. He lists a bunch of tools and he says razor blades.

"Now, Mr. Bondarchuk, have you had occasion in person to see razor blades being used on cases?"

"Yes."

"How many times?"

"I don't know."

Later on, he says, "During that session" -- this is where he is talking with the FBI -- "you testified you hadn't seen Mr. Curcio use razor blades on cases; isn't that accurate?"

"I don't recall. If there is something that shows --"

The fact that he doesn't recall whether he told the FBI that same thing is striking. But we continue.

"So you told the government that you never saw Mr. Curcio use razor blades on cases, right?"

And he says, "According to these notes, yes," when we tried to refresh him. The fact that he says "according to these notes" on something as simple as "Did you see razor blades being used or did you use them," is striking. Even more striking is Mr. Bondarchuk's inability to keep his story straight with respect to what he actually wants this whole thing to turn into for him.

"What sentence are you hoping to get?" he is asked. "Whatever the judge sees fit based on my testimony and cooperation."

Well, that makes no sense. Mr. Bondarchuk, the government elicited multiple times, faces a potential maximum sentence of 40 years in jail. Nobody is indifferent to that. And we hit him with that common sense. He responded.

"You said whatever sentence the judge sees fit. That's not actually your preference, is it?"

"It's not, no," he admitted. So he hadn't been telling the truth.

"You are not indifferent to the difference between lots of jail time or no time, right?"

"That's correct."

"Your hope and preference is to get no jail time, right?"

"Correct."

Now, ladies and gentlemen, why would you even shade the truth about something like that? Why lie about something as simple as what you get out of this?

Now, the government established that Mr. Bondarchuk getting a 5K letter doesn't depend on the outcome of this trial, but the content of that letter would. It's one thing to be able to say he testified at trial. It's another thing for the government to be able to say he testified at trial in a successful prosecution. Bondarchuk, despite his efforts to play dumb, understands that.

And so, I think for the most part Mr. Bondarchuk told the truth because he didn't know a whole lot about anything, including whether the cards were misgraded. But here and there, he did lean in a little bit where it would make his presentation a little neater and a little more compelling. That may begin to explain his differing accounts on the one really important subject that he discussed: The scheme itself.

He had to be asked the right questions in order to get things out. Initially he was asked what the scheme was.

Mr. Prussien asked him, "In your own words, what was the scheme?" And he says, in sort of conclusory fashion, "It was to increase the value of the card by altering the grade associated with the card in order to add value to it." That's at page 466.

Bondarchuk describes the scheme in a simple, conclusory sense, the same way that Mr. Felton ultimately did today. But we later learned that Mr. Bondarchuk didn't understand his actions to be illegal or to involve misgraded merchandise until buyers complained.

I asked him, "So when you initially got involved, you didn't believe or understand that any crimes were being committed, right?"

"Yes."

"At worst, you were serving as a front for Mr. Curcio, but it didn't go further than that, right?"

"Correct."

"Then gradually, over time, you reached the conclusion that this was a scam? And there were a number of clues that allowed you to reach that conclusion, right?"

"Correct."

"You began being contacted by angry and distraught victims, right?"

"Correct."

We also later learned that Curcio didn't tell Bondarchuk that they were selling misgraded cards.

"He didn't just upfront say this was a scam, did he?"

"No."

"And he didn't say that the purpose of getting you involved was to get people to buy cards with fake grades, right?"

"No."

And in point of fact, ladies and gentlemen, you never heard testimony to that effect from Mr. Bondarchuk, not about how things started, not about how things went later on, not about anything prior to their arrests.

"One of the reasons you reached this conclusion is because" -- sorry, we have been over this.

"Now, you understood that you were going to let Mr. Curcio use your identity, right?"

"Correct."

"But that, without more, didn't lead you to believe that the police were going to get involved, right?"

"Correct."

That's the only way that anybody participating in this scheme makes sense, with that limited knowledge of what product is actually being moved out there, with the absence of knowledge about it being misgraded, because if you actually

know that this is about misgrading product, it's a suicide mission.

Now, Mr. Bondarchuk also talked about his guilty plea on his cross-examination, and he talked about when he was asked then what he had done that made him guilty. Here is pages 797 to 798:

"As part of that answer, you said that when you got involved with Mr. Curcio, you initially weren't aware that the crimes were being committed, right?"

"I believe so, yes."

"And you also said in response to that question that you just didn't understand it at first, right?"

"That's correct."

"You said that you came to understand it after some time, right?"

"Right."

Ladies and gentlemen, I respectfully submit that this cross-examination testimony is the point at which this case falls apart for the Justice Department. That testimony, the testimony of Joe Bondarchuk on cross, should be the first thing that you ask to have sent back to the jury room. But just to summarize it, not once did Mr. Bondarchuk say that Mr. Curcio told him that the cards were misgraded or that this was, in fact, a scam or any kind of contrivance beyond hiding him from PSA and using Bondarchuk as a front.

Bondarchuk surmised that on his own later on, but even he had no firsthand knowledge of the cards, just like the government doesn't. And as he mentioned earlier, he couldn't speak to how the cards he saw modified and helped modify were actually used because he wasn't involved in that, because at worst, he saw a couple of Jordan cards leave the warehouse without knowing where they were going to go. And given what Special Agent Campbell found, the place they probably went was his home. But Bondarchuk did know that the purpose behind the front was to duck PSA.

"For example, he talked to you about PSA in order to explain why he needed your help, right?"

"Correct."

"During this period of time, Mr. Curcio told you a number of reasons why he was upset with PSA?"

"Correct."

"And a number of things he intended to do about it, right?"

"At the time, yes." Bondarchuk also knew that Curcio was motivated by anger at PSA.

So, ladies and gentlemen, the so-called insider's view into the conspiracy, that Mr. Bondarchuk allowed to be used as a front, I submit, was relatively hollow. The most important things to come out of that are this: That Mr. Curcio told Mr. Bondarchuk the truth. He needed them in order to duck PSA.

But there was never some sort of understanding, unspoken or otherwise, that these cards were misgraded until Mr. Bondarchuk began to suspect as much on his own. Mr. Curcio didn't share that state of mind, in part because he was still deeply skeptical of PSA. And on some occasion where he may have gotten that sense, well, you know that he refunded the cards a number of times.

The third source of reasonable doubt -- these at least get shorter, by the way. We have gone over this, but just to bring it home, the evidence points to Curcio having concealed his identity to avoid PSA, not to defraud consumers. The fact that Curcio used his own name up until PSA became a problem strongly supports the idea that Curcio used the aliases and Bondarchuk to duck PSA. He told Bondarchuk he needed him because PSA blocked him. Yeah, that's the actual reason.

Now, not all of those cards ultimately had issues, by the way. That's in the record as well. And that further supports the idea that the motivation wasn't a fraud, but to avoid PSA, because that's the only conceivable reason that there could have been to use Joe with respect to those cards.

This is Bondarchuk's testimony.

"Now, you were asked about a number of PSA-graded cards, purportedly PSA-graded cards that were sold during this period by Mr. Curcio through you, right?"

"Correct."

"There were also actual PSA-graded cards sold through you, right?"

"I believe so, yes."

"That's your understanding even today?"

"Yes."

It makes sense for those cards to be sold through Joe Bondarchuk because PSA was still an issue. That helps you get an overall sense of why this was done, why Bondarchuk was used, why the aliases were used.

The fourth reason for reasonable doubt we have already largely gone over. You have been given almost nothing regarding the state of the cards when Curcio actually acquired them. Were they misgraded at the time? What did Curcio know at the time? Crickets, largely. With respect to the trial record, this period of time is largely a black box. And at a trial at which Mr. Curcio's intent is the most important issue, some might say the only issue up for grabs, we respectfully submit that this lack of evidence is bonkers. It's nuts. If the government is going to demonstrate proof beyond a reasonable doubt with respect to intent, they have got to give you something there. They haven't.

The fifth source of reasonable doubt we have also largely gone over. You have been given almost no evidence regarding the use of the items recovered from Mr. Curcio's home. Mindful of the fact that Mr. Curcio was also trying to

essentially crack the PSA system in order to get his revenge, in order to get media attention, in order to get a documentary made, well, the government hasn't given you reason to believe that any particular item, that any of the items that they used were dedicated towards one purpose as opposed to the other. They have given you nothing forensic. They have given you nothing definitive with respect to that.

The templates aren't terribly helpful because, of course, it makes sense that you would model what you are trying to do off of actual cards. And the templates don't come with some sort of documentary evidence as to when precisely they were used relative to each card. The one witness who claims to have seen them being used couldn't testify as to what happened with the modified cards. Joe Bondarchuk wasn't helpful in this sense. And again, in some cases this might be a big deal. Where you didn't have evidence that Mr. Curcio had this other purpose for manipulating cards, you could just do essentially what the government did through Mr. Campbell: Pile these things up here and go, Tools, Cards, Holders. But because there is another explanation, the government owed you more in order to clear the reasonable doubt bar. They didn't give it to you.

I was reminded in thinking about that about one of the hit songs from last year by a British pop artist named Pink Pantheress called Illegal. You may have heard it. If you have

heard it, it's hard to hear anything else for the next ten days. But the thrust of the chorus of that song is basically this: A person introduces herself, then she sings, "It's nice to meet you." It sounds like it's about a drug deal. Then she says, "Hey, ooh, Is this illegal? Hey, ooh, it feels illegal."

Whether or not what they are doing is actually illegal is not further explained. Is this illegal? "It feels illegal," is ultimately what the government gave you with respect to those items, but "it feels illegal" isn't enough, ladies and gentlemen. It's not enough when there is another coherent explanation for why those items were being used. Ask for more because more doesn't give you beyond a reasonable doubt.

It's worth noting again that the tools were common, for the most part, and had other potential purposes; Home Depot, Staples, Amazon availability. You are talking about acetone. You are talking about relatively common handheld tools. To the extent that Curcio in some of those text messages that you saw talks about using those tools to create fake cards, well, yeah, we know that that's what he was doing, but those text messages don't definitively tell you why.

By the way, he's got this massive Lego display. Legos themselves presumably don't involve tools. That's just a matter of snapping things together, but there is a complex set of platforms, as you saw in some of the pictures, pieces,

holding all of those things, the city, the monorail, all of those items together. Tools can be used for that as well. Not the cards, just the tools. We have already talked about what the cards and the labels and holders were used for.

A sixth basis for reasonable doubt is that the government outsourced large chunks of the investigation to PSA. Look, the government has made certain choices here. They have decided to prove that something was wrong essentially by endorsing and co-opting PSA's account of signs of tampering through the testimony of Ms. Curiel, and that's their right, but you should think about what they didn't do.

They didn't, for example, present any independent evidence of what grade any particular card should have received or that there was a deficit with respect to the value of any particular card. There is no expert witness who came in to opine on that. There is nobody else who testified to that end. What you are left with, by and large, is subjective art from a flawed decider, and there is room for subjectivity there. Oddly enough, Ashish Jain gave you some of the best testimony on that. He explained that because the grading is done by humans, "I could say this card is a 10 today, but tomorrow, in my humanity, I could also say it's a 9." This, coming from his experience. The term "shit 10" and the other term "shit Jordan" came up over the course of this. And you understand what they mean, thanks in part to other testimony.

We asked Mr. Bondarchuk to explain what that meant. Sure, the term "shit 10" came into being because there were different types of 10s. So there were cards that shouldn't have been a 10. That will happen every once in awhile. And, look, if a card that should have gotten an 8 or 9 is graded a 10, that's the grade. But it's hard to, for any given example, put a witness up there, a victim witness up there as if they are an expert -- they are not -- have them look at a card and have them definitively say, This couldn't have gone to the grade next door or two over. The existence of, quote, unquote, "shit 10s" or "shit Jordans" demonstrates as much. We also know that as part of that subjectivity --

MR. FELTON: Objection, your Honor.

MR. BELL: Judge, this is argument.

THE COURT: I am going to overrule. You can respond on rebuttal.

MR. FELTON: Thank you.

MR. BELL: You also know from evidence put in by the government that the value of these PSA 10s could change abruptly. You saw that in Government's Exhibit 14 and 15, which basically keeps tabs on the sale price of, I believe it was, a number PSA 10 Charizard card over a period of time that isn't that long. We are talking about from 2018 to 2022. And even within those increments, you see swings of tens of thousands of dollars. You have cards sold in March of 2021

that goes for $399,000, just under 4. Then you have one six months later that is sold for 270,000. The government has introduced to you testimony that suggests, well, you can't expect there to be that big a discount of price. You are seeing it with your own eyes here. The presence of a discount, the presence of a variance, especially at a time this volatile for the card industry, doesn't prove anything. Needless to say, Mr. Dills was asked, "Is it fair that the price of a PSA 10 Charizard goes up and down over time?"

"That's fair to say."

And finally, those prices, which really make up the market, could go up and down based on the subjective preferences and knowledge of a particular buyer. Remember when we asked Mr. Dills about Tom Chambers, one of the more fun parts of the trial. He testified, you know, "We opened a couple of packs. One of the cards was a Tom Chambers, average player." He was being kind of playful. But one guy's just average player is another guy's 18-points-per-game-averaging, four-time All Star.

And so you are going to see variance, particularly within the sports cards, setting aside Pokemon, because there is varying knowledge about what these cards might be worth, about how cool their underlying players are. There are sports debates in bars all over the country because of divergences of opinion on this sort of stuff. But here, those divergences of

opinion can give rise to differences that amount to thousands of dollars.

So, when you hear and consider the claims of any witnesses, consider, first of all, that they are not experts, number one, regarding value, that there were no such experts in this case, and number two, that there is some real subjectivity with respect to prices. That has a number of impacts. For one, it impacts this argument that somebody was selling a card too cheap. Well, they may have their own circumstances to do so. Maybe they are, in fact, losing their house in a divorce and they need some quick cash, and they don't mind parting with the money that they didn't exactly earn when the market went way up, thanks to Covid.

Number seven, this is another quick hit source of reasonable doubt: Mr. Curcio's actions would only make matters involving him and the card subject to more scrutiny. The evidence and testimony has shown that Mr. Curcio meaningfully planned to expose or embarrass PSA in two ways: He wanted to get this documentary made and he wanted to file a lawsuit. And he didn't -- that wasn't just empty language. That wasn't just talk. He tried to get ahold of the body camera footage for use in a potential lawsuit against PSA for what they had done to him. Mr. Curcio told the officer who stopped him at the New Jersey card show, when he was being ready to be let go, "By the way, can I get ahold of that body cam footage? I may need it

for that lawsuit." And you saw that he put in a request under the Jersey Open Public Records Act for that body camera footage, did it on May the 22nd, 2024, just a couple of days before he was arrested.

By the way, the other side that he was serious about that lawsuit was the other side of this note, Government Exhibit P33, the one that we had to show you. And it's interesting to note, ladies and gentlemen, that, you know, Mr. Prussien asked the documentarians, Well, was your documentary about Brian Dills? Was your documentary, you know -- did you list all -- did Mr. Curcio name all of the victims in talking about that?

Well, he does seem to think that Corey Trammell's involvement is relevant to the lawsuit that he is planning to file. This is on November 29 of 2023: "Things needed for lawsuit," goes the big banner headline. And under that, "Corey Trammell," and then his handwriting is not great. And "PSA guarantee screen shot." The government is suggesting that PSA guarantee is bad for him. This would seem to suggest that he was actually using the PSA guarantee in the context of this lawsuit.

Now, once again, ladies and gentlemen, more than anything else, this is a naked appeal to common sense. As a general matter, people involved in fraud tend to want to push away from courtrooms, not toward them. What would a lawsuit

have involved? You don't really know at the outset, I suppose. But would there have been depositions? Would there have been testimony? Would there have been document requests for discovery? That's not something you want to get into if you are running a fraud in the exact same subject. It undermines the very idea. Yet, here Mr. Curcio was, even after he had been on notice from the FBI, gathering materials for precisely that purpose.

He was also serious about the publicity and the documentary. We heard from not one, but two documentarians who testified as to this. And we had them both come in because they covered different areas. Mr. Jones covered 2002. In 2002, Mr. Curcio brought up PSA to him. He basically made a pitch to him about what he was looking to do. And that would have been in around August of 2022. That testimony was remote.

Then you heard in person from Jeremiah Murphy.

"Without going into the details, did he share details with you as to why he was upset with PSA?"

"Yes."

"And so what, if anything, did Mr. Curcio want to do with that information and your documentary knowhow?"

"He wanted to make a documentary."

"Did Mr. Curcio express an intent or plan to expose PSA?"

"Yes. I would say he wanted to -- not -- he kind of

knew, I think, that this was not something he could do on his own, that he needed --"

"I'm asking more in terms of what he said than what you understood specifically."

"Yeah," he says, unambiguously. "He wanted to expose PSA."

Mr. Murphy was able to give you a lengthy speech in response to Judge Abrams' question as to what it is that Mr. Curcio told him about why. I am not going to repeat that speech because I don't have a whole lot of time here, but you get the general gist. At all times during this event, Mr. Curcio was looking to publicize this encounter. And I know we have all watched some true crime documentaries on Netflix, but it's generally not the case that the guilty person brings their own documentarian on board. That's not how it happens. People in fraud tend to not want to bring on their documentary film crews to record them, not only because of the potential exposure, but also, why poke the bear, and why risk exposing the fraud?

Now, you have heard a little bit about dual intent. Judge Abrams is going to instruct you as to this. Dual intent is basically the idea that it's possible that Mr. Curcio was both doing what he was doing for an illegal and a legal purpose, and if that's the case, he is just as guilty. I respectfully submit that dual intent as applied here doesn't

make sense.

You can't be doing something to both run a successful scam and to get back at PSA if your actions only aim at one of those purposes. Your actions of publicizing all of this doesn't help you run a successful scam. Your actions of doing all of these early transactions with your name on them likewise doesn't do the same thing. The publicity sought undermines the idea of dual intent. A lawsuit he was putting together undermines the idea of dual intent. The fact that Mr. Curcio did this in his own name before PSA blocked him undermines the idea of dual intent.

Reasonable doubt source number eight: The scheme was not coherent or existent enough to be a fraud. I will be quick on this one. Ms. Curiel said:

"You would agree with me that the characteristics reflected in this chart" -- this was the chart of what she observed in looking through all those cards -- "are not all the same?"

"Correct."

"So there is a variation from card to card as to which characteristics, if any, were present; is that fair?"

"There are some, a very few number of cards that differ, but the majority are the same."

"To be clear, not every card has the same yeses, nos, and not applicables in their columns, fair?"

"Correct."

It defies belief, I respectfully suggest, to think that this was some kind of a common scheme, because if you have got Anthony Curcio in his home lab, tinkering about ways to pass this -- get this past PSA and the public, he would find one way to do so over time with respect to these old labels that aren't changing over time, and stick with it. But there were all sorts of variations in the problems with these cards, and that undercuts the idea that this was sort of one unified common scheme.

Likewise, what happened with the customers, shameful as some of it may have been, also is diverse enough to undermine the idea that all of this was part of one common scheme. Was an alias used? Was Bondarchuk used? Was John Steele used? Did this happen in person or not? Was there a refund given or not? Were there concerns expressed about the possibility of reversal or not? How did the parties meet? Over what platform did they meet? All of these things varied from card to card, from transaction to transaction, and it undercuts the idea that this was some sort of unified common scheme to defraud.

I am going to talk about venue for a moment, and I am going to say something. I don't think the government has proven guilt beyond a reasonable doubt, but I actually don't think venue is an issue here. But what I want to do is take

venue just for a moment to show you something. Venue, Judge Abrams will instruct you, is the only matter here for which there is a lesser standard of proof, that is, preponderance of the evidence; there more likely is than not venue. And that's why the government can get by with piecing together inferences like, Oh, he must have crossed this other district of New York in order to get back from Edison, New Jersey to JFK Airport. Those types of inferences are fine when you are talking about a preponderance of the evidence standard. This is proof beyond a reasonable doubt, ladies and gentlemen. The question of guilt or innocence is proof beyond a reasonable doubt. And if they don't give you anything to go on with respect to the origins or the conditions of the cards at origin, with respect to the tools or how they were used, then they haven't met that high standard, much higher than what you get when you are just looking at venue.

The tenth and final source of reasonable doubt only has to do with the conspiracy. Now, Mr. Curcio is charged with engaging in this scheme, but he's also charged with engaging in the scheme with Joseph Bondarchuk. And I expect that the judge is going to give you a number of instructions as to what a conspiracy actually is and what has to be in place in order to find one. When you hear those instructions, ask yourself, Joe Bondarchuk didn't even understand this to be selling misgraded items.

I understand that not every conspiracy -- most aren't going to be written down in ink or blood. They are not going to be affirmatively discussed or shaken hands on, but you can imagine given the slow evolution of Joe Bondarchuk's thinking, you can ask yourself, was there ever actually, in fact, a criminal meeting of the minds between these men? And I would respectfully submit that the answer is no. And that's not only because the evidence shows that Mr. Curcio didn't know that these items were misgraded, which, by the way, also makes him not guilty of the other counts, but with respect to conspiracy this is just an ill-fitting shoe, certainly as to Joe Bondarchuk, and to the other people that the government attempts to last minute wedge in as conspirators.

Stephanie? Read the e-mails with Stephanie. Let's say for a moment that Stephanie was his girlfriend. Let's also say, because it's the case, that each of those -- each of those text messages happens after the FBI has started contacting people, and they know the FBI is involved, and after they also know that Mr. Curcio is going to be looking to file a lawsuit. I would respectfully submit that all that the person known as Stephanie does, assuming that's the same person who is at the card show, is accompany him places, generally provide support, and joke with him at length about the prospect of there being a criminal case, because they know, or at least know that they believe, that they are not purposefully selling misgraded

cards. The fact that the two of them are still talking about filing a lawsuit, as you saw in some of those text messages, says something.

And finally, with respect to other purported conspirators, Dennis the gym guy, I don't even know who Dennis the gym guy is. They haven't given you enough evidence to prove conspiracy-level participation on the part of any of these men. They have demonstrated that he got Dennis the gym guy in on the fact that he was trying to make misrepresentations to customers, but we know why that was, and we know nothing of Dennis's state of mind with respect to that.

This effort to get other coconspirators on or involved somehow smacks of an effort that is the result of realizing that the meeting of the minds evidence with respect to Joe Bondarchuk is deficient. And then Jack Zhu, the guy who sells him the cards, that's a conspirator? What do we know about that guy? What do we know about his knowledge of the rest of the scheme?

So ladies and gentlemen, for that additional reason, there is not sufficient proof with respect to the conspiracy count. Joe Bondarchuk's testimony casts serious doubt on whether he and Anthony Curcio had a shared criminal understanding.

I want to hit some quick points here, some of which the government raised, which I took advantage of a couple of

minutes while you were away to put on a card as well.

There is all this talk about safes and floors and where you put your cards. And, of course, most card owners would do something different with their cards. They keep them in a safe all the time because they are not taking them out and playing or tinkering with them. It's not like if you collect Teenage Mutant Ninja Turtle action figures, and even with the plastic you are sort of going, Argh, Leonardo, something like that. But you know that Mr. Curcio was not your typical collector because he was also actively working with these cards to try to find a way to beat their technology and get his revenge on PSA. So it makes sense that at the very moment the government entered his home, that, yeah, they were out. But you did notice from the pictures of Mr. Curcio's home that there were, in fact, I believe, not one, but two wall safes. It's not like he didn't own a wall safe for the purpose of keeping these valuable cards in; he was just also using them.

Then there's been this thing throughout the trial concerning cracking cases. Nobody has got a potential reason to crack a case, and everyone would recognize the risk of potentially doing this, and there were cracked cases found at the scene when they executed the search warrant. Ladies and gentlemen of the jury, again, of course, there was a reason for him to crack a case. His whole thing is tinkering with PSA's cards to try to prove that their security measures are

insufficient or deficient. And, by the way, to the extent that it would take a pretty arrogant person to think that he could do that without damaging the cards therein, that he is -- he thinks he's got that level of skill, well, you heard Mr. Greaney note on his very record of dealing with Mr. Curcio, "Yeah, this guy is arrogant." I hate to tell you this, ladies and gentlemen, because it may not be flattering to Mr. Curcio, who I quite like, but if this trial were about whether he was arrogant, we would have a very different discussion going on right now. The fact that cases were cracked doesn't mean anything at all.

We talked a little bit about the reasons for a discount again. Mr. Curcio was under extraordinary circumstances. The market had started to come back down after Covid. Covid was a once-in-a-lifetime inflationary event. They wanted to sell while the selling was good. And he didn't know, he himself specifically didn't know if PSA would allow him to do so for very long.

There is a text that Mr. Felton didn't show, but nevertheless, I wanted to address, in which Stephanie Brown talks about good criminal, bad criminal, affirmative defenses. They are aware at this point of the prospect of the FBI getting involved. They are mocking it because they don't believe that Mr. Curcio has actually done anything criminally wrong. And with respect to affirmative defenses, they are talking about a

lawsuit that Mr. Curcio was planning.

Reversals, we talked about those as well. Telegram. I want to make something clear. Mr. Prussien asked Mr. Bondarchuk about the Telegram program, this encrypted app that you can use to make messages disappear. Then he asked him about a bunch of texts. But as we uncovered during cross-examination, those texts weren't sent through Telegram. Those texts were texts. And the fact that he had the option of Telegram but sent those texts anyway, along with all the others that you have seen, indicate something very real: That he wasn't concerned about the possibility of their being one day discovered because they didn't relate to anything that he understood to be criminal.

Templates we talked about a little bit, but I want to say a couple of other things on that score. Most of them related to the creased card. The creased card has come up a number of times, or at least what's been referred to as the creased card. Understand the following things: Number one, you have not heard anybody definitively say that each of those depictions of the creased card is, in fact, the same card, is, in fact, deficient in the same way. And as a result, you are not in a position to be able to say that the creased card is the trump card that the government suggests that it is.

They showed you three exhibits, one right after the other. Take a look at them closely. The pictures differ.

Mr. Felton concludes, as he would, given the government's approach to this case, that the reason why they look different is because they were modified. I submit that the creased looks different because the creased is different. There were somewhere upwards of 12 Jordan Fleer '86 cards discussed at this trial, and some of them were not very good. It is entirely possible for some of them to have similar defects. But let's assume for a moment that everything they say about the creased card is actually true, and that somehow a blue Sharpie marker was used to modify it from one stage to the other.

We asked Chris Campbell, "Did you find a blue Sharpie marker amongst all of the supposed contraband?" And he said "No." So once again, we are stimied in our ability to actually draw a straight line between the tools and the equipment, and what we are talking about in terms of the activities that were actually alleged. There is a mismatch there. There is a disconnect there, and it offers you an insight into how well that exercise might have gone had the government tried to do some sort of a forensic account of how that equipment was used, but they didn't, so you don't have it.

Ladies and gentlemen, we have spent a lot of time -- before we do that, just a quick rundown here. I need you to understand what you would have to believe beyond a reasonable doubt in order to find Anthony Curcio guilty as charged in this

case. You would have to believe that Mr. Curcio, knowing the cards were misgraded, entered into an impossibly stupid scheme, one that guaranteed he was going to get caught. You would have to do this despite there being no real proof on the record of the gradedness or the condition of the gradedness at the time of origins or Mr. Curcio's knowledge thereof. You would have to believe this despite the fact that he had already used his name in connection with a sequence of transactions.

You would have to believe his guilt despite clear evidence that he knew the risks of using his own name in connection with something illegal. You would have to believe that Joe Bondarchuk's initial testimony, even though it's now -- the simplistic conclusory one, even though it's now clear that he and Curcio had no clear meeting of the minds with respect to the cards being misgraded, and that Mr. Bondarchuk's understanding was evolving gradually on its own, not with Mr. Curcio's involvement.

You would have to believe the government's theory regarding why those tools were there, even though there is no forensic or other proof to support it. You would have to ignore the evidence that the real use of the tools and labels was to embarrass PSA. You would have to get comfortable with the government having outsourced so much of its work to PSA in a field where there are inherent subjective issues, and to have outsourced a lot of its measures as to what a card was worth to

the testimony of lay victims on the stand.

You would have to ignore the evidence that Curcio wanted to make his relationship with PSA more public, that he wasn't acting like someone who had something to hide. You would have to buy the fact that Curcio doubled down for months while knowing that the FBI was involved, which I submit also makes no sense. And you would have to ignore that little about the alleged scheme to defraud was consistent or coherent. There wasn't one clear scheme here. It varied substantially from card to card, from transaction to transaction, as Mr. Curcio was trying to deal on an individual basis from feedback from the card holders, some of which resulted in refunds.

Ladies and gentlemen, I am going to sit down in a little bit, and I am a little anxious about what's going to happen because then you are going to get to hear from the government again. You are going to get to hear from Mr. Prussien, and Mr. Prussien is very good at his job, and I am not going to get to speak to you again. But at the same time, ladies and gentlemen, I don't have to because I am confident that you have paid enough attention in this case to ask the hard questions and to recognize that there are hard questions that Mr. Prussien is not really going to be able to answer based on the evidence.

Where is the evidence that Curcio knew the condition

of the cards at the outset? Why did Curcio switch to aliases and Bondarchuk only right after PSA became a problem, right around the time they blacklisted him? What else explains that timing? What evidence ties the tools and holders and labels to fraud as opposed to the embarrassing PSA project? Why was Curcio doing so much to publicly broadcast his PSA issues while he was supposedly defrauding card purchasers, knowing where that might go, knowing the attention that might get him, knowing how it could compromise any theoretical fraud?

Where is the government's reliable proof of the value difference that the scheme was intended to reek or did reek? Why did Curcio, supposedly running a single scheme to defraud, interact with the purchasers so differently from transaction to transaction, and from card to card?

We had the opportunity to talk to you, to speak about a lot of 1980s and '90s NBA guys over the course of this trial. For me, that's a delight. A lot of my friendships in life consist entirely of sitting around with people I have known from high school going, Hey, man, do you remember Brad Daugherty? Oh, yeah, Brad Daugherty. But that's because I am an American man, so forgive me.

But I did want to mention one more guy. He wasn't on a card relevant to this case. I want to make that clear. This isn't from the evidence. I am making a point. But there was Dikembe Mutombo, depicted here, in what turns out to be, we

hope, a gem mint condition PSA 10. Mr. Mutombo, in addition to being a Georgetown graduate and a tremendous humanitarian for his native country of what was at the time known as Zaire, now the Congo, was also the best shot blocker in the history of the NBA. You put up a shot, and he would swat it away, and his trademark was wagging his finger after doing so and going, "No, no, no," as if to say, as Americans do, Don't bring that weak stuff in here.

Ladies and gentlemen, nothing over the course of what's happened to Mr. Curcio required Jackie Curiel and the PSA to set aside their biases. Nothing about it required the government to ask the right questions about the origins, about the tools, about the seeming impossibility of the scheme before they brought this case. But, thank God, ladies and gentlemen, that there is a stage before something happens to him where somebody has to ask the hard questions, where somebody has to hold them to their proof, where somebody has to actually demand proof beyond any reasonable doubt, and where they haven't provided it, as here, to essentially swat it away and to say, No, no, no, don't bring that weak stuff in here.

Ladies and gentlemen, you are Mr. Curcio's Dikembe Mutombos. You have the ability to do away with a short-sighted, half-baked prosecution that's understandable on some level because the facts are so unique, but at the same time never should have been brought. You are the only people

who can bat this away. For the last few weeks and months, me and my team, we have been the only people who can set that up. Anthony Curcio has been in our care, my care, Ms. Karp's care, our young, talented associates' care. We have been next to him as he stood up to introduce himself to you at the outset of this case. We have been next to him as he stood up so that Brian Dills could recognize that they met at the parking lot, something we never denied. We were next to him as he stood up and gave that voice exemplar so that Mr. Campbell could compare it to the recording. We were there as he stood up because he was not afraid of any of those things because, although they make him look bad, although they are embarrassing to him now, they do not make him guilty of fraud.

We have been next to him the whole time, and he's been in our care. Now, ladies and gentlemen, we give him over to you. And my request to you is very simple: Give him back to us. Give him back. Recognize that you can't prove guilt beyond a reasonable doubt if you don't ask the most important questions relative to intent. Give him back, and recognize that you can't prove anything about how tools were used by just saying, Tools, if there is another fully-fleshed reason why those tools were there. Give him back and recognize that it makes no sense that Anthony Curcio would embark in what amounts to a suicide mission in order to temporarily have somebody else's money, when it's clear to anybody who knows that the

cards were misgraded that this was a one-way ticket to jail. Give him back to us. End this nightmare. Recognize that the government hasn't and can't prove this case beyond a reasonable doubt. Just give him back. Find Anthony Curcio not guilty. Thank you.

THE COURT: All right. Thank you. We are going to take our lunch break. Please be back here at 2:30. And remember, don't yet discuss the case. Thank you.

(Jury not present)

THE COURT: All right. Two quick things, and then we will take our lunch break.

So, one, there was an objection at one point, and I think it related to the issue of PSA's practices, right, and the objectivity of that? Is that right?

MR. FELTON: Yes, your Honor. And really, it was maybe the slide before that where I think it was explicitly on the slide, where defense counsel referenced what grades the cards should have been given.

THE COURT: I thought so. Because it was made a little late, I overruled it. That said, I gave a limiting instruction on this on page 863 of the transcript. So, you know, the government can make its argument, you know, if it chooses to do so, and that limiting instruction is already on the record, just on the fact that the jury should not consider the objective merits of or its agreement or disagreement with

PSA's practices in its deliberations, but -- that that evidence may only be considered to the extent that it relates to Mr. Curcio's state of mind, such as motive, intent, and plan.

And then the second thing is that, you know, just with respect to the issue of the refunds, just to be clear, Mr. Bell, I stand by my ruling. I think it's correct under the law in the circuit. But just to be clear, you are not asking that I change any of the language from the charge, correct?

MR. BELL: I think insofar as had our initial motion been granted it would have read differently, and insofar as I thought that Mr. Felton's ability now to sort of -- Mr. Felton having essentially opened the door to that territory in a one-sided way could have prompted further argument for us that probably would have tweaked those instructions, yeah, I think I am asking for --

THE COURT: My question -- I don't think the argument you wanted to make was proper under the law. But my question is, are you asking me to tweak this language so that it says, "Offered a refund" or "did not give a refund" or -- you know what I mean? You know, "The refund" or "absence of a refund"? Are you asking me to change the language? I think the good faith charge is on page 14 and 15.

MR. BELL: I don't have it handy, unfortunately.

THE COURT: It's on the top of 15. So right now it reads, "You have heard evidence that Mr. Curcio offered or gave

a refund to certain customers who expressed concern about the card each of them had purchased from Mr. Curcio. The mere fact of such a refund cannot be considered evidence of Mr. Curcio's good faith, and you cannot use it in determining whether Mr. Curcio intended to defraud customers in the first place or not. If an individual convinces someone to buy something with the intent to defraud them, their subsequent willingness to give a refund does not change the fact that they acted with intent to defraud in the first place."

I still think that's accurate, so I am going to give it. My question is, are you asking me to tweak it in some way or not?

MR. BELL: I think I would add a sentence that says, "The refund" -- "Refunds can still be considered for other permissible purposes," and leave it like that. That would be my request. That would be my tweak.

THE COURT: And what permissible purpose is that? Is your argument about the common scheme and plan? Just tell me what that is.

MR. BELL: At the very least, it involves the common scheme and plan.

Thank you. Mr. Lussier has now handed me the instruction.

That would refer, at the very, very least, to the common scheme and plan. My question is whether we limit it to

that in the instruction or whether we are open-ended about it since we already made clear what it can't be considered for. I am good either way, but I do think --

THE COURT: You are not asking me to put in language about, should not be considered evidence of Mr. Curcio's good faith or bad faith, or whether they gave a refund or did not give a refund? Like, you are not asking, kind of, for the negative of this? I just want to be clear about that.

MR. BELL: I guess you are asking in a curative sense. Right?

THE COURT: I am just asking -- I just want to know what, if anything, you are asking for.

MR. BELL: I think, recognizing that your Honor isn't going to change her ruling -- I get that --

THE COURT: Right.

MR. BELL: -- it may make sense to sort of undo some of what the jury could potentially do with what Mr. Felton brought by essentially saying they can't consider the other way either. I don't know. It's hard to unring that bell.

THE COURT: My question is just -- Mr. Felton, I mean, do you -- is your position that after the fact, that he didn't give a refund, that properly goes to intent?

And so, you know, I will tell you, the only thing I was thinking about, but I want to hear you out, is whether we should say something like, you know, "You have heard evidence

that Mr. Curcio offered or gave a refund or did not give a refund to certain customers who expressed concern about the cards each of them had purchased from Mr. Curcio. The mere fact of such a refund or the absence of a refund should not be considered as evidence of Mr. Curcio's good or bad faith, and you cannot use that fact in determining whether Mr. Curcio intended to defraud customers in the first place or not. If it is proven that an individual convinces someone to buy something with the intent to defraud them, their subsequent willingness or unwillingness to give a refund does not change the fact that they acted with intent to defraud in the first place."

Is that -- do you agree with that? Do you think I am --

MR. FELTON: I think going -- taking the step and now saying it can't -- is irrelevant to bad faith and, sort of, should all be thrown out, your Honor, I don't believe that's an accurate statement of law.

THE COURT: That's what I am asking.

MR. FELTON: Your Honor, respectfully, I think the Court's charge was proper, and we agree with the Court's rulings. I don't think -- look, if Mr. Bell wants in a line that can go to common scheme or plan and, sort of, cabin it with that, I don't oppose that. I don't believe, sort of, leaving it "other permissible purposes" is OK. There is too big a risk of it going to the intent issue, which is against

clearly-established law.

So I think the cabin proposal, sort of, consistent with how it was argued in summation is an accurate statement of law and is not confusing, and we would not object to that. But I think the Court's formulation that, sort of, any consideration of it with good or bad faith, and -- I think -- I don't know if that comports with my understanding of the law. I think that goes too far, and I think the way the Court had it before is consistent with other charges in this district that, respectfully, I think is what we would request.

MR. BELL: The issue, I guess, I have is that we are still in a place where the government wants it to be relevant when it's helpful and not relevant when it's not helpful, which I think is the net effect of not giving this some treatment above and beyond outlining the one permissible purpose that we have identified. To be clear, I think that's the bare minimum that should happen here. I think there should be something carved out for the evidence against the common scheme or plan.

THE COURT: OK. So tell me what language you are seeking on that line.

MR. BELL: So I think it would be after what I understand -- after what I understand -- something along the lines of, "Evidence of a refund can, however, be used to prove the absence of a common scheme or plan," period.

Now, again, my position is, I think that's kind of the

bare minimum here because it -- I don't think that that remedies the asymmetry that we are discussing here, where Mr. Felton has teed this thing up so you can consider the absence of a refund as essentially evidence of intent after the fact, and you can't consider the presence of a refund as the opposite. I think it would be possible to do so while still recognizing that the mere fact of the refund doesn't eviscerate the fraud if intent to defraud has been proven. Maybe that's the way to characterize it.

THE COURT: I already say that. I already say, "If it is proven that an individual convinces someone," so it's clear that there is an "if" there.

Mr. Felton, do you want to be heard on this?

MR. FELTON: Yes, your Honor. I think the only thing that goes to his intent is that he took the money, and I think it's over at that point. Look, I think whether we increased our burden, you know, by saying what I did in summation, I don't think it opens the door to a legally incorrect instruction that, sort of, after-the-fact refunds have any bearing on his intent.

THE COURT: Is it incorrect to say that not giving a refund goes to intent?

MR. FELTON: Look, I mean, your Honor, I think there is the line of cases where conduct after a transaction does get brought up to, sort of, infer earlier conduct. I mentioned the

lulling context. Sort of, after you have completed a transaction, a fraudulent transaction, sort of, trying to persuade the victim not to go to police years later, and doing nice things for them, that often comes in in fraud trials as after-the-fact conduct that bears on intent. There is this pretty hard and fast rule about refunds that sort of treats it differently from these other areas.

So, you know, I think opening the door -- I think the current charge is proper, and I think, sort of, saying, well, the defense can now, sort of, give a -- I don't think there is any error in the current charge, and I think, sort of, these proposals is mischief that I think is probably creating more problems than we are solving.

MR. BELL: With respect to problems to be solved, though, I don't think that inaction on that score really solves the fact that, once again, Mr. Felton is allowing for the inverse conduct to be admitted -- to be used for, you know, the absence -- or, rather -- for the opposite of what the presence of the refund could be used for.

I think the only reason, Judge, why there isn't case law on this that we have been able to find so far is because I am not sure that anybody has, like, put the question in this precise, sort of, relief. And I think that, like, it is, in fact, consistent with all those other types of after-the-fact conduct that can be used to determine present or prior intent

and those other circumstances that Mr. Felton described. Here, I think this type of conduct is being singled out for not being able to be considered along the same line, not because of the legal statement that refunds don't, you know, sort of, get rid of prior fraud, but because I think it's just harder to say something subtler.

THE COURT: So the government's position is that you can't use the fact that someone gave a refund because, you know, the crime is already committed, right? And so, you know, if it's proven that an individual convinces someone to buy something with intent to defraud, their subsequent willingness to give a refund doesn't change the intent in the first place, right, but that the fact that they -- I don't know. I am just trying just to avert any legal issue of the imbalance that Mr. Bell has highlighted, but maybe that's just what the law is.

MR. FELTON: Yes, your Honor. I mean, I think -- how about something like the following, which I believe is an accurate statement of law that may get Mr. Bell some of what he is looking for: "If you find that the defendant had fraudulent intent at the time of the transaction, whether he gave a refund or did not give a refund later does not change his intent at the time."

THE COURT: Yeah, I think that's right. So tell me, looking at page 15, where you would put that. You would add

that to the end?

MR. FELTON: One second, your Honor.

THE COURT: Yes. Or is that in place of the last sentence?

MR. FELTON: I think I would just, maybe, add it.

MR. BELL: So, Judge -- and forgive me for sitting down. I am trying to read the screen.

THE COURT: That's fine.

MR. BELL: So that strikes me as an entirely reasonable start. The problem is that we have had a trial full of repeated limiting instruction that I think creates an impression that is still well beyond what we are doing here. Frankly, I think it needs to be corrected. I think -- and by that, I specifically mean the jury needs to know what they can consider the refund for. And I think insofar as Mr. Felton --

THE COURT: I have let you make those arguments as to the refund in different contexts. And this section is about good faith, so I don't know that I need to --

MR. BELL: It may not be here, Judge, but the fact of the matter is that the judge -- sorry, the jury has been instructed one way on this. Mr. Felton is offering the absence of a refund as proof, essentially, of a debt, and the jury hasn't been instructed not to take that into consideration. But they have been instructed that the presence of intent they can't consider at all. That, respectfully, is something that

still needs to be remedied that this additional sentence does not do.

MR. FELTON: Your Honor, I don't see how this has anything to do with the Court's prior accurate limiting instruction. I think this is purely a response to summation, and I think the government's proposal is more than sufficient under the circumstances.

MR. BELL: There does come a point -- I think the government has to figure out where the line is. Do they want the jury to be able to consider after-the-fact refund determinations or not? The government has argued, consistent with that, they can, which I think makes perfect sense to me, provided that there isn't an asymmetry in how we are able to have the jury consider refunds going the other way.

So I think the instruction needs to be clearer on this because the jury has no map of how to get through this issue in the shadow of the Court's earlier limiting instruction unless there is a clarification.

And I don't mean to eat through everybody's lunchtime on this, but I think it's actually pretty important.

THE COURT: What about you? Do you want to pass out -- I mean, my understanding is the government objects to this, but just take a look. And I want to hear you out because you may be right, and I want to make sure we are getting the law right.

MR. FELTON: Your Honor, I think the absence of a refund is evidence of intent and of committing the scheme, so I think we would oppose this proposed revised limiting instruction as drafted.

MR. BELL: And I think that so far as the government is on all fours with the fact, that this creates an asymmetrical ability --

THE COURT: Can you address that asymmetry, Mr. Felton? We can go back to the transcript, but my recollection is he said something to the fact that, The reason you know that he is lying is that he didn't return the money. So you are using what he did later.

MR. FELTON: I guess --

THE COURT: Which in a lot of contexts you can, you are right. Like, there is consciousness of guilt statements. There are lots of scenarios in which what someone does after the fact bears on his intent.

MR. FELTON: At least under my notes, and I don't know if it came out this way -- I am reasonably confident it did -- I said that, The defendant, Curcio, lied in order to make money. You know that he lied in order to make money because he kept the money. In order to -- the reason why he was, you know -- his intent was to make money is because he kept the money. And I think that's a pretty targeted point. That's not, sort of, a free-flowing, just general good faith point.

We do have to show that the lies were done with the intent to make money, and that he received money, of course. The crime is complete. But the point is that he kept the money.

THE COURT: OK. All right. Mr. Bell, any final comments? And then I will just make a decision.

MR. BELL: I think that Mr. Felton is both generally right and I think that his point doesn't respond to the asymmetry at all. And we are left, I think, with the same problem that we had before.

I am looking at the proposed revised limiting instruction, and I think that that's fine as far as it goes, but I think it requires something slightly further in order to clarify what they can actually use after-the-fact refund decisions for, up or down. That's the only way you remedy the asymmetry. And I think the asymmetry has to be remedied in order to avoid something approaching error here.

THE COURT: Look, I am going to tell the jury that these are arguments, and that they have to rely on my instructions with respect to the law. So that part will be clear.

MR. BELL: Agreed, Judge.

THE COURT: What the government -- I just want to go back to what you suggested that we do.

MR. FELTON: I think it was something along the lines of, If you find that the defendant --

THE COURT: Slow down.

MR. FELTON: If you find that the defendant had fraudulent intent at the time of the transaction, whether he gave a refund or did not give a refund later does not change his intent at the time of the transaction.

MR. BELL: So, I think that that sentence largely does what the last sentence in the printed proposed version does, but I think that you still need to, in light of what's happened, affirmatively indicate what the jury can consider this for. That's the issue. I don't think we can sidestep that.

THE COURT: And what about just shortening this paragraph on 15, and not marshaling the evidence so much, and just saying, "You have heard evidence about refunds. If you find that the defendant" -- sorry, what was the beginning of your proposal? "If you find that" --

MR. FELTON: "If you find that the defendant had fraudulent intent at the time of the transaction, whether he gave a refund or did not give a refund later does not change his intent at the time of the transaction."

THE COURT: "So, you have heard evidence about refunds. If you find that the defendant had fraudulent intent at the time of the transaction, whether or not he gave a refund" -- "whether or not he later gave or offered a refund does not change that intent."

MR. BELL: And then I think the other shoe would be, "However, you can use the presence or absence of a refund in determining whether that intent existed at the time of the transaction."

THE COURT: I don't think that's true under the law. Like, that is not -- there's Second Circuit law that clearly states that that's not true. I mean, I have read you the cites earlier.

MR. BELL: I do, I continue to believe that there is a difference between that and the legal statement that the presence of a refund does not mean that there was no fraud. And I do think -- I think that's what the cases say. I think that's what their holding is. But if you are going to accommodate the type of interpretation that Mr. Felton, I think appropriately, gives to the absence of refunds in some circumstances, the flip side has to come in as well.

THE COURT: I don't think so. I am very clearly going to say that the arguments of the lawyers are arguments, and that they have to take the legal instructions from me. So I don't think that there is a need for me to -- I think that would be clear.

So I am just trying to tweak this a little bit to -- so what I am inclined to do -- if you like it better, Mr. Bell, than what exists already, to say, "You have heard evidence about refunds. If the defendant had fraudulent intent at the

time of the transactions" -- I will say "transactions in question, whether or not he later gave or offered a refund does not change that intent." I think that's an accurate statement of the law.

MR. BELL: Are you still going to include the --

THE COURT: I am saying whether or not he gave a refund.

MR. BELL: Right. Is your Honor still going to include the bit about the common scheme, which is a clear permissible purpose --

THE COURT: Tell me what you are asking for with respect to the common scheme.

MR. BELL: So I think you can say, "The presence or absence of refunds can, however, be considered in determining whether or not a common scheme existed." I don't think that's an issue that the government -- I don't think the government has taken issue with that premise. I don't think the Court has taken issue with that premise. I think your Honor specifically endorsed by making that argument for that purpose, and I think that clarification would be helpful. To be clear, I don't think it addresses the asymmetry problem, but I do think it ought to be there independently on its own.

MR. FELTON: Your Honor, it strikes us as a defense argument making its way into the charge. I mean, I don't think the charge bars such a --

THE COURT: What about just leaving it a little vaguer and saying, "The presence or absence of refunds may, however, be relevant for another proper purpose."

MR. BELL: That's kind of what I was suggesting before, and I think that's fine.

MR. FELTON: I think we can live with that, your Honor, I think.

THE COURT: Can you type this out, please. Thanks.

All right. It seems like -- I don't want to speak for you, Mr. Bell. It seems like the government can live with this revision.

MR. FELTON: Yes.

THE COURT: OK.

MR. BELL: And our objection on the other thing is noted, but recognizing that, I think that's fine.

THE COURT: OK. All right. So we are going to print it out. We are going to show it to you. I'm sorry that we are taking your lunch.

MR. FELTON: Sorry, your Honor. On the "what grades the cards should have been given" limiting instruction, which your Honor cited, I think given that it featured prominently in the defense summation, we would ask that that sentence or two make its way into the final charge. A number of limiting instructions have made their way into the charge, and I think this would be grounds for that.

THE COURT: I am not going to do that, but if Mr. Prussien wants to quote it, he can, OK.

We are going to print this out and make sure we are all on the same page.

All right. Is everyone OK with this?

MR. FELTON: Yes, your Honor.

THE COURT: OK.

MR. BELL: As far as it goes, your Honor. I think it still kind of begs the question, but the record is made.

THE COURT: I'm sorry to deprive you of lunch.

(Recess)

THE COURT: Folks, we are bringing the jury in. Mr. Bell, we are bringing the jury in now. I just wanted to let you know, I am going to leave it to them to decide if they want to sit late tonight or just start fresh tomorrow, but we will make clear that they need to all be present before they deliberate, OK.

MR. BELL: I will note, Judge, I am going to tell Judge Torres that I am probably going to be late.

THE COURT: I think you will be. I'm sorry.

(Jury present)

THE COURT: Everyone may be seated.

So, because the burden of proof rests with the government, we give the government an opportunity to have a shorter rebuttal summation.

You may proceed, Mr. Prussien.

MR. PRUSSIEN: Anthony Curcio is guilty. This is the government's last chance to respond to what you have heard from the defense. And what you heard is distraction, after distraction, after distraction. The defense's presentation was designed to do one thing: Distract you from the overwhelming evidence that you have heard during trial. The defense really had no choice but to try and divert your attention away from the actual evidence in this case because the actual evidence is overwhelming.

The testimony from victims, PSA, eBay, the materials from Curcio's own home and electronic devices that showed you that he committed the charged crimes, and the recordings of Curcio lying to his victims, that's all devastating evidence. The evidence clearly shows beyond a reasonable doubt that Curcio is guilty. That's why the defense wants to distract you.

I want to remind you that Curcio has absolutely no burden whatsoever during this trial. The burden of proof is always on the government. The defendant can simply sit there throughout trial, doesn't have to call any witnesses, doesn't have to cross-examine any witnesses, doesn't have to make any arguments to you whatsoever. The government always bears the burden of proof, and we embrace that burden. And in this case, the evidence meets that burden overwhelmingly.

But if the defendant does make arguments to you through his lawyer, as he just did, you can and should scrutinize those arguments like any other arguments, and you should not accept nonsense or distractions. You are the judges of the facts, the facts to believe and the facts to reject.

I am going to spend just a few minutes speaking about how you should scrutinize the arguments you just heard. I am not going to address every point that defense counsel made, but I don't have to. You have seen all the evidence in this case, and the evidence speaks louder than anything I can say. The evidence speaks louder than anything defense counsel can say. So I am just going to talk about their main arguments.

For the defense arguments I don't directly address, I want you to ask yourselves a few questions: Does that really explain all the evidence you saw? Is it really a reasonable understanding of what you saw in this trial with your own eyes and what you heard with your own ears, or is it just a distraction?

The defense focused on how the government hasn't shown all the prior possible card owners before it got into Curcio's hands. The evidence doesn't need to show that. The evidence shows that Curcio knowingly sold cards with fake grades because they were his own creation. The clearest evidence that the cards that he was creating were the cards that he was selling, we will start with the tools in his home.

Bondarchuk told you what those tools are for. This isn't a situation on QVC where the tools are laid out for no purpose. Bondarchuk testified about the erasers, about the markers, about the razor blades, about the scissors, about all the tools necessary, about the drills, the buffers. It's no coincidence that those are the tools that were before you during this trial. And there are additional tools, digital tools, the numerous label templates that matches the cards that he sold. There are multiple examples of those physical -- those digital tools included in Government Exhibit 5702. There are also examples of loose labels that just maybe coincidentally match up with the cards that he sold. You have P46D. That matches up with 3356. These are two government exhibits that show that the loose labels that were found match the cards that Curcio sold. That is no coincidence.

The creased Michael Jordan card that shows a PSA grade and packaging was his own creation. Curcio sold that exact same card three times, each time bumping it down, from a 9, to a 7, to an authentic altered, because it keeps getting kicked back, because it's in a fake PSA case with a fake grade. The repeat sales show that the same card with a different grade each time is being sold, and it proves that Curcio was creating the grades and did so knowingly.

Many of the cards he sold were on his "finished cards list." That is the title. The finished cards list was not a

list of cards being made for a documentary. These were cards he wanted to sell, and often did sell, and they had fake grades. He often wrote a notes column where he sold them or tried to sell them. And the PSA witness, Jackie Curiel, testified that there were unused, open, fake PSA cases in Curcio's home, that's P18, and that they were exactly the same kind of cases as many of the fake cases in that chart, Government Exhibit 5702; the exact same misaligned border texture issue, the identical curve in the corner, the bottom right-hand corner; the fact that the same type of fake PSA case as the cards that Curcio was found with are the same cards he worked on in his workshop. Those were his cards that he put in those cases and sold to the victims. The evidence makes clear that the cards Curcio was creating were the same cards he was selling.

The defense has said that this case somehow hinges on what's in Curcio's mind, that Curcio never knowingly lied to people, and that he told them what he truly believed. Curcio said all the right things to get his victims to pay him, but you shouldn't believe tall tales about Curcio's thoughts and motivations because you don't have to. You have all the compelling evidence to consider, the evidence of what Curcio was really doing. He was lying to people, people who cared deeply about trading cards, to make hundreds of thousands of dollars, and he was hiding his own involvement in the scheme.

The defense has argued that Curcio simply didn't know he was selling trading cards in improper cases with altered labels, but that doesn't make any sense. The evidence that Curcio knew exactly what he was selling, that the cases and labels were fake, and that he was the person who altered those cases and labels is overwhelming.

Let's start with the obvious. Again, Bondarchuk testified that he and Curcio modified cases, cards, and labels. Defense counsel asked Bondarchuk to be specific, and that's exactly what Bondarchuk did. Bondarchuk covered every little detail of what he and Curcio did. Again, Curcio kept his "finished cards list" in a folder titled "Ill Eagle." A clever name, but it's clear that he knew he was committing fraud. His finished cards list tracks in great detail the cards he was selling, including which certifications have been deactivated.

And you know that the finished cards list was discovered in Curcio's home based on seizing his devices, and that same search led to the pictures and recovery of the forgery tools in his workshop. You saw his desk photographed mid forgery. Let's take a quick look at Government Exhibit 7. There is no confusion what was happening here. The defense argues that the government didn't prove that there was a blue Sharpie somewhere and that blue Sharpie is somehow devastating. On his desk you have paint, you have labels, you have empty card cases, you have a screwdriver, Swiss army knife, paint

brushes. There is a toothbrush here. The government doesn't have to prove that he didn't brush his teeth to know what he was doing with this toothbrush in his workshop.

Let's look at the cards on the floor, Government Exhibit 32. Curcio purportedly had valuable PSA 9s and 10s just lying around the workshop, not kept in any kind of safe. All the other victims testified that they keep these kind of valuable cards locked away in a safe. Curcio had a safe. You saw the photos. But he kept his cards on the floor. Curcio did that because he knew they were worth very little because they weren't really PSA 9s and 10s. He did that because he knows that he created the grade. Curcio knew exactly what he was doing.

Defense counsel said he had extensive knowledge of the trading cards and the cases and the labels, and he was planning to make a documentary on the same exact topic. So now, you have to believe that Curcio is claiming that he was working on a lawsuit to expose PSA and a documentary on unfairness in counterfeiting in the trading card industry, and he was also saying he didn't know that the cards in his personal collection had counterfeit slabs and labels. That makes no sense, and you know it. Someone legitimately focused on exposing PSA or unfairness in counterfeiting in the trading card industry would check their own collection for counterfeit slabs and labels. They would believe others when told numerous times that their

own collection had issues. They would send their cards to an authentication company when offered, even if they hated PSA. There is testimony that there are other authentication companies to choose from, like Beckett or SGC.

Even if Curcio despised PSA, when put on notice that his cards had issues, he could put them in a Beckett case, got a Beckett 10, an SGC 10. He didn't because he knew that a PSA 10 was valuable. He knew that the victims would buy a PSA 10.

How do you know Curcio was committing fraud? How do you know he lied about the grades to make money? There are a few obvious reasons shown by the evidence. First, he was modifying the holders and labels themselves. He knew what he was doing. He also lied about the grades, and he knew that PSA grades were important. He also used Bondarchuk's identity because he knew that it would be better if he didn't put his own name out there, which is why he used fake names like Brendan Wooley and John Steele and many, many more.

And he actually sold and traded these cards, the same cards he created. It didn't require a trade or a sale for a documentary. It didn't require a trade and a sale for a lawsuit. The filmmakers who testified, they said that none of the transactions were done, even in their imagined films that they never recorded.

Curcio also lied to buyers when confronted about issues. He didn't say, "Hey, you got me; this is for a

documentary" or "This is for a lawsuit." He reached for whatever lie he could find at the time. He kept the money. He kept the money from Baudo, kept the money from Ryan Dills. He kept the money because he did it to make money.

How else do you know that Curcio did not have good faith when he sold cards in tampered cases with forged labels? It's because it happened repeatedly. He didn't make mistakes. He didn't get unlucky. The same issues with the slabs and labels showed up again and again and again, in deal after deal after deal, with Curcio using his own name or hiding behind someone else's, even after he had been caught repeatedly.

Now, defense wants you to believe and the defense argues that Curcio was not in a conspiracy with Bondarchuk, that they had no agreement because Bondarchuk didn't understand everything that Curcio was doing. Does that make any sense to you? They were obviously in a conspiracy, working together based on their understood agreement that they would be fraudulently selling trading cards.

Conspiracies often involve multiple people working together in different roles and different parts to play. That's the whole point of a conspiracy. Some people, some members of the conspiracy pick up packages and use their online accounts. Other members of the conspiracy make the deals and handle the product, in this case, cards. The scheme is not complicated. It's not one of a kind, and there's nothing

surprising about this. They were a team.

Just because Bondarchuk had to figure out they were engaged in a scheme doesn't mean he didn't figure it out. It doesn't mean that he didn't continue to engage in this fraud. He testified on this very witness stand, when transacting with Joe Baudo, he knew it was a fraud, when taking Ryan Dills' cards and boxes, he knew it was a fraud. On the plane back from this meeting with Ashish Jain, he knew it was a fraud. They operated just like any other business.

Think about Wal-Mart. Not everyone driving a truck for Wal-Mart is negotiating prices with the customers. Not everyone stocking shelves is making brand deals. But that's just not how it works. When you are running a business, people play different roles, and this was an illegal business.

I expect Judge Abrams will instruct you that the manner or extent of participation in a conspiracy doesn't matter. What matters is that the members deliberately joined the criminal conspiracy. And on that point, the evidence is overwhelming that Curcio and Bondarchuk did just that. They took a plane from Seattle to Dallas. They weren't going to a Cowboys game. They weren't going to a rodeo. They flew across the country with specific intent to sell trading cards that Curcio himself put in false cases with false labels. They were going to commit fraud.

Bondarchuk went inside the bank to meet with Ashish

Jain because Curcio pretended to be Bondarchuk, and Jain was just expecting to meet Bondarchuk. While Bondarchuk and Jain were in the bank, Curcio crept around the area, staying by his phone to answer questions that he knew that Bondarchuk was just unequipped to handle. You saw the messages between Curcio and Bondarchuk; Curcio checking on the money over and over and over again. We will pull up GX 212. But you know it's not just this. There's Government Exhibit 215, Government Exhibit 216, 219, 220, 223, 225, 228. Repeatedly, Curcio was asking, "When is the check going to clear? Did you call your bank? Do you know how to move your money from your checking to your savings in case they recall it? Call your bank again. Do you know when the check will clear?" Repeated questions to make sure that he kept the money that they defrauded Joe Baudo out of.

There's also text of Curcio telling Bondarchuk to be prepared to hop on a call, to use a cover story, to pretend to be Ryan Jones. That's Government Exhibit 229. There's text with Curcio instructing Bondarchuk to find fake names for them to use. Sooner or later, they couldn't use Bondarchuk's name. They needed more fake names. They needed more accounts. They needed more debit cards and credit cards and fake phone numbers because, as you saw in Government Exhibit 227, there was a point where Curcio thought things were coming together and it would soon be a full-time job for Bondarchuk to engage in this fraud.

Curcio wants you to believe that he wasn't working with Bondarchuk and that he didn't know he was lying and cheating people, but that defies common sense. You know that they talked frequently about their scheme, and when Curcio instructed Bondarchuk on how to move money between accounts to keep their ill-gotten proceeds, Curcio was playing his role. He was calling the shots and having Bondarchuk's name, reputation, and finances at risk because that was the point of their agreement. Just because Curcio lied to Bondarchuk and manipulated him before Bondarchuk figured out what was going on doesn't mean that Curcio wasn't in a conspiracy with Bondarchuk once they had this meeting of the minds and defrauded all those victims who testified on that stand.

And Curcio was also in a conspiracy with others. You saw the messages. With Bondarchuk, Curcio was calling the shots. With Dennis Ha, he is laying out their scheme and they are getting their stories straight. And with Curcio's girlfriend, Stephanie Brown, they are making up back stories and bragging about their Bonnie and Clyde good criminal/bad criminal dynamic. Curcio wants you to believe that these messages don't mean what they obviously mean, what Bondarchuk told you they mean, but you know that defies common sense. You know they talked about their illegal activities because you saw it for yourself.

And on the point of Bondarchuk joining after PSA was

out to get Curcio, there is no evidence of that. The evidence is that Bondarchuk joined after Curcio was banned from eBay because these same trading cards were being recalled and flagged by customers. Banned by eBay in November 2022, enlisted Bondarchuk fall 2022, banned from PSA in February 2023. That's the timeline. There is no evidence that PSA is out to get Anthony Curcio. There is evidence that Curcio was making counterfeit PSA products in cases and labels, and that PSA wanted him to stop. And that's just common sense.

Bondarchuk said on this witness stand that he knew he was committing fraud. So the employee knew it was a fraud, but the boss didn't know it was a fraud? Does that make any sense to you? If a cashier at Burger King knows he is selling burgers and fries, what do you think the manager knows? Bondarchuk knew that he and Curcio were selling cards in fake or altered cases with forged labels, and Curcio knew too.

Curcio wants you to believe that he is a victim, that his precious card collection had just unfortunately included one or two cards in fake or tampered cases with altered labels, completely unbeknownst to him, and that when he tried to sell those problematic cards in his own collection, although people told him many times that PSA or other self-described experts identified issues with the slabs and labels, and sometimes even with the cards themselves, Curcio just didn't believe what he was told, and he just truly believed in his heart of hearts

that his cards were completely legitimate even when he was told otherwise, even when he got caught time after time after time. That makes absolutely no sense.

Perhaps the first time he sold a card and received a complaint, maybe that could be a mistake, but you know it's not because you know he was making the cards. But just imagine, maybe the first time is a mistake. The second time, that's a choice. The third time, that's a pattern. And having pretty much the same issues with over 40 cards, that's explained by only one simple, reasonable conclusion: That Curcio was knowingly selling cards with false PSA grades, that Curcio was committing fraud. If it walks like a duck, swims like a duck, sounds like a duck, then it's a duck. If it sounds like a criminal scheme, if the evidence shows it's a criminal scheme, then it's a criminal scheme. You can believe the evidence.

My colleague walked you through the evidence slide by slide, through the testimony, the e-mails, the text messages, the recordings, all of it, and the evidence painted a very clear picture of Curcio's guilt. The defense chose a different approach. You heard about Burger King. You saw a slide of a burger. You got Samuel L. Jackson references, QVC references, Teenage Mutant Ninja Turtle references, and even a Dikembe Mutombo reference; whatever it took to get you to focus on anything other than the actual evidence, because if you look at the evidence, one thing is clear: Anthony Curcio is guilty.

There is no evidence that PSA was out to get him. Don't be distracted by that. Don't be distracted by Curcio claiming that he wanted to put together a so-called documentary or sue PSA as part of some expose. The documentary and lawsuit just can't explain Curcio's conduct during the scheme. They don't make sense. They don't explain his motive. The filmmakers never heard of Bondarchuk. They didn't know about any of the transactions at issue in this case. Those were not part of any so-called documentary, the documentaries that they never started filming. Those transactions don't make any sense as a way to expose PSA because the cards weren't even submitted to PSA, going through PSA for authentication. The scheme didn't hurt PSA. The scheme hurt victims who bought the cards with fake grades.

There is also no explanation for why a documentary or lawsuit means that Curcio wasn't committing fraud. Two things can be true. Curcio could be working on a documentary or a lawsuit and also committing fraud. There is no logical explanation for why these things can't be happening separate and apart from one another. Curcio committed fraud, period. That's what the evidence shows.

How do you know he was doing these things separately? Because everyone you would expect to be in a so-called documentary, the filmmakers never heard of them. Never heard of Bondarchuk, never heard of any of the victims. The only

subject of a so-called documentary was Curcio.

How else do you know this was separate? Because the defendant meticulously saved all his files in an "Ill Eagle" folder. Separate from whatever lawsuit folder might exist, his "Ill Eagle" folder was for just that, his illegal activities. Don't be fooled into distractions. Just come back to the evidence. Defense mentioned law enforcement's interpretation of the evidence, PSA's interpretation of the evidence, but none of that matters. All that matters is your interpretation of the evidence.

Curcio's conduct, as you know, is not explained by a lawsuit or a documentary. Curcio's actions are consistent with a man committing fraud. You learned that Curcio took real PSA labels from other trading cards and he carefully erased all that information, except the PSA branding, and he put his own fake high ratings on the erased labels and other fake information, and he put the forged label on the cases. The card Curcio put inside the fake case with the forged label did not receive the grade that Curcio put on the label. If the card transactions were really related to any lawsuit or documentary, Curcio would have said so, but he didn't.

You learned that the forgeries were not perfect, and when confronted, he just made up excuse after excuse and never said, "Hey, this is all for some documentary. You will be a part of it." You heard none of that. But you did hear from

Curcio's own words, as recorded. You heard the phone call with Joe Baudo, a man from Ohio, with Curcio making every excuse he could come up with. You even saw the text messages to Bondarchuk beforehand, saying, "Hey, be Brian Jones. Here is the lie you tell. Here is how we trick Joe Baudo." You heard the anger in Darren Adams' voice, the shop owner. He couldn't believe that someone would be so bold as to send a front man to his shop to sell cards with fake slabs, with altered labels, not once, but twice.

Even if you believe that Curcio was working on a lawsuit or a documentary, you still also know that Curcio lied about the grade assigned to trading cards, and he did it to make money. He lied to avoid getting caught. He lied to cover it up. You have seen and heard the evidence for yourself. The defense wants you to believe that Curcio's lies just don't matter, that he didn't believe that PSA's grades were reliable, and so because he didn't care about them, it doesn't matter. Big whoop.

The government didn't call an expert to prove that any given card deserved a particular grade, and somehow that changed the analysis, but it doesn't because the victims all told you how important a PSA label was to them. They all testified that they relied on the PSA grade to determine how much the cards were worth. You know that the grades impact a card's value. You have learned that the higher the grade, the

more money the card can sell for. You know that; Curcio knows that. You know that he knows that because he explained it in his own memoir. That's why he changed the grades in the first place. That's how you know that the lies Curcio told about the grades mattered. He knew that PSA's opinion mattered.

He also knew that no one cares what he would assign a grade. He didn't put "Curcio Media" or "DLA West" on any of these labels. He put "PSA 10", "PSA 9." And Curcio could have graded these cards himself under his own name if he wanted. You heard from witnesses that there are multiple grading companies, and even smaller ones. You even saw in the memoir that sometime ago Curcio did just that.

MR. BELL: Judge, sorry, I am going to object as to beyond the scope. I have let it go for some degree, but I don't know that this is responsive.

THE COURT: Overruled.

MR. PRUSSIEN: Curcio can't pass off his own grades as PSA's grades when he sells cards. That's a lie. That's fraud. Defense has argued that Curcio did not intend to commit fraud because, frankly, his plan was so bad that it could not have been a criminal plan at all. It just made no sense that he would do it so, therefore, he didn't do it. No one suggested that Curcio was the most sophisticated criminal in the world, but lying to others is a crime, even when the plan is a bad one.

Curcio tried to cover his tracks by using Bondarchuk and other fake names and, frankly, didn't do it very well, but he is still guilty of wire fraud and conspiracy to commit wire fraud. You do not need to be a criminal mastermind to be a criminal. If you did, jails would be empty. Being too stupid to be a crime, too stupid to be a criminal is not a defense. Stupidity is not a defense.

This idea that reholdering was risky, yeah, that's obvious. Reholdering was a gamble, but it could be a gold mine if it worked. That's the whole purpose, because if PSA didn't notice because PSA doesn't regrade cards during reholdering, the cards would be in, in fact, an authentic PSA case, and that would help him sell these cards.

You saw the texts yourself. When Curcio later thinks that he figured out a workaround, he tells Bondarchuk the fraud will be a full-time job because all the pieces are coming together, that he has the right cases, he has the knowhow. This is going to be profitable. He thought his fakes were good enough to get by experts. He thought his fakes were good enough to get by PSA, but he was wrong. That was stupid. That doesn't mean he didn't commit a crime.

The defense has argued that the government has rushed to judgment and that the FBI and prosecutors just adopted PSA's view of the world and of Curcio, and that the government didn't really look into this or didn't look into that. Well, whatever

defense counsel wants you to believe the government could have possibly uncovered, what possibly could have been on that thumb drive, that's just speculation. It's all beside the point. All you need to do is focus on the overwhelming evidence that is actually before you that shows you exactly what happened: The evidence in Curcio's phone where he was candid because he never expected you all to see it, testimony from victims who bought cards, forged PSA labels, the testimony from Bondarchuk who was in on the fraud, who took time to learn. He told you he thought he was in too deep at a certain point because he knew it was a fraud.

You looked at the exhibits. You listened to the testimony for two weeks. You know there is a lot of evidence, and you should not speculate about any theoretical, imaginary evidence that could have been, because the evidence you do have proves beyond a reasonable doubt that the defendant is guilty. You should not speculate about why certain techniques were used or not used because you already have a mountain of evidence to consider.

Now, the defense talked about the burden of proof, and again, the government embraces that burden. There is nothing mystical or magical about it. It's the same standard of proof used in every criminal case, from the most simple shoplifting case to the most complex corporate fraud. It's the same burden of proof applied in every single court in this country, the

same burden of proof applied in every criminal case since the founding of this nation. You have heard the evidence for yourselves. You know that Curcio committed fraud and was in a conspiracy to commit wire fraud. You know he lied about the grades, saying that PSA gave these cards 9s and 10s, and that he did it to make hundreds of thousands of dollars.

When the trial started, you were asked to do three things. The first was, pay attention to the evidence, and you have done that. Thank you. The second was, follow Judge Abrams' instructions on the law, and soon she will give you those instructions. Third, use your common sense, the same common sense you use every day. Don't let defense counsel distract you. When you consider the evidence, if you follow the law, if you use your common sense, you will see that the evidence in this case is overwhelming. Anthony Curcio is guilty. Thank you.

THE COURT: All right. Thank you very much.

So folks, that ends the summations, and the next portion of the trial is for me to instruct you on the law. Ms. Fabiani is going to hand you each a copy of the charge that I intend to read. This is going to take a little while, a little over an hour and a half, so if anyone needs to use the restroom or needs to stretch, just raise your hand at anytime.

THE COURT: OK. Members of the jury, you have now heard all the evidence in the case as well as the final

arguments of the parties. You have paid careful attention to the evidence, and I am confident that you will act together with fairness and impartiality to reach a just verdict.

Now it's time for me to instruct you as to the law that governs this case. There are four parts to these instructions. First, I am going to give you some general instructions about your role. Second, I will give you some instructions about the elements of the charged crimes. Third, I will give you some instructions about various legal rules and how you are to decide the facts of the case. Many of these instructions would apply to just about any trial. Finally, I will give you some final instructions about procedure.

Listening to these instructions may not be easy. It's important, however, that you try and listen carefully. You will notice that I am reading these instructions from a prepared text. It would be livelier, no doubt, if I just improvised, but it's important that I not do that. The law is made up of words, and those words are very carefully chosen. So when I tell you the law, it's critical that I use exactly the right words.

You will have copies of what I am reading in the jury room to consult, so don't worry if you miss a word or two. But for now, just follow along and try and concentrate on what I am saying.

My duty at this point is to instruct you as to the

law. It is your duty to accept these instructions of law and to apply them to the facts as you determine them. With respect to legal matters, you must take the law as I give it to you. If any attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow. You must not substitute your own notions or opinions of what the law is or ought to be.

But nothing I say is evidence. If I commented on the evidence at anytime, do not accept my statements in place of your recollection or your interpretation. It is your recollection and interpretation that govern. And do not draw any inference from any of my rulings. The rulings I made during trial are no indication of any view I might have of the evidence. You should not seek to find from any of my rulings any such view or opinion, nor should you otherwise speculate as to what I may think.

At times I may have directed a witness to be responsive to questions, to pause when an objection had been made by counsel, or to keep their voice up. At times I may have asked a question myself. Any questions that I asked or instructions that I gave were intended only to clarify the presentation of evidence. You should draw no inference or conclusion of any kind, favorable or unfavorable, with respect to any witness or either party in the case by reason of any comment, question, or instruction of mine. Nor should you

infer that I might have any views as to the credibility of any witness, as to the weight of the evidence, or as to how you should decide any issue that is before you. That is entirely your role.

As members of the jury, you are the sole and exclusive judges of the facts. You pass upon the evidence. You determine the credibility of the witnesses. You resolve such conflicts as there may be in the testimony. You draw whatever reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

This is your sworn duty, as you have taken the oath as jurors to determine the facts. As I have mentioned, any opinion I might have regarding the facts is of absolutely no consequence.

It's the duty of the attorneys to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible. It is my job to rule on those objections. Therefore, why an objection was made or why I ruled on it the way I did is not your concern. You should draw no inference or conclusion from the fact that an attorney objects to evidence, nor should you draw any inference from the fact that I might have sustained or overruled an objection.

From time to time, the lawyers and I had conferences out of your hearing. These conferences involved procedural and

other legal matters, and none of the events relating to these conferences should enter into your deliberations at all.

The personalities and conduct of counsel in the courtroom are also not in any way at issue.

I will now turn to my instructions to you relating to the charges brought against the defendant, Anthony Curcio, in this case.

The charges against Mr. Curcio are contained in an indictment. An indictment is not evidence of a defendant's guilt. It is merely an accusation, a statement of charges made against a defendant. It gives the defendant notice of the charges against him and informs the Court and the public of the nature of the accusation. Given that an indictment is proof of nothing, I remind you that every defendant begins trial with an absolutely clean slate.

The indictment contains two counts, or charges, against the defendant.

Count One charges Mr. Curcio with participating in a conspiracy to commit wire fraud from at least in or about 2022 through at least in or about May 2024.

Count Two charges Mr. Curcio with committing wire fraud from at least in or about 2022 through at least in or about May 2024.

As I just indicated, the indictment contains two counts. Each count charges Mr. Curcio with a different crime.

You must consider each count of the indictment separately, and you must return a separate, unanimous verdict on each count. Whether you find the defendant guilty or not guilty as to one offense should not affect your verdict as to the other offense charged. The number of offenses charged is not evidence of guilt and should not influence your decision in any way.

You may find Mr. Curcio guilty of a particular count only if the government has proven each element of the offense charged with respect to that count beyond a reasonable doubt.

As I have just described, there is one count in the indictment that is a conspiracy count, while the second count is what is referred to as a substantive count. Unlike the conspiracy charge, which alleges an agreement to commit a certain offense, the substantive count alleges the actual commission of an offense.

A conspiracy to commit a crime is an entirely separate and different offense from the substantive crime which may be the object of the conspiracy. Congress has deemed it appropriate to make conspiracy, standing alone, a separate crime, even if the object of the conspiracy is not achieved. This is because collective criminal activity poses a greater threat to the public safety and welfare than individual conduct, and increases the likelihood of success of a particular criminal venture.

The essence of the crime of conspiracy is an agreement

or understanding to violate other laws. Thus, if a conspiracy exists, even if it fails, it is still punishable as a crime. Consequently, in a conspiracy charge, there is no need to prove that the crime that was the objective of the conspiracy was actually committed.

By contrast, the substantive count requires proof that the crime charged was actually committed, but does not require proof of an agreement.

Of course, if a defendant participated in a conspiracy to commit a crime, and then actually commits that crime, that defendant may be guilty of both the conspiracy and the substantive crime, as I will instruct you shortly.

There is no significance to the order in which I discuss the counts or the order in which they are presented on the verdict form. For clarity, I am going to start with Count Two.

Count Two of the indictment charges the defendant, Anthony Curcio, with the substantive crime of wire fraud. Specifically, Count Two of the indictment describes the wire fraud, in relevant part, as follows. Now I am reading from the bottom of page 8:

From at least in or about 2022 through at least in or about May 2024, in the Southern District of New York and elsewhere, Anthony Curcio, the defendant, knowingly having devised and intending to devise a scheme and artifice to

defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, in order to induce victims to pay more money for sports and Pokemon trading cards than they otherwise would have paid, Curcio made and caused to be made false statements regarding the grade assigned to the cards by Company-1, and aided and abetted the same, when, in truth and fact, the defendant knew that Company-1 had not assigned the grades to the cards that they represented.

Wire fraud is a violation of Title 18, United States Code, Section 1343. That statute provides, in relevant part: Whoever, having devised or intending to devise any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communications in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice shall be guilty of a crime.

You will note that the word "and" is used between charging words in the indictment. For example, Count Two

charges that the defendant "knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice."

You should read the conjunctive "and" as it appears in the indictment as being a disjunctive "or." Thus, it is enough, for example, that the evidence show that the defendant knowingly having devised or intending to devise a scheme or artifice to defraud, or for obtaining money or property by means of materially false or fraudulent pretense or representation or promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

I will now instruct you on the elements of wire fraud.

To prove the defendant guilty of wire fraud, the government must prove the following three elements beyond a reasonable doubt:

First, that in or about the times alleged in the indictment, there was a scheme or artifice to defraud others of

money or property by means of materially false or fraudulent pretenses, representations, or promises; Second, that the defendant knowingly participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with specific intent to defraud; and Third, that in the execution of that scheme, the defendant used or caused the use by others of interstate or foreign wires.

As to the first element, a "scheme or artifice" is simply a plan for the accomplishment of a specific purpose. A scheme to defraud is any plan, device, or action to obtain money or property by means of false or fraudulent pretenses, representations, or promises reasonably calculated to deceive persons of average prudence.

"Fraud" is a general term that embraces all the various means that human ingenuity can devise and that are resorted to by an individual to gain advantage over another by false representations, false suggestions, suppression of the truth, or deliberate disregard for the truth. Thus, a scheme to defraud is any plan, device, or course of action to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises. It is a plan to deprive another of money or property by trick, deceit, deception, or swindle.

A statement, representation, claim, or document is false if it is untrue when made and was then known to be untrue

by the person making it or causing it to be made. A pretense, representation, or promise is fraudulent if it was made falsely and with intent to deceive. Deceitful statements of half truths, the concealment of material facts, and the expression of an opinion not honestly entertained may constitute false or fraudulent representations.

The false or fraudulent representation or concealment must also relate to a material fact or matter. A material fact is one that would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision. This means that if you find a particular statement of fact to have been false, you must determine whether that statement was one that a reasonable person might have considered important in making their decision. The same principle applies to fraudulent half-truths or omissions of material facts. In considering this element of wire fraud, it is not important whether the other person actually relied on a misrepresentation. It is sufficient if the misrepresentation is one that is merely capable of influencing the person's decision and is intended to do so.

The deception need not be premised upon spoken or written words alone. The arrangement of the words or the circumstances in which they are used may convey the false and deceptive appearance. Indeed, conduct alone can deceive

another, even in circumstances where a person's statements contain no misrepresentation. If there is deception, the manner in which it is accomplished does not matter. In addition, it is not required that the scheme to defraud involve deception of the same person or entity whose money or property is obtained. The deception may target one person or entity in order to obtain the money or property of another.

A scheme to defraud need not be shown by direct evidence, but may be established by all the circumstances and the facts in the case.

Furthermore, it does not matter whether a victim might have discovered the fraud had they probed further or whether a victim did discover the fraud and failed to act upon that discovery. If you find that a scheme or artifice existed, it is irrelevant whether you believe that a victim was careless, gullible, or even negligent.

In order to satisfy the first element, the government must also prove that the alleged scheme contemplated deprived another of money or property. It is not necessary for the government to establish that the defendant actually realized any gain from the scheme or that any particular person actually suffered damages as a consequence of the fraudulent scheme. You must concentrate on whether there was such a scheme, not on the consequences of the scheme.

The second element of wire fraud is that the defendant

devised or participated in the scheme or artifice to defraud knowingly and with an intent to defraud.

To "devise" a scheme to defraud is to concoct or plan it. To "participate" in a scheme to defraud means to associate oneself with it with a view and intent toward making it succeed. While a mere onlooker is not a participant in a scheme to defraud, it is not necessary that a participant be someone who personally and visibly executes the scheme to defraud.

In order to satisfy this element, it is not necessary for the government to establish that the defendant originated the scheme to defraud. It is sufficient if you find that a scheme to defraud existed, even if originated by another, and that the defendant, while aware of the scheme's existence, knowingly participated in it.

It is also not required that the defendant participate in or have knowledge of all the operations of a scheme. The guilt of a defendant is not governed by the extent of his participation. As I previously noted, the defendant must have acted knowingly and with an intent to defraud. "Knowingly" means to act voluntarily and deliberately rather than mistakenly or inadvertently. "Intent to defraud" means to act knowingly and with the specific intent to deceive for the purpose of obtaining money or property.

The question of whether a person acted knowingly with

specific intent to defraud is a question of fact for you to determine like any other fact question. The question involves one's state of mind. Direct proof is not required to establish the defendant's state of mind. As I will explain more later, you may rely on what is called circumstantial evidence to establish the defendant's state of mind. Direct proof of knowledge and fraudulent intent is often unavailable. Indeed, it is not typical that a person writes or states that as of a given time in the past, he or she committed an act with fraudulent intent. Such direct proof is not required. The ultimate facts of knowledge and criminal intent, though subjective, may be established by circumstantial evidence based upon a person's outward manifestations, words, conduct, acts, and all the surrounding circumstances disclosed by the evidence, and the rational or logical inferences that may be drawn therefrom.

What is referred to as drawing inferences from circumstantial evidence is no different from what people normally mean when they say "use your common sense." Using your common sense means that when you come to decide whether the defendant possessed or lacked certain state of mind, you do not limit yourself to what the defendant said, but you also look to what he did and what others did in relation to him and, more generally, everything that occurred.

When deciding whether the individual possessed or

lacked an intent to defraud, you need not limit yourself to just what the individual said, but you may also look at what the individual did and what others did in relation to the individual and, in general, everything that occurred.

The law recognizes that there may be multiple motives for human behavior. Thus, a specific intent need not be the defendant's sole or even primary purpose. A defendant may have the requisite intent to defraud even if the defendant was also motivated by other lawful, proper, or neutral purposes or reasons for his actions. A defendant may, thus, properly be convicted if his intent to commit the crime was any one of his objectives.

Because an essential element of the crime charged is intent to defraud, it follows that good faith on the part of the defendant is a complete defense to the charge of wire fraud. The defendant, however, has no burden to establish a defense of good faith. The burden is on the government to prove fraudulent intent, as I have just defined it for you, and the consequent lack of good faith beyond a reasonable doubt.

Under the wire fraud statute, even false representations or statements or omissions of material facts do not amount to a fraud unless done with fraudulent intent. An honest belief in the truth of the representations made by a defendant is a complete defense, however inaccurate the statements may turn out to be.

In considering whether or not the defendant acted in good faith, however, you are instructed that a belief by a defendant, if such belief existed, that ultimately everything would work out so that the victim would not lose any money, does not necessarily constitute good faith. No amount of honest belief on the part of a defendant that the scheme would ultimately work out such that the victim would not lose money or property will not excuse fraudulent actions or fraudulent representations by him.

A venture commenced in good faith may become fraudulent if it is continued after intent to defraud has been formed. As a result, good faith is no defense when the defendant first made representations in good faith, but later, after realizing the representations were false, nevertheless, deliberately continued to make them.

You have heard evidence about refunds. If you find that the defendant had fraudulent intent at the time of the transactions in question, whether or not he later gave or offered a refund does not change that intent. The presence or absence of refunds may, however, be relevant for another proper purpose.

As to the third element, the government must prove that in the execution of the wire fraud scheme, one or more participants in that scheme used, or caused the use by others of, interstate or foreign wires. An interstate wire is a wire

that passes between two or more states. A foreign wire is a wire that passes between the United States and someplace outside of the United States. Examples of wires include telephone calls, text messages, communications over the internet, commercials on television, and financial wires between bank accounts, among other things.

It is not necessary for the defendant to be directly or personally involved in any wire communication, as long as the wire communication is reasonably foreseeable in the execution of the alleged scheme to defraud in which the defendant is accused of participating. In this regard, it would be sufficient to establish the element of the crime if the evidence justifies a finding that the defendant caused the wires to be used by others, including a victim of the alleged fraud. And this does not mean that the defendant himself must have specifically authorized others to execute a wire communication. When one does an act with knowledge that the use of the wires will follow in the ordinary course of business, or where such use of the wires can reasonably be foreseen, even though not actually intended, then he causes the wires to be used.

The use of the wire need not itself be fraudulent. Stated another way, wire communication need not contain any fraudulent representation or even any request for money. It is sufficient that the wires were used to further or assist in

carrying out the scheme to defraud. Incidentally, the wire communication requirement is satisfied even if the wire communication was done by a person with no knowledge of the fraudulent intent, including a victim of the alleged fraud.

Only the wire communication must be reasonably foreseeable, not its interstate or foreign component. Thus, if you find that the wire communication was reasonably foreseeable, and the interstate or foreign wire communications actually took place, then this element is satisfied even if it was not foreseeable that the wire communication would cross state or national lines.

Count Two also charges the defendant with what is called aiding and abetting and willfully causing a crime.

Aiding and abetting and willfully causing a crime are simply alternative manners of committing a substantive crime. If the government proves beyond a reasonable doubt that the defendant committed the wire fraud alleged in Count Two, then you need not consider whether the defendant aided and abetted the offense or willfully caused it with respect to that count. If, however, you find that the government did not prove beyond a reasonable doubt that the defendant engaged in wire fraud, you should consider whether the government has, nonetheless, proved beyond a reasonable doubt that the defendant aided and abetted someone else in the commission of wire fraud or willfully caused the commission of wire fraud.

First, I will explain aiding and abetting, and then I will explain what it means to willfully cause a crime.

A defendant can be convicted of committing a crime if he helps someone else to commit the crime.

Under the federal aiding and abetting statute, whoever "aids, abets, counsels, commands, induces, or procures" the commission of an offense is punishable as a principal. A person who aids and abets another to commit a crime is just as guilty of that crime as if he had personally committed it. You may, thus, find that the defendant -- you may, thus, find the defendant guilty of wire fraud if you find beyond a reasonable doubt that the government has proven that another person committed the offense and that the defendant helped or assisted that person in the commission of the offense.

The first requirement of aiding and abetting liability is that someone else has committed the crime at issue. The defendant cannot be convicted of aiding and abetting if no one committed the underlying crime. But if you do find that the underlying crime at issue was committed by someone other than the defendant, you should consider whether the defendant aided and abetted that person who actually committed the crime.

To aid and abet another to commit a crime, the defendant must have willfully and knowingly associated himself in some way with the crime, and he must have willfully and knowingly sought by some act to help make the crime succeed.

Participation in a crime is willful if action is taken voluntarily and intentionally.

The mere presence of the defendant in a place where a crime is being committed, even coupled with knowledge that a crime is being committed, is not enough to make him an aider and abettor. A defendant's acquiescence in the criminal conduct of others, even with guilty knowledge, is not enough to establish aiding and abetting. An aider and abettor must have his own affirmative interest in the criminal venture. A defendant may not properly be convicted of aiding and abetting a crime that was completed before his accessorial acts were performed.

To determine whether the defendant aided and abetted the commission of a crime, ask yourself these questions:

Did someone other than the defendant commit the crime at issue? Did the defendant participate in the crime charged as something that he wished to bring about? Did he associate himself with the attempt to commit the crime by other people knowingly and willfully? Did he seek by his actions to make the criminal venture succeed?

If so, the defendant is an aider and abettor, and therefore, he is guilty of the offense under consideration. If not, then he is not an aider and abettor, and he is not guilty of the offense under consideration unless you find that he committed the offense directly or willfully caused it.

The second way the defendant can be found guilty of the crime without having personally committed the conduct that meets all the elements that I defined earlier is by willfully causing someone else to commit the crime.

Under federal law, whoever willfully causes an act to be done which, if directly performed by him or another, would be an offense against the United States, shall be guilty of a crime. The term "willfully cause" can be found in the answers to the following questions:

First, did the defendant take some action without which the crime would not have occurred? Second, did the defendant intend that the crime would actually be committed by others?

I just want to pause here. Does anyone need to stand or stretch or user the restroom?

OK. Feel free to go ahead. Thank you.

(Recess)

THE COURT: Is there something you want to talk to me about?

MR. BELL: Yes, Judge.

(Continued on next page)

(At sidebar)

MR. BELL: Hi, Judge.

THE COURT: Did I miss something or misstate something?

MR. BELL: I think we collectively did. You did great as a reader. On page 14, though, the third paragraph, the sentence that begins -- the last sentence of the third paragraph that begins, "No amount of honest belief on the part of the defendant," there is a double negative in there that your Honor read that I think changes the meaning of the sentence. I think the "not" should be excised, and I think it should probably be --

MR. FELTON: The "not" before "excuse."

MR. BELL: The "not" before "excuse" should be excised, and it should be clarified for the jury's benefit.

THE COURT: I will clarify that.

(Continued on next page)

(In open court)

THE COURT: All right. So, we noticed a small typographical error, so I am going to ask you to all go back to page 14. It is the last sentence in the third paragraph, and I am going to read it and clarify what needs to be changed.

So, no amount of honest belief on the part of the defendant that the scheme would ultimately work out such that the victim would not lose money or property will -- and then take out the "not" -- excuse fraudulent actions or false representations by him. So if you can all cross out that "not" between "will" and "excuse."

All right. And now I am going to continue on with conspiracy to commit wire fraud towards the bottom of page 18.

Count One of the indictment charges the defendant, Anthony Curcio, with conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1347 -- excuse me, 1349.

Count One of the indictment describes the charged conspiracy, in relevant part, as follows:

From at least in or about 2022 through at least in or about May of 2024, in the Southern District of New York and elsewhere, Anthony Curcio, the defendant, and others, known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code,

Section 1343. It was part of and an object of the conspiracy that Anthony Curcio, the defendant, and others, known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication, in interstate and foreign commerce, writing, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, in order to induce victims -- and this should be a to -- to pay more money for sports and Pokemon trading cards than they otherwise would have paid, Curcio and others agreed to and did make and cause to be made false statements regarding the grade assigned to the cards by Company-1 when, in truth and in fact, Curcio and his coconspirators knew that Company-1 had not assigned the grade to the cards that they represented.

Title 18, United States Code, Section 1349 provides, in relevant part, any person who attempts or conspires to commit any offense under this chapter commits a crime.

So, Section 1349 refers to offenses under this chapter, which include Section 1343, which is wire fraud. I have previously discussed the elements of this crime.

As I will explain, a conspiracy is a kind of criminal

partnership, an agreement of two or more people to join together to accomplish some unlawful purpose. The essence of the crime of conspiracy is an agreement or understanding to violate other law. If a conspiracy exists, even if it should fail in its purpose, it is still punishable as a crime.

In order to sustain its burden of proof with respect to the conspiracy charged in Count One of the indictment, the government must prove beyond a reasonable doubt the following elements:

First, that the charged conspiracy existed; in other words, that there was, in fact, an agreement or understanding between two or more people to commit the object of the conspiracy, which is alleged here to have been wire fraud.

Second, that the defendant knowingly and willfully became a member of the conspiracy with intent to further its illegal purpose, that is, with the intent to commit the object of the charged conspiracy, wire fraud, during the applicable time period.

Now let us separately consider the two elements.

The first element is simply the existence of a conspiracy. A conspiracy is an agreement, or an understanding, by two or more persons to accomplish an unlawful objective by working together.

To meet its burden of proof on this element, the government must prove that there was an agreement between two

or more people. The government is not required to show, however, that two or more people sat down at a table and entered into a solemn pact, orally or in writing, stating that they have formed a conspiracy to violate the law, and spelling out all the details of the plans and the means by which the unlawful object was to be carried out, or the part that each of the persons who is a party to the conspiracy was going to play. Common sense will tell you that when people, in fact, undertake to enter into a criminal conspiracy, much is left to unexpressed understanding. Conspirators do not usually reduce their agreements to writing. They do not typically broadcast their plans publicly.

By its very nature, a conspiracy is almost always secret in its origin and execution. It is enough if two or more people in some way or manner impliedly or tacitly come to an understanding to violate the law. Express language or specific words are not required to indicate assent or agreement to form the conspiracy. You need only find that two or more people entered into the unlawful agreement alleged in the indictment in order to find that a conspiracy existed.

In determining whether there has been an unlawful agreement as alleged in Count One, you may judge the proven acts and conduct of the alleged conspirators that were taken to carry out the apparent criminal purpose. The old adage "actions speak louder than words" is applicable here.

Disconnected acts which when taken in connection with one another can show a conspiracy or an agreement to secure a particular result just as satisfactorily and conclusively as more direct proof.

I am going to read that one more time.

Disconnected acts when taken in connection with one another can show a conspiracy or an agreement to secure a particular result just as satisfactorily and conclusively as more direct proof.

When people enter into a conspiracy to accomplish an unlawful end, they become agents or partners of one another in carrying out the conspiracy. In determining the factual issues before you, you may take into account any acts done or statements made by an alleged coconspirator during and in furtherance of the conspiracy, even though such facts or statements may not have been made in the presence of the defendant or may have been made without his knowledge.

Of course, proof concerning the accomplishment of the object of a conspiracy may be the most persuasive evidence that the conspiracy itself existed, but it is not necessary, as I have said, that the conspiracy actually succeed for you to conclude that it existed. In deciding whether the conspiracy charged in Count One existed, you may consider all the evidence of the acts, conduct, and statements of the alleged conspirators and the reasonable inferences to be drawn from

that evidence.

It is sufficient to establish the existence of the conspiracy if, after considering all of the relevant evidence, you find beyond a reasonable doubt that the mind of at least two alleged conspirators met in an understanding and that they agreed, as I have explained, to work together to accomplish the object or objective of the conspiracy charged in Count One.

The object of a conspiracy is the illegal goal or goals that the coconspirators agree or hope to achieve. As I have mentioned, the object of the conspiracy charged in Count One of the indictment is wire fraud. In order to prove that the defendant is guilty of the conspiracy offense charged in Count One, the government must establish beyond a reasonable doubt that the defendant agreed with others to commit wire fraud.

As I noted, the substantive offense of wire fraud alleged in Count Two of the indictment is charged as the object of the conspiracy in Count One. That is permissible. This is permissible. A crime may be prosecuted for its own sake, and it may also be an object of a conspiracy. However, you must consider them separately. A defendant may be guilty of one and not the other, and you may consider whether the defendant committed the substantive count when determining whether the defendant committed the conspiracy.

If you find that the government has proven beyond a

reasonable doubt the first element of Count One, that a conspiracy to commit wire fraud existed, then you must consider the second element of Count One. The second element the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that the defendant became a member of the conspiracy knowingly, willfully, and with intent to further its unlawful purpose or objective.

I have already instructed you on the definition of "knowingly" and you should apply that definition here.

To act "willfully" means to act knowingly and purposefully, with an intent to do something that the law forbids, that is, with a bad purpose to disobey or disregard the law. A defendant need not have known that they were breaking a specific law or specific statute. They need only have been aware of the generally unlawful nature of their act.

In deciding whether the defendant was, in fact, a member of the conspiracy, you should consider whether that defendant knowingly joined the conspiracy. Did he participate in it with knowledge of its unlawful purpose and with the specific intention of furthering its objective?

Now, obviously, science has not yet devised a manner of looking into a person's mind and knowing what the person was thinking. To make that determination, you may look to the evidence of certain acts that are alleged to have taken place by or with the defendant or in his presence. You may consider

circumstantial evidence based on the defendant's outward manifestation, his words, his conduct, his acts, and all the surrounding circumstances of which you have heard evidence, and the rational and logical inferences that may be drawn therefrom.

You may also consider the acts and statements made by any member of the conspiracy, during the course of and in furtherance of the conspiracy, in determining whether the defendant knowingly and intentionally entered into the conspiracy.

It is not necessary for the government to show that the defendant was fully informed as to all of the details of the conspiracy in order for you to infer knowledge and intent on his part. To have guilty knowledge, the defendant need not have known the full extent of the conspiracy or all of the activities of all of the conspiracy's participants. Similarly, it is not necessary for the defendant to have known every other member of the conspiracy. In fact, the defendant may know and have conspired with only one other member of the conspiracy and may still be considered a coconspirator. Nor is it necessary for the defendant to have received any monetary benefit from his participation in the conspiracy or to have a financial stake in the outcome of the alleged joint venture. It is enough if the defendant participated in the conspiracy knowingly and willfully, as I have defined those terms.

The duration and extent of the defendant's participation has no bearing on the issue of that defendant's guilt. The defendant need not have joined the conspiracy at the outset. The defendant may have joined the conspiracy at anytime in its progress, and the defendant will be held responsible for all that was done before he joined and all that was done during the conspiracy's existence while he was a member. Each member of a conspiracy may perform separate and distinct acts. Some conspirators may play major roles in the schemes while others play minor roles. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw a defendant within the scope of the conspiracy.

It is also not necessary that the defendant receive any monetary benefit from participating in the conspiracy. All that is necessary is proof beyond a reasonable doubt that the defendant unlawfully and knowingly joined in the conspiracy for the purpose of furthering its unlawful object, here, wire fraud.

I want to caution you, however, that the defendant's mere presence at the scene of the alleged crime does not by itself make him a member of the conspiracy. Similarly, mere association with one or more members of the conspiracy does not automatically make the defendant a member. A person may know or be friendly with a criminal without being a criminal

himself. Mere similarity of conduct or the fact that they may have assembled together and discussed common aims and interests does not necessarily establish membership in the conspiracy.

I also want to caution you that mere knowledge or acquiescence without participation in the unlawful plan is not sufficient. Moreover, the fact that the acts of a defendant without knowledge merely happen to further the purpose or objectives of the conspiracy does not make the defendant a member. More is required under the law. What is necessary is that the defendant must have participated with knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishment of those unlawful ends. As I noted before, the government is not required to prove that the members of the alleged conspiracy were successful in achieving any of the objects of the conspiracy.

Both counts in the indictment require that the government establish beyond a reasonable doubt that the defendant had knowledge of some sort, as I have already described to you. In your consideration of whether the defendant acted knowingly with respect to either of the counts charged in the indictment, you may consider whether the defendant deliberately closed his eyes to what otherwise would have been obvious to him. If you find beyond a reasonable doubt that the defendant acted with a conscious purpose to

avoid learning the truth, then the requirement that he acted knowingly may be satisfied. Similarly, if you find that the defendant was aware of a high probability that the scheme was fraudulent and the defendant acted with deliberate disregard of that high probability, then you must find the defendant has proven -- then you must find that the government has proven that the defendant acted knowingly. One may not willfully and intentionally remain ignorant of a fact material and important to his or her conduct to escape the consequences of the criminal law. However, guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish, or mistaken. Moreover, if you find that the defendant actually believed the truth of the representations he made, he may not be convicted.

With respect to the conspiracy charged in Count One, you should not allow this principle regarding the deliberate closing of eyes to have any bearing on your determination as to whether a conspiracy existed or whether the defendant became a member of the conspiracy. If you find beyond a reasonable doubt that the defendant intentionally participated in a conspiracy, but that the defendant deliberately and consciously avoided confirming certain facts about the specific object of the conspiracy, then "conscious avoidance" may support a finding that the government has proven that the defendant knew of the conspiracy's objectives.

However, conscious avoidance may apply only to the defendant's knowledge of the specific objective of the conspiracy, not to whether the defendant joined the conspiracy in the first place. It is logically impossible for a defendant to intend and agree to join a conspiracy if the defendant does not actually know that it exists.

Thus, with respect to Count One, if you find that the defendant was aware of a high probability that the object of the conspiracy was to commit wire fraud, and that the defendant acted with deliberate disregard of the fact, you may find that the defendant acted knowingly. However, if you find that the defendant actually believed that the object of the conspiracy was not to commit that act, the defendant may not be convicted of the associated conspiracy count.

It is entirely up to you whether you find that the defendant deliberately closed his eyes and any inferences to be drawn from the evidence on this issue.

Proof of motive is not a necessary element of the crimes with which the defendant is charged. Proof of motive does not establish guilt, nor does the lack of motive establish that the defendant is not guilty. If the guilt of a defendant is shown beyond a reasonable doubt, it is immaterial that the defendant's motive for the crime may be -- sorry. It is immaterial what that defendant's motive for the crime may be, or whether the defendant's motive was shown at all. The

presence or absence of motive is, however, a circumstance which you may consider as bearing on the intent of the defendant.

Now, in addition to dealing with the elements of each offense, you must also consider the issue of venue as to each offense, namely, whether any act in furtherance of the unlawful activity occurred within the Southern District of New York. The Southern District of New York includes the counties of New York, that is Manhattan, the Bronx, Westchester, Rockland, Putnam, Orange, Dutchess, and Sullivan, as well as bridges over bodies of water within the boundaries of the Bronx, Queens, and Brooklyn, such as the Verrazzano-Narrows Bridge. Anything that occurs in the counties I have listed for you occurs in the Southern District of New York.

Venue must be established separately for each count in the indictment. Venue on one count does not establish venue on any other counts, although, if applicable, you may rely on the same evidence to establish venue on both counts.

With respect to Count One, which charges conspiracy, it is sufficient for the government to prove that some act in furtherance of the offense occurred within the Southern District of New York. In this regard, the act that occurred in this district need not be a criminal act. It could include, for example, meeting with others involved in the criminal scheme within this district. The act need not be taken by the defendant or a conspirator, as long as the act was caused by

the conduct of the defendant or a conspirator or was reasonably foreseeable.

As to Count Two of the indictment, which charges wire fraud, it is sufficient to establish venue if the government has proven that any of the wire communications you found to satisfy the third element of the offense, use of interstate wires, were transmitted to or from the Southern District of New York so long as the defendant reasonably anticipated that a wire communication in furtherance of the scheme would be transmitted from or to the Southern District of New York. As noted previously, this may include wire transfers of money, phone calls, e-mail communications, faxes, or text messages.

To satisfy this venue requirement only, the government need not prove the burden of proof beyond a reasonable doubt. It need not meet that standard on the venue requirement and the venue requirement only. The government meets its burden of proof if it establishes by a preponderance of the evidence, simply tips the scales in its favor, that an act in furtherance of the crime occurred within the Southern District of New York. A preponderance of the evidence means that something is more likely than not.

As to each count in the indictment, various date ranges are alleged. As to the substantive count, it is sufficient if you find that the charged conduct occurred around the dates set forth in the indictment. As to the conspiracy

count, it is not essential that the government prove that the conspiracy alleged started and ended within the date ranges in the indictment, but you must find, with regard to -- it should be -- the conspiracy count, that a conspiracy was formed and that it existed for some time within the period set forth in the indictment.

This is also a good opportunity to instruct you that it does not matter if a specific event or transaction is alleged to have occurred on or about a certain date, and the evidence indicates that, in fact, it occurred on another date. The law only requires substantial similarity between the dates alleged in the indictment and the dates established by the testimony and other evidence.

I will turn now to my instructions about various legal rules and how you are to decide the facts of the case.

I will first instruct you on the presumption of innocence and the government's burden of proof in this case. The defendant, Mr. Curcio, has pleaded not guilty. By doing so, he denies all of the charges in the indictment. Thus, the government has the burden of proving each element of the charges against him beyond a reasonable doubt. The defendant does not have to prove his innocence. To the contrary, the defendant is presumed innocent of all the charges contained in the indictment. This presumption of innocence was in the defendant's favor at the start of the trial. It continued in

his favor throughout the entire trial. It is in his favor even as I instruct you now, and it continues in his favor during the course of your deliberations in the jury room.

The presumption of innocence is removed if and only if you, as members of the jury, are unanimously satisfied that the government has sustained its burden of proving the guilt of the defendant as to a particular count of the indictment beyond a reasonable doubt. For those of you who have served as jurors in civil cases, it is not a mere preponderance of the evidence standard. The government's burden is heavier than that.

The question that naturally comes up is: What is a reasonable doubt? The words almost define themselves. It is a doubt founded in reason and arising out of the evidence in the case, or the lack of evidence. It is doubt that a reasonable person has after carefully weighing all the evidence. Reasonable doubt is a doubt that appeals to your reason, your judgment, your experience, and your common sense.

If, after a fair and impartial consideration of all the evidence, you do not have an abiding conviction of the defendant's guilt with respect to a particular count of the indictment, in sum, if you have such a doubt as would cause you, as prudent persons, to hesitate before acting in important matters in the personal affairs of your own life, then you have a reasonable doubt. And in that circumstance, it is your duty to acquit the defendant of that count.

On the other hand, if, after a fair and impartial consideration of all the evidence, you do have an abiding belief of the defendant's guilt as to a specific count of the indictment, the kind of belief that you would be willing to act upon without hesitation in important matters in the personal affairs of your own life, then you have no reasonable doubt, and under such circumstances it is your duty to convict the defendant of that count.

One final word on the subject. Reasonable doubt does not mean beyond all possible doubt. It is practically impossible for a person to be absolutely and completely convinced of any disputed fact which by its nature is not susceptible to mathematical certainty. It follows that the law in a criminal case is that it is sufficient if the guilt of the defendant is established beyond a reasonable doubt, not beyond all possible doubt.

Moreover, the government is not required to prove the essential elements of the offense by any particular number of witnesses. The testimony of a single witness may be sufficient to convince you beyond a reasonable doubt of the existence of the essential elements of the offense you are considering if you believe that the witness has truthfully and accurately related what they have told you.

In determining the facts, you must rely upon your own recollection of the evidence. The evidence in this case is the

sworn testimony of the witnesses, the stipulations of the parties, and the exhibits that were received in evidence. Exhibits that were marked for identification but not admitted are not evidence, nor are demonstrative aids or materials that were used only to refresh a witness's recollection. I will briefly summarize what is not evidence in this case.

The indictment or charging instrument is not evidence and may not be considered by you in rendering your verdict.

Testimony that I have stricken or excluded is also not evidence. In addition, if certain testimony was received for a limited purpose, you must follow the limiting instruction I gave you and use the evidence only for the purpose I indicated.

As I told you at the start of this case, statements and arguments by lawyers are not evidence because the lawyers are not witnesses. What they have said to you in their opening statements and in their summations is intended to help you understand the evidence to reach your verdict. However, if your recollection of the facts differs from the lawyers' statements, it is your recollection that controls. For the same reasons, you are not to consider a lawyer's questions as evidence. It is the witnesses' answers to questions that are evidence, not the questions themselves.

Finally, as I have mentioned, any statements that I may have made do not constitute evidence.

It is for you alone to decide the weight, if any, to

be given to the testimony you have heard and the exhibits you have seen.

Generally, there are two types of evidence that you may consider in reaching your verdict. One type of evidence is direct evidence. Direct evidence is testimony by a witness about something they know by virtue of their own senses; something they have seen, felt, touched, or heard. For example, if a witness testified that when they left the house this morning they observed that it was raining, that would be direct evidence about the weather.

Circumstantial evidence is evidence from which you may infer the existence of certain facts. For example, assume that when you arrived at the courthouse this morning the sun was shining and it was a nice day. Assume that the courtroom blinds were drawn and you could not look outside. As you were sitting here, someone walked in with an umbrella which was dripping wet. A few minutes later, another person entered with a wet raincoat. Now, because you cannot see outside of the courtroom, you cannot tell whether or not it is raining. So you have no direct evidence of that fact. But on the combination of facts that I have asked you to assume, it would be reasonable for you to conclude that it had been raining.

That is all there is to circumstantial evidence. You infer on the basis of reason and experience and common sense from one established fact the existence or non-existence of

some other fact.

As you can see, the matter of drawing inferences from facts in evidence is not a matter of guesswork or speculation. An inference is a logical, factual conclusion that you might reasonably draw from other facts that have been proven. Many material facts, such as what a person was thinking or intending, can rarely be proved by direct evidence.

Circumstantial evidence can be as valuable as direct evidence. The law makes no distinction between direct and circumstantial evidence, but simply requires that before convicting the defendant, the jury must be satisfied of the defendant's guilt beyond a reasonable doubt based on all the evidence or lack of evidence in the case, circumstantial or direct.

There are times when different inferences may be drawn from the evidence. The government asks you to draw one set of inferences; the defendant asks you to draw another. It is for you, and you alone, to decide what inferences you will draw.

In this case, you have heard evidence in the form of stipulations that contain facts that were agreed to be true. In such cases, you must accept those facts as true. However, it is for you to determine the effect or weight to give that stipulated fact.

A stipulation of testimony is an agreement among the parties that, if called, a witness would have given certain

testimony. You must accept as true the fact that the witness would have given that testimony. However, it is for you to determine the effect or weight to give that testimony.

You have had the opportunity to observe the witnesses. It is now your job to decide how believable each witness was in their testimony. You are the sole judges of the credibility of each witness and of the importance of their testimony. You should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, the impression the witness made when testifying, the relationship of the witness to the controversy and the parties, the witness's possible bias or impartiality, the reasonableness of the witness's statement, the strength or weakness of the witness's recollection viewed in the light of all other testimony, and any other matter in evidence that may help you decide the truth and the importance of each witness's testimony.

In other words, what you must try to do in deciding credibility is to size a witness up in light of their demeanor, the explanations given, and all the other evidence in the case. How did the witness appear? Was the witness candid, frank, and forthright, or did the witness seem to be evasive or suspect in some way? How did the way the witness testified on direct examination compare with how the witness testified on cross-examination? Was the witness consistent or

contradictory? Did the witness appear to know what they were talking about? Did the witness strike you as someone who was trying to report their knowledge accurately? These are examples of the kinds of common-sense questions you should ask yourselves in deciding whether a witness was or was not truthful.

In passing upon the credibility of a witness, you may also take into account any inconsistencies or contradictions as to material matters in their testimony. If you find that any witness has willfully testified falsely as to any material fact, you have the right to reject the testimony of that witness in its entirety. On the other hand, even if you find that a witness has testified falsely about one matter, you may reject as false that portion of their testimony and accept as true any other portion of the testimony. A witness may be inaccurate, contradictory, or even untruthful in some respects, and yet be truthful and entirely credible in other respects of their testimony.

The ultimate question for you to decide in passing upon the credibility is: Did the witness tell the truth before you? It is for you to say whether their testimony at this trial was truthful in whole or in part.

In evaluating the credibility of witnesses, you should take into account any evidence that the witness who testified may benefit in some way from the outcome in this case. Such an

interest in the outcome creates a motive to testify falsely and may sway the witness to testify in a way that advances his or her own interests. Therefore, if you find that any witness whose testimony you are considering may have an interest in the outcome of the trial, then you should bear that factor in mind when evaluating the credibility of his or her testimony and accept it with great care.

This is not to suggest that every witness who has an interest in the outcome of the case will testify falsely. It is for you to decide to what extent, if at all, the witness's interest has affected or colored his or her testimony.

You have heard from law enforcement officials and employees of the government. The fact that a witness may be employed as a law enforcement official or government employee does not mean that their testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.

In this context, defense counsel may attack the credibility of such a witness on the ground that their testimony may be colored by a personal or professional interest in the outcome of the case.

It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement or government witness and to give that testimony the weight you find it deserves.

You have heard testimony that the defendant made statements in which the government claims the defendant falsely exculpated himself. If you find that the defendant gave a false statement in order to divert suspicion from himself, you may infer that the defendant believed that he was guilty.

You may not, however, infer on the basis of this alone that the defendant is, in fact, guilty of the crimes for which he is charged. Whether or not the evidence as to the defendant's statements shows that the defendant believed that he was guilty and the significance of any to be attached to any such evidence are matters for you, the jury, to decide.

You will recall that I have admitted into evidence against the defendant statements of another who, the government charges, was a coconspirator of the defendant on trial. The reasonably foreseeable declarations and statements of any member of the conspiracy made in furtherance of the common purpose of the conspiracy are deemed, under the law, to be those of all of the members. It is the jury's function to determine whether the evidence, including the coconspirator's statement, is credible and convincing. The burden of proving beyond a reasonable doubt that a conspiracy existed and that the defendant was a member of that conspiracy remains with the government.

Does anyone need to take a break, stand and stretch, use the bathroom?

Everyone is OK. OK. Let's continue. Page 36.

You have heard a witness who testified that he was actually involved in the crimes charged in the indictment.

Experience will tell you that the government frequently must rely on the testimony of witnesses who participated in the alleged crimes at issue. The government must take its witnesses as it finds them, and frequently must use such testimony in a criminal prosecution because otherwise it would be difficult or impossible to detect and prosecute wrongdoers.

The testimony of such accomplices and cooperating witnesses is properly considered by the jury. If accomplices and cooperating witnesses could not be used, there would be many cases in which there was real guilt and conviction should be had, but in which convictions would be unobtainable.

For these very reasons, the law allows the use of testimony from accomplices and cooperating witnesses. Indeed, it is the law in federal courts that the testimony of an accomplice or cooperating witness may be enough in itself for conviction, if the jury believes that the testimony establishes guilt beyond a reasonable doubt.

Because of the possible interest of an accomplice or cooperating witness may have in testifying, the testimony should be scrutinized with special care and caution. The fact that a witness is an accomplice or cooperating witness may

be -- can be considered by you as bearing upon his credibility. However, it does not follow that simply because a person has admitted to participating in one or more crimes that he is incapable of giving a truthful version of what happened.

Like the testimony of any other witness, accomplice witness testimony should be given such weight as it deserves in light of the facts and circumstances before you, taking into account the witness's demeanor, candor, the strength and accuracy of a witness's recollection, his background, and the extent to which his testimony is or is not corroborated by other evidence. You may consider whether accomplice witnesses or cooperating witnesses, like any other witnesses called in this case, have an interest in the outcome of the case, and if so, whether it has affected their testimony.

You heard testimony about an agreement between the government and one cooperating witness. I must caution you that it is no concern of yours why the government made such an agreement with a witness. Your sole concern is whether this witness has given truthful testimony here in this courtroom before you.

In evaluating the testimony of an accomplice or cooperating witness, you should ask yourselves whether the accomplice or cooperating witness would benefit more by lying or by telling the truth. Was the testimony made up in any way because he believed or hoped that he would somehow receive

favorable treatment by testifying falsely? Or did he believe that his interests would be best served by testifying truthfully? If you believe that the witness was motivated by hopes of personal gain, was the motivation one which would cause him to lie, or was it one which would cause him to tell the truth? Did this motivation color his testimony?

If you find that the testimony was false, you should reject it. However, if, after a cautious and careful examination of the accomplice witness's testimony and demeanor upon the witness stand, you are satisfied that the witness told the truth, you should accept it as credible and act upon it accordingly.

As with other witnesses, let me emphasize that the issue of credibility need not be decided in an all-or-nothing fashion. Even if you find that the witness testified falsely in one part, you still may accept his or her testimony in other parts or may disregard all of it. That is a determination entirely for you, the jury.

You have heard evidence during the trial that some witnesses have discussed the facts of the case and/or their testimony with lawyers for the parties.

You may consider that fact when you are evaluating witnesses' credibility, but I should tell you that there is nothing unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of

the subjects they will be questioned about, focused on those subjects, and have the opportunity to review relevant exhibits before being questioned about them. Such consultation helps conserve your time and the Court's time. In fact, it would be unusual for a lawyer to call a witness without such consultation.

You have also heard that some of the witnesses are, or were, themselves represented by lawyers, and that the witnesses' lawyers may have attended meetings that those lawyers had with the government. Witnesses have a right to legal representation and there is nothing improper about a witness requesting his lawyer be present for meetings with the government or during trial. Indeed, if a witness was represented by a lawyer, the government was required to communicate with the witness's lawyer and include the lawyer in meetings with the witness, if the witness desired.

The weight that you give to the fact or the nature of the witness's preparation for their testimony and what inferences you draw from such preparation are matters completely within your discretion.

There are people whose names you have heard during the course of the trial but who did not appear here to testify. I instruct you that each party had an equal opportunity or lack of opportunity to call any of these witnesses. Therefore, you should not draw any inference or reach any conclusions as to

what they would have said had they been witnesses in this case. Their absence should not affect your judgment in any way about what any witnesses would have testified about if they had been called as a witness.

You should, however, remember my instruction that the law does not impose on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

You may not draw any inference, favorable or unfavorable, towards the government or the defendant, from the fact that any person in addition to the defendant is not on trial here. You also may not speculate in any way as to the reason or reasons why other persons are not on trial. Those matters are wholly outside your concern and have no bearing on your function as jurors.

Mr. Curcio did not testify in this case. Under our Constitution, a defendant has no obligation to testify or to present any evidence because it is the government's burden to prove a defendant guilty beyond a reasonable doubt. That burden remains with the government throughout the entire trial. It never shifts to a defendant.

A defendant is never required to prove that he is innocent. Therefore, you must not attach any significance to the fact that Mr. Curcio did not testify. No adverse inference against the defendant may be drawn by you because he did not

take the witness stand, and you may not consider it against the defendant in any way in your deliberations in the jury room.

You have heard excerpts of a 2013 book that Mr. Curcio co-authored and published with another individual that discusses how Mr. Curcio engaged in conduct similar in nature to the conduct charged in the indictment. You may not consider this evidence of similar acts as proof that Mr. Curcio has a bad character or as a substitute for proof that Mr. Curcio committed the crimes charged. Specifically, you may not use this evidence to conclude that because the defendant may have committed the other acts, he must also have committed the acts charged in the indictment. You may consider this evidence only for the purpose of deciding whether the defendant had the knowledge necessary to commit the crime charged in the indictment, had a motive or opportunity to commit the acts charged in the indictment, was preparing or planning to commit the acts charged in the indictment, or did not commit the acts for which the defendant is on trial by accident or mistake. Do not consider this evidence for any other purpose.

Of course, it is for you to determine whether you believe this evidence, and, if you do believe it, whether you accept it for the purpose offered. You may give it such weight as you feel it deserves, but only for the limited purpose that I described to you.

You have heard evidence that the defendant committed

another crime. You may not consider this evidence as evidence of guilt for the crime for which the defendant -- I should say, crimes for which the defendant is now on trial.

The law does not require any party to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matter in issue at this trial. Nor does the law require any party to produce as exhibits all relevant papers and things available to either party during the course of the trial.

During the trial, you have heard testimony of witnesses and argument by counsel that the government did not utilize certain investigative techniques. You may consider this in deciding whether the government has met its burden of proof because, as I told you, you should look to all of the evidence or lack of evidence in deciding whether the defendant is guilty. However, you are also instructed that there is no legal requirement that the government use any specific investigative techniques to prove its case. Your concern, as I have said, is to determine whether or not, on the evidence or lack of evidence, the defendant's guilt has been proven beyond a reasonable doubt.

You have heard testimony about evidence seized in connection with certain searches or seizures conducted by law enforcement officers, including of certain electronic devices.

Evidence obtained from these searches and seizures was properly admitted in this case and may be properly considered by you. Such searches and seizures were entirely appropriate law enforcement actions. Whether you approve or disapprove of how evidence was obtained should not enter into your deliberations because I instruct you that the government's use of the evidence is entirely lawful.

You must, therefore, regardless of your personal opinions, give this evidence full consideration along with the other evidence in the case in determining whether the government has proven the defendant's guilt beyond a reasonable doubt. However, as with other evidence, it is for you to determine what weight, if any, to give such evidence.

Some of the evidence in this case has consisted of electronic communications seized from computers or electronic accounts. There is nothing illegal about the government's use of such electronic communications in this case, and you may consider them along with all the other evidence in the case. Whether you approve or disapprove of the seizure of these communications may not enter into your deliberations.

You may, therefore, regardless of any personal opinions, consider this evidence along with the other evidence in the case in determining whether or not the government has proven the defendant's guilt beyond a reasonable doubt. However, as with the other evidence, it's for you to determine

what weight, if any, to give such evidence.

Among the exhibits received in evidence, there are some documents that are redacted. "Redacted" means that part of the document was taken out. You are to concern yourself only with the part of the item that has been admitted into evidence, and you should not consider any potential reason why the other part of it has been deleted or hidden.

Audio recordings have been admitted into evidence in this case. This evidence was lawfully obtained and properly admitted in this case. Whether you approve or disapprove of the recording of these conversations may not enter into your deliberations. I instruct you that these recordings were made in a lawful manner and that no one's rights were violated, and that the government's use of this evidence is entirely lawful.

You must, therefore, regardless of any personal opinions, give this evidence full consideration along with all the other evidence in the case in determining whether the government has proven beyond a reasonable doubt the guilt of the defendant.

To help your listening, transcripts have also been prepared. In this case, those transcripts were admitted into evidence along with the audio recordings. The purpose of these transcripts is to aid you in your understanding of the recordings themselves.

Some of the exhibits that were admitted into evidence

were in the form of charts and summaries. For these charts and summaries that were admitted into evidence, you should consider them as you would any other evidence.

Now, in reaching your verdict, you must remember that both parties stand equal before the jury in the Courts of the United States. The fact that the government is a party and the prosecution is brought in the name of the United States does not entitle the government or its witnesses to any greater consideration than that accorded to any other party. By the same token, you must give the government no less deference than you would give to any other party.

It would also be improper for you to consider, in reaching your decision as to whether the government sustained its burden of proof, any personal feelings you may have about the race, religion, national origin, gender, sexual orientation, or age, either perceived or actual, of the defendant, a witness, or anyone else involved in the case. All persons are entitled to the same presumption of innocence, and the government has the same burden of proof with respect to all persons. Your verdict must be based solely on the evidence or the lack of evidence.

Under your oath as jurors, you are not to be swayed by sympathy or prejudice. You are to be guided solely by the evidence in this case, and the crucial, bottom-line question that you must ask yourselves as you sift through the evidence

is: Has the government proven the guilt of the defendant as to any of the counts in the indictment beyond a reasonable doubt?

It is for you alone to decide whether the government has proven that the defendant is guilty solely on the basis of the evidence or lack of evidence and subject to the law as I explain it to you. It must be clear that once you let fear, prejudice, bias, or sympathy interfere with your thinking, there is a risk that you will not arrive at a true and just verdict.

If you have a reasonable doubt as to the defendant's guilt, you must not hesitate for any reason to find a verdict of acquittal. But on the other hand, if you should find that the government has met its burden of proving the defendant's guilt beyond a reasonable doubt, you should not hesitate because of sympathy or any other reason to render a verdict of guilty.

The question of possible punishment of the defendant is of no concern to the jury and should not enter into or influence your deliberations. The duty of imposing a sentence rests exclusively upon the Court. Your function is to weigh the evidence in the case and determine whether or not the defendant is guilty beyond a reasonable doubt solely upon the basis of such evidence. Under your oath as jurors, you cannot allow a consideration of the punishment which may be imposed upon the defendant, if he is convicted, to influence your

verdict in any way, or, in any sense, to enter into your deliberations.

Similarly, it would be improper for you to allow any feelings you might have about the nature of the crimes charged to interfere with your decision-making process. Your verdict must be based solely upon the evidence or lack of evidence presented in this courtroom.

So we have got about ten more minutes. Does anyone need to stretch or stand up or take a break? OK.

So, ladies and gentlemen of the jury, that concludes the substantive portion of my instructions to you. You are about to go into the jury room and begin your deliberations. I will send a list of all the exhibits and witnesses into the jury room. If you request, I will send back any and all of the exhibits that have been admitted into evidence, as well as a laptop containing all of the electronic exhibits. If you want the transcript for any of the testimony provided to you, you may also request that. It is not always easy to locate what you might want, so please be as specific as you possibly can in requesting exhibits or portions of the testimony. If you want any further explanation of the law as I have explained it to you, you may also request that.

Your communications with the Court, including any requests for testimony, should be made to me in writing, signed, dated, and timed by a foreperson you will choose, and

given to one of the court security officers. I will respond to any questions or requests you have as promptly as possible either in writing or by having you return to the courtroom so I can speak to you in person. In any communications, please do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached and announced in open court by your foreperson.

I referred a moment ago to a foreperson. You should by your own vote select one of you to sit as your foreperson. The foreperson doesn't have any more power or authority than any other juror, and their vote or opinion doesn't count for any more than any other juror's vote or opinion. The foreperson is merely your spokesperson to the Court. They will send out any notes, and when the jury has reached a verdict, they will notify the marshal or court security officer that the jury has reached a verdict, and you will come into open court to give the verdict.

If any of you have taken notes throughout the trial, I want to emphasize to you as you are about to begin your deliberations that notes are simply an aid to memory. Notes that any of you may have made may not be given any greater weight or influence than the recollections or impressions of other jurors, whether from notes or memory, with respect to the evidence presented or what conclusions, if any, should be drawn from such evidence. All jurors' recollections are equal. If

you can't agree on what you remember the testimony was, you can ask to have the transcript read back.

Although during your deliberations you may discuss the case with your fellow jurors, you must not communicate with or provide any information to anyone else by any means. You, thus, must not use any electronic devices or social media platforms to communicate with anyone any information about this case or to conduct any research about this case until I accept your verdict.

Momentarily, you will retire to decide the case. Your function is to weigh the evidence in this case and to determine the guilt or lack of guilt of the defendant with respect to each count charged in the indictment. You must base your verdict solely on the evidence or lack of evidence and these instructions as to the law, and you are obligated on your oath as jurors to follow the law as I instruct you, whether you agree or disagree with a particular law in question.

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement. Each of you must decide the case for himself or herself, but you should do so only after consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous. Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either

party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth. You are not to discuss the case until all jurors are present. Nine or ten or even 11 jurors together is only a gathering of individuals. Only when all jurors are present do you constitute a jury, and only then may you deliberate.

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous. However, you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of the other jurors. Each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors. No juror should surrender their conscientious beliefs solely for the purpose of returning a unanimous verdict.

Remember, at all times, you are not partisans. You are judges, judges of the facts. Your sole interest is to seek the truth from the evidence in the case. If you are divided, do not report how the vote stands. And if you have reached a verdict, do not report what it is until you are asked in open court.

After you have reached a verdict, you will fill out

the form that will be given to you and sign and date it, and advise the marshal outside your door that you are ready to return to the courtroom. There is only one verdict form for the entire jury. Each juror does not receive their own verdict form. The verdict form lists the questions that you must resolve based on the evidence and the instructions that I have given you. When the form is complete, it will be marked as a court exhibit.

I will stress that each of you must be in agreement with the verdict which is announced in open court. Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

At this time, the first 12 jurors will begin their deliberations in the case. The final two, both of whom are alternates, will not deliberate at this time. Nevertheless, the alternate jurors are not quite excused. While the jury conducts its deliberations, you do not have to be in court, but you should give Ms. Fabiani phone numbers where you can be reached or e-mail addresses, I will add, because it's possible that one or more of you could be needed to deliberate if a juror is unable to continue. Ms. Fabiani will call you when deliberations are complete so that you know that you are completely finished.

Between now and then, you must continue to observe all the restrictions I have instructed you on throughout the trial.

That is, you must not discuss the case with anyone, including your fellow alternate juror, the other jurors, other people involved in the trial, members of your family, friends, coworkers, or anyone else. And until a verdict is reached, as I have already instructed, you may not communicate with anyone about the case in any way. If anyone approaches you and tries to talk to you about the case, please report that to me through Ms. Fabiani immediately.

Do not listen to or watch or read any news reports concerning this trial, if there were to be any. Do not do any research on the internet or otherwise. The reason for this, of course, is that should you be asked to participate in reaching a verdict in this case, the only information you will be allowed to consider is what you learned in this courtroom during this trial. But please accept my heartfelt gratitude for your service.

I'm sorry that you will likely miss the experience of deliberating with the jury, but the law provides for a jury of 12 persons in this case. So before the rest of the jury retires to the jury room, we are going to, you know, ask you to remove any clothing or objects before the deliberations start. I mean, you can say a quick good-bye, but don't talk anything of substance with them. Without discussing the case, you may also say your good-byes to your fellow jurors.

Members of the jury, that nearly concludes my

instructions to you. The most important part of this case, members of the jury, is the part that you, as jurors, are now about to play as you deliberate on the issues of fact.

It is for you, and you alone, to weigh the evidence in this case and determine whether the government has proved beyond a reasonable doubt each of the essential elements of the crimes with which Mr. Curcio is charged.

If the government has succeeded, your verdict should be guilty as to that charge. If it has failed, your verdict should be not guilty as to that charge.

You should be guided solely by the evidence presented during the trial and the law as I have given it to you, without regard to the consequences of your decision. You have been chosen to try the issues of fact and reach a verdict on the basis of the evidence or lack of evidence.

As you deliberate, please listen to the opinions of your fellow jurors and ask for an opportunity to express your own views. Every juror should be heard, and no one juror should hold center stage in the jury room, and no one juror should control or monopolize the deliberations. If, after listening to your fellow jurors, and if, after stating your own view, you become convinced that your view is wrong, do not hesitate because of stubbornness or pride to change your view. On the other hand, do not surrender your honest convictions and beliefs solely because of the opinions of your fellow jurors or

because you are outnumbered. Your final vote must reflect your conscientious belief as to how the issues should be decided.

Since the earliest days in our nation's history, jurors like you have been asked to decide cases, and your role is just the same as that of the countless jurors before you. You must be entirely fair and impartial to both parties. You must decide the case only on the evidence before you, and you must follow my instructions on the law. This is a hard but important task, doing justice fairly and impartially, but I am confident that you will fulfill your duty with the utmost care and, I hope, pride.

I am going to ask you to be seated for one more minute while I speak with the lawyers at sidebar.

(Continued on next page)

(At sidebar)

THE COURT: Is there anything that needs correction, clarification?

MR. BELL: There is one that we may not have to do much of anything about.

THE COURT: OK.

MR. BELL: On page 34, you mentioned being truthful and entirely credible in other "respects" as opposed to "aspects." I think those are essentially synonymous. I don't think there is much of a reason to do anything about those, but --

THE COURT: OK. All right. Then I am going to leave that alone, unless you want -- anything else?

MR. FELTON: Nothing from me.

THE COURT: OK. So you have the exhibit lists and the witness list ready to send back, along with one copy of the verdict form? OK. All right.

(Continued on next page)

(In open court)

THE COURT: All right. So, ladies and gentlemen, in a moment I am going to send you to the jury room to begin your deliberations. And I will send one copy of the verdict form. I will send, as I noted, one copy of all the exhibits and one copy of all the witnesses.

I should note that Ms. Fabiani has been dealing with you during the course of the trial, but during your deliberations you won't have contact with her. Any contact with the Court must be made through the marshal by way of notes. So now we will swear in the marshal, who will protect you during the course of your deliberations.

(Marshal sworn)

THE COURT: All right. The last thing I am going to say -- I know the hour is late, so I am going to just ask you to do one more thing. Once you say good-bye to the alternates -- and thank you again, to both of you, for your service -- I am just going to ask you to send a note out to me and let me know how long you intend to deliberate, if at all, today, or whether you would like to begin deliberations in the morning, and if so, what time. Do you want to come in at 10:00 o'clock? Do you want to come in at a different time? But just let me know so that we can be here when you seek to deliberate.

With that, the jury may now retire to deliberate.

(At 5:12 p.m., the jury retired to deliberate)

THE COURT: Why don't we wait for a minute, just to get their letter about scheduling.

Did you get the exhibit list and the witness list?

THE DEPUTY CLERK: Not yet.

THE COURT: Both sides have looked at the exhibit list and the witness list and are comfortable with my sending it back, correct?

MR. FELTON: Yes, your Honor.

MR. BELL: Yes.

THE COURT: OK. Thank you.

I just want to say, I think you all did an outstanding job, all of the lawyers, every one of you. So, well done.

MR. BELL: Judge, to the extent that allowing my associates to come in and be a part of this required patience on your part, I absolutely appreciate that, and it's a transformative professional experience. We are particularly grateful for that and just generally for the Court's courtesy.

THE COURT: Absolutely. It was my pleasure.

(Pause)

THE COURT: Folks, I am going to read this to you. We just got this from the jury. It says, "Stay today until 6:15 p.m. Returning tomorrow at 10:30 a.m." Foreperson is Harvey Turkiewicz, number 8.

All right. So why don't we just stay nearby until 6:15. All right. Thanks, all.

(Recess pending verdict)

THE COURT: All right. We got another note from the jury. It's not a verdict, but it is asking for a whole lot of evidence. But they are ready to head home.

Do you think I need to see them tonight? I feel like I gave sufficient instructions not to discuss the case or research the case.

MR. BELL: I don't think there is a need for us to see them, Judge.

THE COURT: OK.

MR. FELTON: Agreed, your Honor.

THE COURT: OK. All right. So this is what they have asked for. And I will, obviously, show you all the note.

"1, Joe Baudo transcript; 2, Iosif Bondarchuk transcript; 3, Braden Florczyk transcript; 4, spreadsheet Anthony Curcio of list of," something, "cards in Ill Eagle folder (Exhibit 4159); Chris Campbell transcript; 3 different visuals of physical evidence, card with crease, Michael Jordan; 7, Baudo card image Michael Jordan; 8, the same card that was sold to Joe Baudo and then resold with the same certificate number."

So why don't we copy this, give it to each of you. And why don't you start working on that. And we should have all this ready to go in the morning when they come in at 10:30.

Is there anything here that you have questions about?

I mean, it seems pretty self-explanatory, what they are asking for. You might want to check the, you know, exhibit number is right.

MR. BELL: So I think, Judge, with respect to the Baudo transcript, I can imagine that being one of two things. My question is, do we want to have them both ready?

One of those, of course, could be the transcript of Joe Baudo's testimony. The other, of course, could be the transcript of the recording that came in through Mr. Baudo.

THE COURT: That's a good point.

MR. BELL: I don't know, reading that, what that means, and whether the better -- the better side of valor would be asking or sending them both in.

THE COURT: I don't think we should send them both in without asking. I think we should ask. If they are still here, I will ask them now, but they probably left. So I think we can ask in the morning. We can just be ready to send both back.

MR. BELL: Do you know what, Judge, I take it back. I will say this: They should have the Baudo recording transcript among the exhibits anyway.

THE COURT: We haven't sent the exhibits back. We all agreed.

MR. BELL: In that case, the question is still alive, and maybe we should still ask.

THE COURT: I think you should have all of them ready to go at 10:30 tomorrow. And, I mean, the only thing I will say is, the way it's written with the other transcripts, it suggests that it's the transcript of his testimony, but I don't know for sure.

MR. BELL: Right. I tend to think so too, but honestly, how sound a footing we are on, you know, on that, I don't know because it could be coming from multiple different jurors. It could be anything. So maybe we will just have both ready, and if we ask them tomorrow, we will get another note, a clarifying note.

MR. FELTON: I am fine with that. The government is fine with that. It does seem like the way it's written, "transcript," is the same way it's described for three other witnesses where there wasn't a recording transcript.

THE COURT: Exactly.

MR. FELTON: I think the most natural interpretation is the testimony transcript.

THE COURT: And for the exhibits, they listed the exhibit number, at least for some. OK. So have them ready to go.

MR. BELL: I take it then, Judge, that your practice would, obviously, be for us to redact everything but the Qs and As for questions that remain on the -- you know, that haven't been struck, or anything like that, or interrupted.

THE COURT: Right. So we are going to redact sidebars. We are going to redact, you know, an answer that was stricken. So it should just be the questions and answers. And I assume, you know, you all can get that together with anything redacted. My practice is to print it out and just send it back, not bring them in and reread everything.

But is there anything else on this list that you want to talk about?

MR. BELL: I think that we may need to confer about number 6 on our own, but I think the parties can handle that. If there is something to elevate to your Honor, we can do that I am not sure what one or two of these words are. I am looking at number --

THE COURT: What I would be inclined to do is send whatever we can back, you know, as soon as we can, and then, you know, bring them in to court, you know, whether it's 10:30 or a little bit after 10:30 and say, you know, I have this letter asking for, you know, these eight things. You know, we sent back this, this, and this. We did have a question about you know, number 6.

I mean, I would be inclined to just send Baudo's transcript back, given the way it was written with the other ones, but I am also happy to ask first, if that's your preference.

MR. BELL: I think it probably makes sense for us to

ask first, if that's OK.

THE COURT: OK. But have it ready.

MR. BELL: I am looking at the -- obviously, Braden Florczyk is the paralegal who read a bunch of things. I take it that we would just be putting in the transcript and not the bunch of things he read.

THE COURT: That's correct.

MR. BELL: OK.

THE COURT: I mean, I think we should read this literally, and if they want the exhibits, I think they should ask for them. But, again, if you want me to ask that, I can ask it.

MR. BELL: That one, I think, is clear enough on its face that we should probably just apply the same interpretive lens that your Honor said. It asked for the transcript; we send the transcript. If they want a follow-up --

MR. FELTON: We agree with that. It says "transcript." Just the transcript for now.

THE COURT: We are all on the same page with that. Why don't you all get working on this, get everything, sort of, ready to go, to send back in the morning. And then, you know, I will see them. But I think, you know, we can send stuff back that we feel confident that they are asking for, and then we can, as I said, hold onto the things that are in dispute and bring them in.

OK. Everyone is comfortable with that?

MR. BELL: Very good.

THE COURT: OK.

MR. BELL: Thanks, Judge.

THE COURT: All right. Thank you. Have a nice evening, all.

In terms of when the court reporter should be here, I am going to say 10:30.

(Adjourned to January 28, 2026, at 10:30 a.m.)